# Exhibit 1

DONALD J. PUTTERMAN (SBN 90822)
E-mail: dputterman@plylaw.com
CONSTANCE J. YU (SBN 182704)
E-mail: cyu@plylaw.com
GEORGE CHIKOVANI (SBN 254437)
E-mail: gchikovani@plylaw.com
ELLEN P. LIU (SBN 280459)
E-mail: eliu@plylaw.com
PUTTERMAN | YU | WANG LLP
345 California Street, Suite 1160
San Francisco, CA 94104-2626
Telephone:    (415) 839-8779
Facsimile:    (415) 737-1363

Attorneys for Plaintiff
MOUSEBELT LABS PTE. LTD

ELECTRONICALLY
**F I L E D**
*Superior Court of California,*
*County of San Francisco*

**12/17/2021**
**Clerk of the Court**
BY: KAREN VALDES
Deputy Clerk

**CGC-21-597202**

## SUPERIOR COURT OF THE STATE OF CALIFORNIA
## CITY AND COUNTY OF SAN FRANCISCO

| | |
|---|---|
| MOUSEBELT LABS PTE. LTD, <br><br> Plaintiff, <br><br> v. <br><br> BRIAN ARMSTRONG, RESEARCHHUB TECHNOLOGIES, INC., RESEARCHHUB, LLC, COINBASE, INC., COINBASE ASSET MANAGEMENT, INC., d/b/a COINBASE VENTURES, and DOES 1-25, inclusive, <br><br> Defendants. | Case No. <br><br> **MOUSEBELT LABS PTE. LTD'S COMPLAINT FOR:** <br><br> **(1) FRAUD** <br> **(2) INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS;** <br> **(3) INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE;** <br> **(4) NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE;** <br> **(5) UNJUST ENRICHMENT** <br> **(6) QUANTUM MERUIT** <br><br> **<u>JURY TRIAL DEMANDED</u>** |

Plaintiff MouseBelt Labs Pte. Ltd. ("MouseBelt") hereby brings this action against Defendants Brian Armstrong ("Armstrong"); ResearchHub Technologies, Inc. and ResearchHub LLC (collectively, "ResearchHub"); and Coinbase, Inc. ("Coinbase") and its wholly-owned subsidiary Coinbase Asset Management Inc., dba Coinbase Ventures ("Ventures") (collectively, "Coinbase Defendants"). MouseBelt alleges as follows:

**INTRODUCTION AND SUMMARY**

1.      MouseBelt is an ecosystem promoting blockchain innovation and education by supporting hands-on development of the emerging projects and leaders in the industry.  MouseBelt is constantly working to improve the blockchain industry through its full-service accelerator, engineering services, media, and educational programs. MouseBelt's Blockchain Accelerator supports early-stage companies with capital and in-kind investments; its Engineering branch supports accelerator companies and other developers and projects with open-source tools and a development shop; and its Media, University Program, and Blockchain Education Alliance branches encourage newcomers to get involved with blockchain, and introduce MouseBelt accelerator companies to the greater blockchain community.

2.      Knowledgr was a company in which MouseBelt had invested and a participant in MouseBelt's accelerator program.  Patrick Joyce founded Knowledgr's predecessor, Co-Lab, LLC, (Knowledgr and Co-Lab, LLC shall be referred to collectively as "Knowledgr") in late 2017. Lacking financial resources and having considerable and worrisome student debt that was interfering with him completing his medical degree, Joyce approached and solicited MouseBelt for assistance in 2018.  After executing a Letter of Intent ("LOI") with Knowledgr in September 2018, MouseBelt thereafter invested money and work into Knowledgr pursuant to two Accelerator Agreements and accompanying Simple Agreements for Future Equity ("SAFEs") executed in January and May of 2019.

3.      Knowledgr was to be a platform for crowdsourcing academic research, through which users would be incentivized to contribute by receiving in exchange for their contributions decentralized blockchain tokens issued by Knowledgr – cryptocurrency similar to Bitcoin – which could be listed on a token/cryptocurrency exchange and thereafter bought and sold by the holders of

such tokens through the exchange.  Knowledgr would have been the first new entity to legally take advantage of and advance a revolt against traditional academic publishers and their expensive "paywall" limits on access to published academic research, by creating a forum for open-source access to academic research, including for critique, commentary and inspiration for further work.

4.     The current system of grant funding makes competition more important than collaboration and limits the sharing of ideas and resources. Knowledgr's platform was going to revolutionize the way research is conducted and funded by allowing scientists to determine how their results are published and rewarded. Scientists would then be compensated for their efforts in ways that incentivize ethical behavior. This would also lower the barrier to entry for participation and increase the diversity of thought in the scientific community. An open-science decentralized platform would allow for more transparency and more effective research funding.

5.     Armstrong, the founder and CEO of the Coinbase Defendants, also was interested in a similar crowdsourced platform for publishing research and using tradeable tokens as an inducement to participation in this platform.  MouseBelt is informed and believes, and thereon alleges, that Armstrong had even hired Quant Five and its CEO, Patrick Lu, to assist in developing Armstrong's concept. However, development of Armstrong's platform (known internally as ResearchHub, but the existence of which was not yet disclosed publicly), was far behind that of Knowledgr. But Armstrong did have one very substantial potential advantage:  he controlled Coinbase, the largest and most well-known cryptocurrency exchange in the United States.  A blockchain token listed on Coinbase would have a major advantage in tradability compared with a blockchain token listing on a smaller, lesser-known exchange, and therefore was much more likely to generate interest in the tokens and consequent profits from selling them.

6.     Armstrong was still designing ResearchHub when he learned Knowledgr was about to beat ResearchHub to market as a direct competitor.  After Armstrong published an article in late February 2019 expressing his perspective on a possible open-source, scientific publishing platform, in which he solicited comments but did not disclose ResearchHub's existence and the ongoing work to design it, Armstrong was contacted by Joyce.  Joyce described to Armstrong Knowledgr's plans and its stage of development – which was being accomplished by MouseBelt on Knowledgr's behalf.

7.      Thereafter, with ResearchHub still being developed in stealth mode, Armstrong elicited confidential information about Knowledgr's product from Joyce under the guise of a potential investment by Coinbase Ventures in Knowledgr followed by Coinbase listing Knowledgr's token on its exchange. In doing so, Armstrong acted as ResearchHub, Coinbase and Coinbase Ventures' actual and apparent agent. Impressed with Knowledgr's (really, MouseBelt's) creative and forward-thinking work, Armstrong preyed upon Joyce's gullibility and told Joyce that Armstrong might fund ResearchHub to be a competitor but might instead invest in Knowledgr after learning more about it. This was all a ruse.  Armstrong had already been developing ResearchHub for over six months and saw Joyce and Knowledgr as a dramatic time- and cost-saving hack.  Armstrong's ultimate plan was to obtain Knowledgr's confidential information and then present Joyce with a Hobson's Choice: either take the best deal Armstrong chose to offer and allow Armstrong and ResearchHub to pillage Knowledgr of its MouseBelt-engineered platform on the cheap; or see Armstrong use his personal wealth, celebrity and reputation, and his control of Coinbase, to quickly launch ResearchHub and snuff out Knowledgr.

8.      Unaware of Armstrong's secret plan for ResearchHub, Joyce offered Armstrong an opportunity to invest $750,000 to $1,500,000 for ten to twenty percent of Knowledgr's shares. Armstrong instead offered to individually invest only $50,000, for a one percent interest.  To induce acceptance of his de minimis offer, Armstrong indicated that, once Armstrong could conduct some due diligence, Coinbase Ventures would invest a greater sum and that Coinbase would list Knowledgr's token on its exchange.   Joyce accepted Armstrong's offer because, among other things, he knew Armstrong was founder and CEO of Coinbase with the authority to make and deliver on these representations, and because of the importance of having Coinbase list Knowledgr's tokens; and because he was desperate to have Armstrong and Coinbase Ventures finance Knowledgr and not abandon it for ResearchHub.  Thereafter, Armstrong purported to act as Joyce's mentor and advisor and, among other things, learned that Joyce was burdened with large amounts of student debt which was interfering with Joyce's completion of his medical degree.  Meanwhile, Joyce delivered Armstrong and his cohorts free access to everything Knowledgr possessed.

9.     Coinbase is the most popular cryptocurrency exchange in the United States with more than 35 million users.  Coinbase's position as industry leader makes listing on their exchange an attractive goal for any blockchain company, especially a new company such as Knowledgr. Armstrong of course completely understood the significance to a start-up of a potential Coinbase listing and, using his position and authority with Coinbase, dangled this prospect as a means of advancing Joyce's strategic plan and objectives for Knowledgr, resulting in Joyce allowing Armstrong, the Coinbase Defendants, Quant Five and Patrick Lu to obtain Trojan Horse access to Knowledgr's confidential information.

10.    Thereafter, matters proceeded exactly as one might expect when Joyce's desperation to be accepted, financial anxiety and greed, and fear of losing everything, were confronted with Armstrong's corresponding ruthlessness and indifference to law and ethics, camouflaged under a veneer of purity and altruism.

11.    One month later, Armstrong made Joyce an offer to acquire a controlling interest in Knowledgr, emphasizing paying off Joyce's hundreds of thousands of dollars of student debt. Armstrong knew of MouseBelt's contractual and investment interests in Knowledgr, and in his offer sought to dilute MouseBelt's interest down to virtually nothing.

12.    Joyce told MouseBelt that he had rejected Armstrong's offer because it failed to value sufficiently MouseBelt's contribution to Knowledgr.  In fact, MouseBelt is informed and believes, and thereon alleges, that Joyce accepted Armstrong's offer (or some variation of it) but agreed at Armstrong's request to conceal that acceptance so that Joyce, Armstrong, and ResearchHub could freeze out MouseBelt with no recourse.

13.    Over the next few months, Joyce and Armstrong, with the participation of the other Coinbase Defendants, surreptitiously engaged in an end-run around Knowledgr's commitments to MouseBelt, in order to eviscerate MouseBelt's contractual interests and rights in Knowledgr.  Upon information and belief, at Armstrong's urging and with the encouragement and participation of the other Defendants, Joyce – still Knowledgr's CEO – stalled Knowledgr's launch while making a variety of excuses to MouseBelt, while simultaneously contributing Knowledgr's resources and proprietary information to ResearchHub.  Joyce told MouseBelt he had hired Daniel Himmelstein, a

prominent advocate of open source scientific publication, to act as Knowledgr's Chief Technical Officer ("CTO"); but in truth, he engaged Himmelstein to assist him in transferring Knowledgr's entire product and plan to ResearchHub and concealed the truth from MouseBelt. As to Joyce, once ResearchHub launched, he would formally switch teams and be rewarded for accepting an offer he couldn't refuse. Knowledgr would be left an empty shell and its contractual commitments to MouseBelt would become worthless.

14.     Just prior to ResearchHub's launch, while Joyce was still Knowledgr's CEO, MouseBelt discovered Joyce had been contributing source code to ResearchHub *for months*. Joyce's own GitHub account was making commits to ResearchHub's GitHub software repository. Himmelstein also was making commits to ResearchHub's GitHub repository. In January 2020, MouseBelt confronted Joyce with the evidence and demanded detailed explanations. Joyce admitted to MouseBelt that in fact he had been working on ResearchHub at Armstrong's inducement. Joyce then immediately ceased all further communication with MouseBelt and formally accepted a position as ResearchHub's Chief Scientific Officer, the position which he holds today and, MouseBelt is informed and believes and thereon alleges, the functions of which Joyce already had been performing for ResearchHub notwithstanding he was still Knowledgr's CEO.

15.     Through the use of his influential position and actual and apparent authority at Coinbase and Coinbase Ventures, Armstrong induced Joyce to breach Knowledgr's agreements with MouseBelt, and to effectively convert and contribute all of MouseBelt's past *and ongoing* work product and other valuable contributions performed for Knowledgr to ResearchHub's use and benefit without paying MouseBelt a dime. MouseBelt has thereby suffered significant damages.

## PARTIES AND JURISDICTION

16.     Plaintiff MouseBelt is a foreign private limited company organized under the laws of Singapore. MouseBelt is a full-service blockchain accelerator and startup studio that invests in blockchain startups all over the world. Through its Blockchain Education Alliance, MouseBelt has

also partnered with San Francisco Bay Area companies to create a network to support education in the blockchain space.[1]

17.     MouseBelt is informed and believes, and thereon alleges, that Defendant Brian Armstrong  is a resident of San Francisco, California, the founder and CEO of Defendant Coinbase, Inc. and its wholly owned subsidiary Coinbase Ventures, the founder and owner of a controlling interest in Defendant ResearchHub Technologies, Inc., and the founder and owner of a controlling interest in ResearchHub LLC.

18.     Defendant ResearchHub Technologies, Inc. ("ResearchHub") is a Delaware corporation with its principal place of business in San Francisco, California.  Upon information and belief, ResearchHub's stated mission is to accelerate the pace of scientific research through its website and application, which permits users to collaborate on scientific research. ResearchHub is/was/would have been a direct competitor of Knowledgr.

19.     Defendant ResearchHub LLC ("ResearchHub LLC") is a Delaware limited liability company with a principal place of business in San Francisco, California.  On information and belief, ResearchHub LLC is a wholly-owned subsidiary of ResearchHub Technologies, Inc.

20.     Defendant Coinbase, Inc. is a Delaware corporation with its principal place of business in San Francisco, California.

21.     Defendant Coinbase Ventures, Inc. is a Delaware corporation with its principal place of business in San Francisco, California.  On information and belief, Coinbase Ventures is a wholly-owned subsidiary of Coinbase, Inc.

22.     MouseBelt does not presently know the identities and involvement of defendants named herein as "Does 1-25" and therefore refers to them by such fictitious names.  MouseBelt will seek leave to amend the complaint to specify the identities and involvement of such Doe Defendants when ascertained.

---

[1] A full list of the members of Mousebelt's Blockchain Education Alliance is available at: https://mousebelt.com/education/alliance

23.     MouseBelt is informed and believes that each of defendants acted in concert with or on behalf of one or more of the other defendants and are therefore jointly and severally liable for the tortious conduct alleged herein.

## JURISDICTION AND VENUE

24.     This Court has jurisdiction and venue is proper in this Court given the residence and/or principal place of business of several Defendants is San Francisco, California, and because Defendants' wrongful acts and conduct occurred in the City and County of San Francisco.

## STATEMENT OF FACTS

### Disrupting the Academic Publishing Market

25.     The market for academic publishing is estimated to be a $16 billion dollar industry. The articles published in academic journals are protected by copyright, and are licensed through companies such as JSTOR, HeinOnline and others, who in turn offer access to their paywalled libraries for a fee.

26.     The Internet's rise has challenged the academic publishing industry's "toll access" or "paywall" business model, a challenge which mirrors that which Napster posed to the recording industry in the 2000s.  By 2010, the academic publishing industry's "Napster" had emerged as Sci-Hub, a file sharing site that empowered users to upload and illegally share copyrighted academic research articles.  Like Napster, a combination of monetary judgments and sweeping injunctions ultimately shut down Sci-Hub for facilitating copyright infringement.  In 2018, eLife.org published an article of which Himmelstein was co-lead author, entitled "Sci-Hub provides access to nearly all scholarly literature." This article traced the history of Sci-Hub and the circumstances surrounding its growth, widespread usage and importance notwithstanding its "illicit" operations.  Among other things, this article and its underlying research demonstrated the vast scope of scholarly articles which had been made available by Sci-Hub as of March 2017, which compared favorably with the numbers accessible through a major research university library.  The article described the extraordinarily high numbers of scholarly publications to which access was otherwise limited by paywalls, and the further constraints on access caused by price increases imposed by research publishers combined with pressure on research library budgets.  It also reported on the substantial numbers of scholars and other

persons who sought access to those publications and who supported Sci-Hub's mission, and the increasing trend toward publishing research papers without previously-standard copyright protection.

27.     The developments described in the Himmelstein article, were encouraging the initiatives toward breaking academic publishing's iron "paywall" grip on access to research, while carefully avoiding illegal activities such as copyright violation which had allowed academic publishing to strike back and negate efforts to open-source important research. Such initiatives prompted researchers and others to eschew traditional paywalled academic publishers in favor of "open source" publication (either *sans* copyright entirely, or through copyrights requiring only source acknowledgement). The key to doing so was creating "hubs" or repositories, like Sci-Hub, through which researchers and other article writers would make open source articles and even research itself readily accessible through a central repository, and inducing publishers and commentators to use these hubs or repositories through which research and articles could be published for further comment, discussion, critique and follow-up. All of the foregoing, of course, required capital, which in traditional form was not readily available.

28.     The rise of blockchain transactions and cryptocurrencies such as Bitcoin helped present solutions to these problems. Companies choosing to operate in the blockchain space raised capital to fund the development of their platforms by selling tokens (of which Bitcoin is an example) to investors, which became known as an initial coin offering ("ICO"). Cryptocurrency exchanges opened markets where these tokens would be listed for trading. Token issuers then began directly listing on exchanges to raise capital from the exchange's customer base, which became known as an initial exchange offering ("IEO").

29.     A token's success now depends on its ability to list on a cryptocurrency exchange. Exchanges with deep customer bases provide tokens with liquidity, which supports further investment and allows platforms to more readily raise capital by selling tokens. As more tokens issued by new enterprises come to market, however, obtaining a listing on an exchange has become difficult, and a token's prospects of success can rise and fall on its ability to obtain a quality exchange listing. Regulation of cryptocurrency and cryptocurrency exchanges is currently in its infancy, with Congress even now holding preliminary hearings on how much regulation is needed and what form it

should take.  Meanwhile, however, the dynamic described above gives cryptocurrency exchanges (and their controlling persons) great leverage over token issuers – especially the most popular exchanges, such as Coinbase, and its dominant person, Armstrong, to the point of being able to make or break newcomers to the field and actually *stifle* innovation.

30.     Where, as here, Coinbase's founder and CEO had and has a direct personal interest in the niche in which Knowledgr and Joyce were looking to be the first to market, and undeterred by the knowledge of MouseBelt's entitlement to equity and continuing technical and other support to Knowledgr, Defendant Armstrong could use or threaten to use his position with Defendant Coinbase as leverage to "freeze out" MouseBelt from its future entitlement to Knowledgr equity and tokens as part of destroying or co-opting a known potential competitor.  Upon information and belief, Defendant Armstrong used his position with, and resources from, Coinbase and Coinbase Ventures to co-opt Joyce into diverting Knowledgr's proprietary assets to Defendant ResearchHub, which was then substantially behind in its development in stark contrast to Knowledgr's final stage development, which it had reached with substantial assistance from MouseBelt.

**MouseBelt's Seed Investment in Knowledgr**

31.     In approximately November 2017, Joyce founded Knowledgr's predecessor, called Co-Lab. Joyce was a former molecular biology Ph.D. candidate and later medical student (without having yet completed his degree) and academic researcher at Georgetown University.  Joyce envisioned Knowledgr as a platform for incentivizing crowdsourced scientific research. The platform would host an open database of scientific research from which users would be financially compensated for making observations, asking questions, and forming hypotheses.  Joyce sought to raise capital to build on this vision through the use of non-traditional blockchain tokens that would have real world value.  These blockchain tokens were to be cryptocurrencies that used the same technology as Bitcoin.  Knowledgr's cryptocurrency would be used both to generate the capital needed to create and operate the platform, and as the means of incentivizing researchers to post their work on Knowledgr's platform and allowing other persons to comment and critique, and potentially be inspired to perform follow-on research.

32.     Joyce required engineering, business development and marketing assistance with regard to both his proposed platform and token method of financing, in order to realize his concept. As a further handicap, Joyce had no money available and had crippling student debt from his extended education. He therefore was dependent on finding an incubator/accelerator such as MouseBelt willing to help him. Joyce solicited MouseBelt's assistance through both an application form available on MouseBelt's website and also through MouseBelt's university research outreach program through which students could talk to MouseBelt about joining its program.

33.     On September 20, 2018, Alexander Levin Holz as MouseBelt's CEO and Joyce as Knowledgr's CEO, signed a Letter of Intent (the "LOI"). The LOI described itself as the initial step in a negotiation between MouseBelt (and its partners) and Knowledgr relating to engineering, business development and marketing consulting services to be provided by MouseBelt "for the Co-Lab platform and CLC Token Generation Event" as described in the LOI.

34.     Over the course of two transactions in January and May 2019, MouseBelt acquired the right to own Knowledgr preferred stock equal to 19% of its fully diluted shares through the execution of Simple Agreements for Future Equity ("SAFEs"). In addition, MouseBelt and Knowledgr entered into an Accelerator Agreement in which MouseBelt agreed to provide both growth capital and engineering services in exchange for future equity in Knowledgr.

35.     In addition to entitling MouseBelt to significant equity in Knowledgr, MouseBelt's two contracts with Knowledgr also required Knowledgr to issue MouseBelt 10.1% of the total number of blockchain tokens that Knowledgr was to issue for use on its platform. Knowledgr promised to issue these tokens to MouseBelt on or before December 31, 2019. Knowledgr also promised to (i) provide MouseBelt with any information that would materially affect MouseBelt's ability to perform the services; (ii) provide MouseBelt with notice of any material changes in Knowledgr's prospects of success; (iii) keep certain information confidential; and (iv) not circumvent any of the covenants in its agreement with MouseBelt.

36.     MouseBelt paid Knowledgr $315,000 in cash and services as consideration for its investment. Specifically, MouseBelt paid Knowledgr $40,000 cash and agreed to perform certain services for Knowledgr as part of MouseBelt's start-up accelerator program, which MouseBelt

performed in full by contributing $275,000 worth of developer services billed in increments of $40 to $50 per hour.  MouseBelt also provided Knowledgr with access to its valuable material assets—computers, other equipment, programs, software, and other intellectual property—for Knowledgr's use in developing its business.

37.     MouseBelt performed pursuant to the agreements. Because of Armstrong and the other Defendants, Knowledgr did not.  MouseBelt never received either the equity or tokens to which it was entitled, for the reasons described herein.

**Armstrong Founds ResearchHub**

38.     Defendant Armstrong is the co-founder, CEO and Chairman of the Board of Coinbase. Coinbase is the most popular cryptocurrency exchange in the United States with more than 35 million users.  https://www.coinbase.com/about.

39.     In or about April 2018, Coinbase launched Coinbase Ventures for the purpose of investing its profits into early stage blockchain companies. Given Armstrong's control over the largest cryptocurrency exchange in the United States and his consequent control over a venture capital fund for investing in blockchain projects, Armstrong began contemplating an IEO of his own.

40.     In November 2018, Armstrong formed ResearchHub LLC as a Delaware limited liability company for the purpose of conducting an IEO in connection with a platform that would incentivize open-source publication of academic research.  On information and belief, Armstrong was the sole member of ResearchHub LLC at the time.

41.     On a date as of yet unknown, Armstrong engaged the services of QuantFive to design ResearchHub's open-source publishing platform. QuantFive is a California based software development and design company founded by Patrick Lu ("Lu").[2]

42.     On February 25, 2019, Armstrong published an article on *Medium,* an online publishing platform,[3] and shared it with his more than 300,000 Twitter followers.  That article, entitled "Ideas on How to Improve Scientific Research," laid out Armstrong's self-admittedly

---

[2] Because of QuantFive's and Lu's importance to the events in question, more information is available at https://www.quantfive.org/about.

[3] *Medium* is an online publishing platform, developed by Evan Williams, co-founder and former CEO of Twitter, with 60 million online readers.

incomplete vision for incentivizing scientific research.  https://medium.com/@barmstrong/ideas-on-how-to-improve-scientific-research-9e2e56474132.

43.     Nowhere in the article did Armstrong mention ResearchHub, ResearchHub LLC, or that Armstrong was contemplating an eventual IEO in connection with his idea.  Armstrong's February 25, 2019 article suggested a basic idea that publishers could license their research papers on a website and receive license fees through the platform.  His article also articulated a basic idea regarding the creation of a reputation-ranking system, stating that reputation should be based on user contributions in a manner similar to other sites like Reddit or HackerNews, coupled with information from LinkedIn.

44.     Defendant Armstrong's February 25 *Medium* article admitted that his idea for a "killer app" was not yet complete and that he was searching for others to help him finish the idea:

      a.  "For this to work, at least one of you need to publish your half baked idea (I call this putting out a bat signal) so the other person can find you."

      b.  "I'm writing this to put out my own bat signal. Maybe someone in the world has another piece of the solution. I've also thought about investing in a good team that might want to tackle this challenge."

      c.  "If you're interested in hearing more about this idea, have a piece of the solution you think I should know about, or might want to work on this yourself **please fill out this form here**."

Defendant Armstrong's "bat signal" was answered by Joyce, and Armstrong soon discovered that Knowledgr was the missing "piece of the solution."

**Defendant Armstrong Claims to be Interested in Investing in Knowledgr**

45.     On or about April 18, 2019, Joyce responded to Armstrong's February 25 *Medium* article and informed Armstrong that he was working on essentially the same project Armstrong had described in his article.  That project was Knowledgr.

46.     Joyce and Armstrong's communications led to Armstrong expressing an interest in investing in Knowledgr, which Joyce brought to MouseBelt's attention in May 2019.  MouseBelt and

Joyce sent a video demonstration of Knowledgr's prototype to Armstrong so he could gauge whether he wanted to invest.

47.     On June 7, 2019, Armstrong invited both Joyce and MouseBelt to attend a teleconference to discuss the possibility of investing in Knowledgr, indicating that he had seen Knowledgr's demo and liked what he saw.  Armstrong's invitation came directly from Armstrong's Coinbase email address.



48.     The teleconference took place on June 14, 2019, and the participants included Armstrong, Coinbase Chief of Staff Carly Emmer, Joyce, and MouseBelt CTO Galen Danziger ("Danziger").

49.     The purpose of the teleconference was to discuss potential investment in Knowledgr by Armstrong and/or Coinbase Ventures.  It was planned that Knowledgr would be presenting information that was both confidential and proprietary for that purpose.

50.     At no point during or prior to the June 14 teleconference did Armstrong indicate that he was, or intended to be, a direct competitor of Knowledgr.  Up until this point, Armstrong had not disclosed that he already was creating ResearchHub and would be Knowledgr's competition.

51.     During the June 14 teleconference, Joyce discussed with Armstrong (i) Knowledgr's prototype for its platform; (ii) Knowledgr's use of an algorithm to determine user reputation based on academic credentials; and (iii) Knowledgr's method for displaying research and citations, which it had paid around $20,000 to a specialist to design.

52.     During the June 14 teleconference, Armstrong expressed interest in investing in Knowledgr, both individually and through Coinbase Ventures, and expressed interest in conducting an IEO through Coinbase for Knowledgr's tokens.  Armstrong was well aware of the significance of such an event for a company like Knowledgr and for someone in Joyce's professional and personal position.

53.     On June 17, 2019, Armstrong emailed Joyce, ostensibly to continue pursuing investment into Knowledgr.  Armstrong's email stated that (i) he would introduce Joyce to Coinbase Ventures; and (ii) that Coinbase might support Knowledgr with an IEO for its token, but would not be ready to do so until around Q3 2019. Armstrong also sought further information about Knowledgr and requested an updated version of Knowledgr's demonstration materials, and a second meeting with Joyce, this time in-person.

54.     MouseBelt is informed and believes, and thereon alleges, that Armstrong knew he had significant influence over Joyce by virtue of his celebrity and reputation, by having expressed a desire to invest Coinbase's resources and benefits into Knowledgr and by his seeming acknowledgement and treatment of Joyce as a peer.  MouseBelt is further informed and believes, and thereon alleges, that Armstrong also realized that Joyce was inexperienced and naïve with regard to business matters, and understood that the more he could interact with Joyce alone, the more likely he was to obtain Knowledgr's confidential (and MouseBelt-generated) information from Joyce.

55.     Joyce, beguiled by Armstrong's solicitous attention and prospects accompanying that attention, could not and did not comprehend that Armstrong's solicitation of Knowledgr's valuable assets, including its trade secrets and confidential information, was anything other than an honest

exploration by Armstrong in an opportunity to collaborate with and finance Knowledgr, similar to what MouseBelt had offered.

56.     Instead, Joyce's understanding and belief was that (i) investment from Coinbase Ventures could provide Knowledgr with sufficient resources to build its platform; (ii) an IEO on Coinbase could instantly create a liquid market for Knowledgr's token; (iii) and a future acquisition by Coinbase Ventures could alleviate Joyce's student debt and perhaps even make him wealthy.

57.     On information and belief, Armstrong set about using the prospect of Coinbase's involvement with Knowledgr to influence Joyce to disclose Knowledgr's confidential and valuable information, all produced and financed by MouseBelt, and cause Knowledgr to breach its agreements with MouseBelt.

**Armstrong Reveals ResearchHub and Continues to Discuss Investment in Knowledgr**

58.     On June 22, 2019, Armstrong emailed Joyce and revealed for the first time that he was contemplating funding a competing project, ResearchHub.  Armstrong's June 22 email stated that he was going to make one of three choices within the following week: (i) invest in ResearchHub, (ii) invest in Knowledgr, or (iii) invest in both.  Armstrong threatened that if Joyce declined his invitation for a second meeting, Armstrong would proceed with funding ResearchHub only.  The implied threat was that Knowledgr, as ResearchHub's competitor, would never be able to list its token on Coinbase.  Armstrong had now turned from carrot to stick in a very obvious way.



**Brian Armstrong**
to Genevieve, Carly, me ▾                                    3:54 PM (1 hour ago)

Hi Patrick,

Assuming you will not be in SF in the next 1-2 weeks, perhaps we can do one more meeting over Google Meet where we run through a demo of the Knowledgr.io and we discuss a bit more about the team? This will help me make a decision on a next step. I have a development firm waiting to begin work on ResearchHub, so I'd like to make a decision by the end of next week on my next step, which could be:

1. invest in you (either through Coinbase Ventures or personally)
2. invest in ResearchHub - (i have a firm waiting to start work on it, hence the decision coming up shortly)
3. both 1 and 2

Would you be up for a video call in the next week to do this meeting? If you're not ready yet, no worries at all. We can always schedule something in the future when you are. I will probably proceed on ResearchHub in that case just to keep things moving, but we can re-evaluate down the road if it makes sense to join forces somehow.

If you're up for the above meeting, I'd like to invite Patrick Lu, with your permission. He is the entrepreneur/technical person who I was planning to hire to help me build out the first version of ResearchHub.

If you are up for the meeting, +Genevieve Khoo can help us find a time (50 minutes would be ideal) in the next week or so. Hope you are well, thanks!

59.     These statements by Armstrong also were intentionally misleading because, by June 22, Armstrong had already been working on ResearchHub for more than six months, having formed and invested in ResearchHub LLC in November 2018 for this purpose.  On information and belief, by June 22, Defendant Armstrong was in fact past the point of contemplating whether to fund ResearchHub and was actually doing so, and viewed Knowledgr as a potential competitor to be pumped dry of valuable information and then eradicated.

60.     Armstrong's June 22 email requested that Joyce attend another meeting within the next couple of weeks.  Armstrong, again using his Coinbase email address, invited Knowledgr, Joyce, and others to a follow-up meeting at Coinbase's headquarters in San Francisco.  Armstrong's assistant sent out an invitation for the meeting.  The fact that the invitation appeared to be at Coinbase's behest was not surprising because Joyce had told MouseBelt that Armstrong had suggested it would be advantageous to Knowledgr to have its potential IEO on Coinbase.  Armstrong informed Joyce that he had hired Lu from QuantFive to build ResearchHub, and asked if Lu could attend the meeting.

61.     hat same day, Joyce shared Armstrong's June 22 email with MouseBelt's team members, all of whom expressed reservations since Armstrong had just revealed he actually might directly compete with Knowledgr.  MouseBelt advised Joyce to take the obvious precaution of having Armstrong sign a non-disclosure agreement ("NDA"); MouseBelt was concerned because of  an alleged incident where Armstrong misappropriated source code from a digital identity company Coinbase had engaged, and pointed out that allowing Joyce unfettered access without an NDA would disincentivize Armstrong from investing in Knowledgr. MouseBelt COO Patrick McLain also warned Joyce about just what Armstrong was doing:" [G]uys like this [Armstrong] know they are famous, and they know people want to work with them very badly.  So, they use this to their advantage. And if you aren't firm in the beginning, he is going to steam roll over you."

62.     MouseBelt suggested to Joyce that he should object to Lu's participation at the meeting and inform Armstrong that there would be no need for a meeting if he was already proceeding with ResearchHub.

63.      Joyce flatly ignored MouseBelt's advice.  That same day, June 22, Joyce replied to Armstrong, agreeing to allow Lu to attend the meeting and making no objection to Armstrong

investing in ResearchHub.  Only then did Joyce share his decision with MouseBelt's team members, who objected.  MouseBelt told Joyce to send a follow up email asking Armstrong to clarify his intentions for ResearchHub and asking Armstrong to sign an NDA.

64.     Joyce resisted MouseBelt's request to ask Armstrong to sign the NDA.  Joyce informed MouseBelt that Knowledgr had "no proprietary info at this point," and that Knowledgr's real "protection" was "the scientific community's disdain for plagiarism" since "no one would use a CB [Coinbase] version of Knowledgr if it was clear he took our idea."

65.     MouseBelt promptly informed Joyce (i) that he was wrong; (ii) that Knowledgr had significant proprietary information it needed to protect; and (iii) that the scientific community's disdain for plagiarism was not a legal protection.  Joyce responded that he would welcome "all of the advice MouseBelt had to offer" and asked to schedule a call to discuss how to handle the upcoming meeting with Armstrong.

66.     On June 25, 2019, the day before the in-person meeting at Coinbase, MouseBelt provided Joyce with a draft NDA for Armstrong to sign.  Joyce assured MouseBelt he would have Armstrong sign the NDA and would ask him to clarify his intentions for ResearchHub.  Joyce then shared with MouseBelt a draft email he said he would send Armstrong for this purpose.

67.     Joyce's draft email informed Defendant Armstrong that the request to clarify his intentions about ResearchHub and sign an NDA were MouseBelt's idea, but that "[m]y intentions are to continue the conversation we've been having and tell you more about the amazing progress, traction, and developments we've made over the past year."

68.     Even though MouseBelt's CTO attended the June 26, 2019 in-person meeting at Coinbase, Armstrong asked to speak with Joyce alone.  On information and belief, Armstrong used this opportunity to influence Joyce and solicit information about Knowledgr.

**Armstrong's Investment in Knowledgr**

69.     On June 27, 2019, the day after the meeting at Coinbase's offices, Joyce sent Armstrong an email asking him to invest in Knowledgr by purchasing a stake of between ten and twenty percent at a valuation of $7,500,000.

70.     On June 28, Armstrong called Joyce and informed him that Armstrong wanted to make a small investment in Knowledgr on more favorable terms.  Armstrong offered to personally invest $50,000 at a valuation of $5,000,000 for one percent of Knowledgr's shares.  To induce Joyce to accept his smaller offer, Armstrong told Joyce that Coinbase Ventures was interested in investing a greater sum after it had more time to conduct due diligence, and that Coinbase was interested in conducting an IEO for Knowledgr's token after it launched its IEO platform later that year. MouseBelt is informed and believes, and thereon alleges, that these statements were not true; in fact, Armstrong, who controlled both entities, had no intention of having Coinbase Ventures invest in Knowledgr and had no intention of having Coinbase conduct an IEO for Knowledgr, at any time. The timing of Armstrong's representations to Joyce were significant to Joyce because they were consistent with Knowledgr's strategic business plan, which anticipated an IEO by the end of 2019, long before ResearchHub would have been ready to launch its IEO.

71.     Moreover, MouseBelt is informed and believes, and thereon alleges, that Armstrong knew and intended that Joyce pass these representations on to MouseBelt, and for MouseBelt to rely upon them, to assuage MouseBelt and keep them cooperative and working on the Knowledgr platform.

72.     Joyce relied on Armstrong's representations, accepted Armstrong's offer and sent him a due diligence package to complete the investment, including cap tables and information related to MouseBelt's investment in Knowledgr.  Defendant Armstrong thus learned specifically that MouseBelt held a SAFE that entitled it to nineteen percent (19%) of Knowledgr's preferred shares. MouseBelt relied on these representations to the extent of not stopping work on Knowledgr's platform immediately.

73.     On or about mid-July 2019, Armstrong wired $50,000 to Knowledgr and executed an agreement to complete his investment.

74.     On information and belief, the purpose of Armstrong's investment was to obtain further influence over Joyce by holding out the possibility of significant investment from Coinbase Ventures and an IEO on Coinbase.  On information and belief, Armstrong's true intent was to induce Joyce to cooperate with ResearchHub and cause Knowledgr to breach its agreements with

MouseBelt, while simultaneously inducing MouseBelt not to "pull the plug" for fear that Armstrong was sincere and discontinuing work would sabotage Joyce and Knowledgr's opportunity with Armstrong, Coinbase and Ventures. Defendant Armstrong's investment in Knowledgr also allowed him to appear as if he was contacting Joyce as a Knowledgr investor and/or mentor/advisor to Joyce for the benefit of Knowledgr, when on information and belief Armstrong was instead contacting Joyce to induce him, among other things, to breach Knowledgr's agreements with MouseBelt.  On information and belief, Armstrong and Joyce frequently communicated using the encrypted chat app WhatsApp.

75.    On July 9, 2019, Armstrong sent Joyce a 13-paragraph-long email that continued an ongoing conversation with Joyce concerning Knowledgr's business plans. Armstrong prodded Joyce for more information about Knowledgr's customer acquisition strategy, stating "[w]e only got to touch briefly on your go to market strategy (how to get the critical mass of first users).  I liked that you were willing to go talk to customers, and it sounds like you have some initial interested users which is great."   Armstrong ended by telling Joyce to "[f]eel free to reach out if you think I can be helpful in the future."

76.    On information and belief, in or about June/July 2019, Defendant Armstrong asked Joyce to hire Lu from QuantFive as Knowledgr's CTO, intending to have Lu either learn what Knowledgr was doing in order to incorporate anything valuable into ResearchHub's plans, and/or to conduct further due diligence to help Armstrong arrange an acquisition of Knowledgr.

**Defendant Armstrong's Proposed Acquisition of Knowledgr**

77.    On July 28, 2019 Armstrong contacted Joyce seeking to acquire a controlling interest in Knowledgr.  Joyce informed MouseBelt that Armstrong wanted to acquire a minimum of 51% of its shares at a valuation of $2,000,000, and that Armstrong had stated that by December 2019 Coinbase would launch its IEO platform and would at that time be able to conduct an IEO for Knowledgr.

///

///

///

78.     Armstrong and Joyce prepared a proposed cap table with Knowledgr's post-acquisition shareholdings.  Armstrong would own 50.5% of Knowledgr's shares.  Joyce would own 37.5%, with an eight year vesting cliff, and Armstrong would pay off his student loans immediately.  MouseBelt's 19% stake in Knowledgr would be reduced to 2% and it would have no further involvement with Knowledgr.

Note: All adjustments should be made in the assumptions box, NOT in calculation table

| Assumptions | |
|---|---|
| Valuation | $2,000,000 |
| Cash payment to Patrick | $250,000 |
| Cash payment to Zach | $250,000 |
| Equity returned to other cap table (30% of valuation) | 85% |

fa

| Cap table | Current equity | If all money returned to existing cap table | Cash payment for purchase | Implied equity in new Venture | Comments |
|---|---|---|---|---|---|
| Patrick Joyce | 49.99% | $999,800 | $250,000 | 37.5% | Pay Patrick for student loans, grant rest of equity on 8 year cliff |
| Zachary Miller | 20.00% | $400,000 | $250,000 | 7.5% | Cash payment for Zach, grant rest of equity on 8 year cliff |
| Mousebelt | 19.00% | $380,000 | $323,000 | 2.9% | Pay out mousebelt, no involvement going forward |
| Cristina Escoda | 6.00% | $120,000 | $102,000 | 0.9% | Pay out Cristina, no involvement going forward |
| Tracy Carslile Coleman | 4.01% | $80,200 | $68,170 | 0.6% | Pay out Tracy, no involvement going forward |
| Rini Pek | 1.00% | $20,000 | $17,000 | 0.2% | Pay out Rini, no involvement going forward |
| Brian Armstrong | | | | 50.5% | |
| Total paid out by Brian | | $2,000,000 | $1,010,170.00 | | |

79.     MouseBelt unequivocally rejected its proposed dilution to 2%.  Joyce informed MouseBelt that he would continue to negotiate with Armstrong.  But MouseBelt is informed and believes, and thereon alleges, that Armstrong and the other Defendants had no intention of doing any such thing; instead, they simply agreed to proceed with freezing out MouseBelt, and that Joyce was told as much but also told not to tell MouseBelt the truth.

80.     During August 2019, Joyce appeared to MouseBelt to be focusing his efforts on negotiating with Defendant Armstrong and not on launching Knowledgr's platform.  MouseBelt noticed that Joyce had missed deadlines that had delayed Knowledgr's scheduled July 15 launch, but assumed that Joyce would return to work once the acquisition negotiations were complete.

81.     On August 20, 2019, Joyce messaged MouseBelt and claimed that he had rejected Defendant Armstrong's offer because it did not adequately value MouseBelt's contribution.  Joyce stated that "[we] received an offer from Brian Armstrong of Coinbase to buy Knowledgr and fold it into his own company ResearchHub.  While the offer was significant (and quite tempting), it did not

accurately reflect the value that everyone in this channel has helped create over the past 12 months, so we decided to pass on it." This statement was not true, and was made in furtherance of Joyce's and Defendants' plan to eradicate MouseBelt's interest in Knowledgr.

82.     Joyce would later tell one MouseBelt employee that he in fact wanted to work for Armstrong.  Joyce told this MouseBelt employee that he was willing to accept a significant reduction in shareholdings and wanted to move to Silicon Valley with his best friend and Knowledgr employee, Zachary Miller, to work for Armstrong.   Joyce had also told at least one MouseBelt employee that his main concern was to get out of student debt. (The ResearchHub website currently shows that Joyce now expects to graduate from medical school in a few years.)

83.     On information and belief, Defendant Armstrong and Joyce agreed on a different course whereby Armstrong could acquire Knowledgr:  Joyce would secretly work for ResearchHub while still acting as Knowledgr CEO, in violation of his agreements with MouseBelt,  in exchange for ResearchHub's promise to pay Joyce's student loans and/or provide Joyce with other compensation pursuant to a formal position within ResearchHub after ResearchHub launched its platform and Joyce had formally severed ties with Knowledgr.  Given the history and information known to Joyce, Armstrong, and the Coinbase Defendants, it is impossible that Armstrong did not know this conduct was unlawful.

**Joyce Sabotages Knowledgr While Secretly Working for ResearchHub**

84.     On August 20, 2019, Joyce messaged MouseBelt to express that he was now ready to move forward and launch Knowledgr, which would be ready for launch in seven days.  This statement also was false and, Plaintiff is informed and believes and thereon alleges, was made pursuant to Joyce and Armstrong's agreed-upon game plan for depriving MouseBelt of its valuable rights.  It would be almost one month until Knowledgr's beta platform finally launched on September 16.  Meanwhile, one MouseBelt employee was tasked to work with Joyce on business-related tasks, Danziger was available to work with Joyce as needed, and MouseBelt was arranging MouseBelt's investors for the upcoming ICO in December.

85.     The delay in launching Knowledgr's platform was the result of Joyce's failure to devote his time and effort toward doing so. Beginning in September 2019, Joyce began a pattern of

behavior designed to thwart any progress MouseBelt was making to launch Knowledgr and conduct its ICO by year's end, to MouseBelt's extreme detriment.  Joyce refused to execute on his customer acquisition plan.  After Knowledgr launched its beta platform in September 2019, Joyce refused to reach out to and onboard the 60 academic laboratories that were waiting to use it.

86.     Joyce also ceased developing Knowledgr.  MouseBelt noticed that neither Joyce, nor any of Knowledgr's employees, had been making commits to Knowledgr's GitHub repositories during October through December 2019.  MouseBelt confronted Joyce, who falsely stated that Knowledgr was working on "infrastructure" and there was thus no need to enter anything into GitHub.  But on information and belief, during October through December 2019 Joyce had not been working on Knowledgr's "infrastructure." The real reason there had been no entries into Knowledgr's GitHub is because Joyce and Knowledgr's employees were at that time working for ResearchHub at Armstrong's direction.

87.     On October 14, 2019, Joyce asked MouseBelt to help him open-source all of the closed-source parts of its platform.  On information and belief, Joyce's purpose in seeking to open-source Knowledgr's platform was both to create plausible deniability for contributing Knowledgr's code to ResearchHub and to undercut in advance any potential claim that could be brought either derivatively on behalf of Knowledgr or by MouseBelt, based upon disclosure of trade secrets or confidential information.  Indeed, MouseBelt disagreed with and vigorously objected to Joyce's request to open-source Knowledgr's platform.  MouseBelt explained that Knowledgr's code was a valuable trade secret that it needed to protect and that investors would not be interested in Knowledgr if its code was publicly available to anyone.  Joyce acknowledged it was a risk that competitors could use Knowledgr's code if it was open-sourced. Disregarding MouseBelt's objections, Joyce nonetheless open-sourced portions of Knowledgr's code anyway.

88.     On October 27, 2019, Joyce asked MouseBelt if he could share Knowledgr's remaining proprietary code with the CTO he intended to hire, Daniel Himmelstein. Himmelstein previously had been recruited by Joyce and hired as a Knowledgr advisor in April 2019 with plans to make him Knowledgr's CTO.  Himmelstein had already been writing code for Knowledgr and making commits to Knowledgr's GitHub repository.  MouseBelt responded affirmatively to Joyce's

request that Knowledgr's code be shared so long as Himmelstein signed an NDA.  However, Plaintiff is informed and believes, and thereon alleges, that Joyce never did have Himmelstein sign an NDA, but nonetheless shared Knowledgr's source code with Himmelstein for the ultimate purpose of contributing it to ResearchHub without first having Himmelstein sign an NDA.

89.    Between November 2019 through January 2020, while still employed by Knowledgr, both Joyce and Himmelstein were in fact working on ResearchHub's development and making source code commits to ResearchHub's GitHub repository.  For example, on December 10 to 12, Joyce, Himmelstein, and Lu all collaborated in ResearchHub's GitHub repository to ensure ResearchHub was using the CC BY 4.0 license.  Significantly, two months earlier, on October 5, Joyce was working with Danziger, MouseBelt's CTO, in Knowledgr's GitHub to ensure Knowledgr used the same CC BY 4.0 license.



///
///
///
///
///
///

90.     Joyce and Himmelstein's GitHub accounts also show they had made a number of other commits to private (unidentified) repositories beginning in December 2019.  On information and belief, at least some of these GitHub commits were contributions made to ResearchHub.



91.     By November 2019, Knowledgr was insolvent and did not have sufficient funds to meet its obligations.  Knowledgr had no income and needed to raise capital to fund its operations. It previously had planned to do in the December ICO that MouseBelt was preparing, as referenced above.

///

///

///

///

///

///

///

**Joyce's Relationship with Armstrong Comes to a Head and MouseBelt Discovers the Truth**

92.     By December 2019, MouseBelt was frustrated and concerned with Joyce's delays and failure to keep Knowledgr on schedule.  MouseBelt had performed its services to Knowledgr in full and Joyce had acknowledged he was pleased with MouseBelt's work by (i) raising no issues with MouseBelt's November bill itemizing developer hours it contributed, and (ii) praising MouseBelt's work in a statement that he agreed to allow MouseBelt to publish.



December 17th, 2019 ⌄

**Patrick J** 2:45 AM

Just sent it to Galen - here's the copy tho:

MouseBelt has gone above and beyond to support our project. From Galen's technical expertise to their business development specialists, it felt like we added 5 new team members when we joined the accelerator. We are very lucky to be working with a forward-thinking organization that makes decisions based on what's best for the blockchain community as a whole

let me know if you think that's too corny

93.     MouseBelt had for months been asking Joyce to launch Knowledgr's cryptocurrency testnet (a prototype of Knowledgr's blockchain token for test purposes).  Joyce had refused to do so.  On information and belief, Joyce's refusal was because Joyce had been preparing to launch ResearchHub's testnet, which ResearchHub in fact later launched.  At the same time, Joyce also had failed to provide any updates to MouseBelt about the status of the legal agreements for Knowledgr's ICO investors, for which Joyce had engaged lawyers five months earlier.  MouseBelt had arranged $300,000 worth of investment capital that was waiting to be invested in Knowledgr.  MouseBelt therefore scheduled a phone call with Joyce to discuss this issue.  During this December 21, 2019 phone call between MouseBelt and Joyce, MouseBelt asked whether Joyce had recently been in touch with Armstrong or ResearchHub.  Joyce stated that neither he nor anyone else at Knowledgr had been in touch with Armstrong during the previous four months.  Joyce would later admit the truth, which

was that Armstrong had asked Joyce to work on ResearchHub during that same four-month period and that Joyce actually had been doing so. Joyce's omission of this information was a breach of Knowledgr's agreements with MouseBelt and was done to conceal Joyce and Knowledgr's inappropriate actions.

94.     On January 7, 2020, MouseBelt discovered that Joyce and Himmelstein were working for ResearchHub and had been misrepresenting the nature of their relationship with Armstrong for months.  MouseBelt noticed that ResearchHub had set up a GitHub repository that had been left public.  This GitHub repository had been authored by Joyce and Himmelstein's own GitHub accounts and was populated with comments from Joyce and Himmelstein about ResearchHub's platform dating back to December 10, 2019.

95.     That same day, January 7, MouseBelt showed Joyce screenshots of ResearchHub's GitHub repository showing Joyce and Himmelstein working on ResearchHub.  MouseBelt demanded an explanation. On January 8, Joyce admitted that he and Himmelstein had created the ResearchHub GitHub repositories at Armstrong's request, with the following explanation: "BA [Brian Armstrong] asked if we would give feedback on the RH [ResearchHub] app.  Since there was no forum for public [for] this, Dan [Himmelstein] went ahead and made a repo [GitHub repository] for the RH [ResearchHub] community to use."

96.      Joyce stated that he was available for a call to discuss his involvement with ResearchHub.  MouseBelt scheduled a call for January 9, which Joyce failed to attend.  Thereafter, Joyce refused to speak with anyone from MouseBelt.

97.     ResearchHub was formally incorporated in Delaware on January 21, 2020, with a remarkable 1.7 *billion* shares issued.  Based upon the stated Annual Franchise Tax Assessment of $131,653.54, MouseBelt is informed and believes that ResearchHub valued its assets at incorporation at a valuation of approximately *$325,000,000*.  Whatever value ResearchHub had was substantially attributable to the MouseBelt-created platform and methodology which Armstrong and the other Defendants had purloined from Knowledgr through Joyce (and Himmelstein as well).

98.     On or about February 13, 2020, MouseBelt discovered that Joyce had taken down Knowledgr's online platform.

99.     On or about March 26, 2020 Joyce interviewed Himmelstein for a video that was published to ResearchHub's YouTube account where Joyce stated:

    a.  that for "the past couple years" he had "been working on a few projects to try to align the incentives essentially by rewarding researchers".

    b.  that he had met Himmelstein through his work on these projects and that the two had been collaborating "for the past year or so".

    c.  that "the organization we are with today is ResearchHub, where the idea is essentially a Reddit-style forum where anyone can post manuscripts, curate those manuscripts by upvotes and downvotes, and then comment on them";

    d.  that ResearchHub's idea was to "come up with some kind of algorithm where we can essentially use a financial incentive to encourage good research behaviors".

100.    On information and belief, the algorithm Joyce had stated he was building for ResearchHub in ResearchHub's March 26 YouTube video, either was the same algorithm, or was a repurposed version of the same algorithm, previously created by Knowledgr for itself.

101.    Throughout 2020, Joyce and Himmelstein continued to make commits to private repositories on GitHub.  On information and belief at least some of those commits were contributions made to ResearchHub.

102.    The basic ideas identified in Armstrong's February 25, 2019 *Medium* article were never actually implemented by ResearchHub.  Instead, ResearchHub uses the same licensing method as Knowledgr, Creative Commons 4.0 ("CC BY 4.0"); and on information and belief, ResearchHub now uses an algorithm to determine reputation similar or identical to an algorithm originally designed and created by Knowledgr.

103.    Specifically, both platforms offer extra incentives for users with higher prestige on the platform. Knowledgr called this an "expertise rank" which would initially be determined by academic credentials and publishing history, but aimed to create an algorithm that would reward users who contributed to the platform with a higher expertise rank and tokens. ResearchHub's version of Knowledgr's idea is called "reputation," where contributors to the platform are rewarded with

ResearchCoin (RSC). Their contributions are also rewarded in a reddit-Karma-style system via upvotes and downvotes in "REP."

104.    The goal of building a scientific community incentivized to engage in research and build prestige regardless of their education or publications is worded almost identically in Knowledgr's (and later ResearchHub's) whitepapers:

- Knowledgr: "Our aim is to leverage the community to design an expertise rank algorithm **less reliant on bibliometrics and credentialism**. A user's ER increases within Knowledgr in proportion to the KNLG received for authoring posts, curating, peer-reviewing, and hypothesis-reviewing."

- ResearchHub: "**Rather than relying on citations and bibliometrics**, reputation within the ResearchHub system is linked to ResearchCoin earnings. Reputation acts similarly to aggregated Reddit karma in that it acts as a peer-determined measure of prestige. This allows researchers, particularly those early in their research career, to cultivate recognition and demonstrate expertise that is entirely attributable to the researcher, rather than an entire lab or a principal investigator."

105.    Other user interface (UI) features that are currently live on ResearchHub were also concepts taken directly from Knowledgr, including (i) connecting to user accounts using the ORCiD social network; (ii) incorporating digital object identifiers (DOI) into the application; and (iii) largely using the UNESCO list of fields of science and technology.

## **FIRST CAUSE OF ACTION**

### **(Fraud)**

106.    MouseBelt incorporates all of the above paragraphs as though fully set forth herein.

107.    Defendants at all relevant times knew that MouseBelt was supplying the financial, design and technical resources to create Knowledgr's platform and program.  Defendants further knew that without the foregoing resources, the Knowledgr platform would not come into existence; that the platform being created by MouseBelt for Knowledgr was much further along toward completion than, and superior to, the proposed ResearchHub platform; that if the MouseBelt-created platform could be combined with the leverage afforded by issuing and trading tokens through

Coinbase, ResearchHub would immediately be a dominant open-source publication hub that would make it difficult if not impossible for the development of potential competitors and whose tokens were likely to trade at greatly enhanced value.   They therefore developed a plan to assure that MouseBelt continued its financial support and design and technical development for the Knowledgr plan.  Defendants knew that because of the relationship of Knowledgr and Joyce to MouseBelt, Armstrong could make fraudulent representations to Joyce knowing that these representations would be passed on by Joyce to MouseBelt, as a means of having Armstrong, Research Hub and their agents such as Quant Five and Lu, obtain access to and knowledge of the platform and program being developed by MouseBelt for Knowledgr.

108.    The misrepresentations made to Joyce by Armstrong, with the intention that they be passed on by Joyce to Knowledgr and which were in fact transmitted by Joyce to MouseBelt, included but were not limited to statements that: Armstrong was interested in investing in Knowledgr; that Ventures (which Joyce knew was either under Armstrong's control or could be significantly influenced by Armstrong) was considering causing a substantial investment in Knowledgr; and that Knowledgr's token could be listed and traded on Coinbase (which Joyce knew was either under Armstrong's effective control or could be significantly influenced by Armstrong). These misrepresentations were made by Armstrong not only on his own behalf, but on behalf of and/or for the benefit of the other Defendants, for whom Armstrong had actual or apparent authority to act.

109.    MouseBelt reasonably believed these representations to be true or substantially true, and relied on the representations conveyed by Joyce.  To give credibility to his representations, after Joyce proposed a substantial investment by Armstrong in Knowledgr, Armstrong invested $50,000 for 1% of Knowledgr and stated that after he was allowed to perform due diligence, a larger investment by Ventures would be forthcoming.

110.    The foregoing representations made by Armstrong to Joyce for the purpose of being passed on to MouseBelt were false, and Armstrong knew they were false when he made them. Armstrong already had started funding and designing ResearchHub's development of a platform to provide the same services as Knowledgr, including without limitation accessibility and participation

for open source research and scholarly publications. He had no intention whatever of assisting, or allowing Ventures or Coinbase to assist, Knowledgr in successfully launching its competing platform. Instead, it was Armstrong's and the other Defendants' intent to steal MouseBelt's work for themselves, to not only eliminate a potential competitor but to obtain for ResearchHub the benefits of the financial, design and technical resources MouseBelt put into Knowledgr, thereby allowing ResearchHub to launch sooner at less cost a successful platform based entirely or substantially on MouseBelt's work.

111.    These misrepresentations convinced Joyce, and through Joyce, MouseBelt to allow Armstrong and his agents full access to the work done to date on Knowledgr's platform and the plans for further work to complete the platform.

112.    To continue implementing their scheme, Defendants next turned to duress used against Joyce to cause him to accede to Armstrong's demands to take control of Knowledgr and to make misrepresentations of his own to keep MouseBelt on board while Knowledgr's technology, built by MouseBelt, was surreptitiously transferred to ResearchHub.

113.    First, Armstrong revealed the existence of ResearchHub to Joyce, and told Joyce he would be deciding within two weeks whether to fund Knowledgr, ResearchHub, or both entities. That representation was false because Armstrong had no intention of funding Knowledgr under any circumstances. Armstrong already had weaseled his way into Joyce's confidence by pretending to act as a mentor to Joyce, and through their conversations had learned that Joyce owed hundreds of thousands of dollars of student debt which was impeding Joyce's ability to complete medical school. Armstrong also knew that his implied threat to fund ResearchHub instead of Knowledgr would terrify and create extreme duress on Joyce, who would be faced with the looming destruction of Knowledgr and any of prospect of Joyce profiting from Knowledgr's launch, because of Armstrong's ability to self-finance ResearchHub, publicize it and use Coinbase for ResearchHub's ICO and subsequent token trading exchange.

114.    In this context, Armstrong made his offer to Joyce to buy a majority interest in Knowledgr based upon a $2 million valuation (which MouseBelt is informed and believes, and thereon alleges, was a small fraction of what Knowledgr's actual worth would have been had it been

successfully launched).  As described above, Joyce would retain a 37.5% interest vesting over eight years, and Armstrong or ResearchHub would pay Joyce's outstanding student debt.  MouseBelt's existing investment in Knowledgr would be deemed to buy a 2% equity interest with MouseBelt having no further involvement – essentially preventing MouseBelt from obtaining any return on its investment in Knowledgr.

115.    Also as described above, Joyce told MouseBelt that he had rejected the offer because it was insufficient consideration to MouseBelt.  MouseBelt is informed and believes, and thereon alleges, that Joyce's statement was untrue and that he had in fact agreed to the proposed buyout or something similar, but was expressly or implicitly directed to lie and conceal the truth from MouseBelt, because Defendants still needed MouseBelt to finish up its work for Knowledgr—work that Defendants would then misappropriate for themselves.

116.    MouseBelt is further informed and believes, and thereon alleges, that starting in late summer, 2019 and continuing through the end of 2019, at Armstrong's and ResearchHub's direction and under his control, and acting as their agent, Joyce responded to increasingly urgent inquiries from MouseBelt about performing tasks needed to complete Knowledgr's launch by lying to MouseBelt about: reasons for not completing tasks; the reasons for hiring Daniel Himmelstein as Knowledgr's CTO; and about having no further contacts with Armstrong and ResearchHub, all as described above. The truth was that at Armstrong's direction and under his control, Joyce was taking no steps to move Knowledgr toward a successful launch because he was already employed by Armstrong and ResearchHub to transfer all the key elements of the MouseBelt-designed and implemented platform to ResearchHub; that Himmelstein was actually hired to assist Joyce in doing so, for the benefit of ResearchHub and not Knowledgr; and that not only was Joyce having contacts with Armstrong and ResearchHub, he was working for them.

117.    As described above, MouseBelt only discovered in late 2019, by accident, that Joyce and Himmelstein were actually working for ResearchHub and Armstrong.  Until that time, MouseBelt believed Joyce's misrepresentations, and was unaware and did not suspect that those misrepresentations were being made at Armstrong's and ResearchHub's direction and under their

control, and as their agent. MouseBelt was reasonable in doing so based upon their overall experience with Joyce to date.

118.    The misrepresentations made to MouseBelt through Joyce by Defendants, and by Joyce under Defendants' direction and control, and as their agent, proximately caused substantial damage to MouseBelt, in an amount to be determined at trial.

119.    In doing the acts herein alleged, Defendants acted with oppression, fraud, and malice, and MouseBelt is entitled to exemplary damages in an amount to be determined at trial.

### SECOND CAUSE OF ACTION

**(Intentional Interference with Contractual Relations)**

120.    MouseBelt incorporates all of the above paragraphs as though fully set forth herein.

121.    As described herein, Knowledgr and MouseBelt entered into a series of agreements including two SAFEs and Accelerator Agreements.  Defendants were aware of the various agreements between MouseBelt and Knowledgr, and also were aware that MouseBelt had a reasonable expectation of profits from the agreements and its relationship with Knowledgr.

122.    In engaging in the conduct described above, Defendants intended to interfere, and did interfere, with the agreements and relationship between MouseBelt and Knowledgr, for their own unlawful and unprivileged benefit.

123.    By the use of Joyce's dire personal financial circumstances and by threatening to destroy Knowledgr by funding ResearchHub as a competitor which also would have Coinbase available to list ResearchHub tokens, while denying access Knowedgr access to Coinbase, effectively limiting if not completely precluding Knowledgr from obtaining sufficient financing and successfully launching Knowledgr's platform, Defendants employed fraud and duress to knowingly and intentionally interfered with Knowledgr's Accelerator and SAFE Agreements with MouseBelt.

124.    As a proximate result of Defendants' actions, MouseBelt has suffered damages in an amount to be proven at trial.

125.    In doing the acts herein alleged, Defendants acted with oppression, fraud, and malice, and Plaintiff is entitled to exemplary damages in an amount to be determined at trial.

**THIRD CAUSE OF ACTION**

**(Intentional Interference with Prospective Economic Advantage)**

126.    MouseBelt incorporates all of the above paragraphs as though fully set forth herein.

127.    As described herein, Knowledgr and MouseBelt entered into a series of agreements including two SAFEs and two Accelerator Agreements and a relationship for the prospective economic advantage of all parties.  Defendants were aware of the relationship between Knowledgr and MouseBelt.

128.    Through this relationship, MouseBelt had a reasonable expectation and likely prospects of obtaining economic benefits in addition to the contractual benefits to which MouseBelt was entitled, including but not limited to further profits from ultimately trading the Knowledgr tokens it would have been entitled to receive as part of its contractual compensation, and additional business and investment opportunities generated for MouseBelt by being associated with and instrumental in the successful launch of Knowledgr.

129.    Through their unlawful and unprivileged conduct as detailed herein, Defendants intended to interfere and did interfere with MouseBelt's reasonable expectation and likelihood of prospective economic advantage, as described herein.

130.    As a proximate result of Defendants' actions, MouseBelt has suffered damages in an amount to be proven at trial.

131.    In doing the acts herein alleged, Defendants acted with oppression, fraud, and malice, and Plaintiff is entitled to exemplary damages in an amount to be determined at trial.

**FOURTH CAUSE OF ACTION**

**(Negligent Interference with Prospective Economic Advantage)**

132.    MouseBelt incorporates all of the above paragraphs as though fully set forth herein.

133.    Defendants knew or should have known that MouseBelt had reasonable expectations and likely prospects of obtaining economic benefits in addition to the contractual benefits to which MouseBelt was entitled, including but not limited to further profits from ultimately trading the Knowledgr tokens it would have been entitled to receive as part of its contractual compensation, and

additional business and investment opportunities generated for MouseBelt by being associated with and instrumental in the successful launch of Knowledgr.

134.    In pursuing their own agenda through the use of fraud and duress, Defendants knew or should have known that their conduct would fatally interfere with MouseBelt's ability to reap the prospective economic advantages described above, but failed to use due care to avoid such interference, including but not limited to assuring that MouseBelt received equivalent financial benefits and reputational credit for its role with Knowledgr and consequent role its financial, design and technical resources played in the successful launch of ResearchHub.

135.    By their conduct, Defendants negligently interfered with MouseBelt's prospective economic advantage as described herein, and that interference was not privileged because of the manner in which and means through which it occurred.

136.    As a proximate result of Defendants' actions, MouseBelt has suffered damages in an amount to be proven at trial.

137.    In doing the acts herein alleged, Defendants acted with oppression, fraud, and malice, and Plaintiff is entitled to exemplary damages in an amount to be determined at trial.

## **FIFTH CAUSE OF ACTION**

### **(Unjust Enrichment)**

138.    Plaintiff incorporates all of the above paragraph as though fully set forth herein.

139.    By diverting MouseBelt's valuable financing, design and technical work and resources to its own benefit, without compensating MouseBelt and while disabling Knowledgr from compensating MouseBelt, ResearchHub and Armstrong unlawfully obtained valuable benefits to which they were not entitled while simultaneously depriving MouseBelt of the reasonably expected benefit of its finance, design and technical resources.  Armstrong and ResearchHub were thereby unjustly enriched at MouseBelt's expense, as measured by the equity interest and tokens MouseBelt was to have received from Knowledgr.  Armstrong and ResearchHub have been unjustly enriched by an amount equivalent to the reasonably expected value of that equity interest and those tokens, as measured by the value of ResearchHub's equity and tokens.

140.    MouseBelt is entitled to restitution of the amounts by which Armstrong and ResearchHub were unjustly enriched, in an amount to be determined at trial.

## SIXTH CAUSE OF ACTION

### (Quantum Meruit)

141.    MouseBelt incorporates all of the above paragraphs as if fully set forth herein.

142.    By virtue of the unlawful conduct described herein, MouseBelt's finance, design and technical work and resources were in fact not performed for Knowledgr pursuant to contract, but at Armstrong's and ResearchHub's request and demand on Joyce which were unknown to MouseBelt, were performed for Armstrong and ResearchHub, with whom MouseBelt did not have an enforceable contract.

143.    By operation of law, therefore, Armstrong and ResearchHub therefore agreed to pay MouseBelt the reasonable value of the work performed and services provided by MouseBelt for the benefit of Armstrong and ResearchHub.

144.    The reasonable value of such work and services is best measured by an equity interest and percentage of tokens by which MouseBelt would have been compensated pursuant to contract, had it performed the same work and services for Knowledgr before the aforementioned work and services were diverted to and performed for the benefit of Armstrong and ResearchHub.

145.    MouseBelt has been damaged by the acts complained of herein, and is entitled to receive the reasonable value of its work and services performed for the benefit of Armstrong and ResearchHub, in an amount to be determined at trial.

///

///

///

///

///

///

///

///

1

## PRAYER FOR RELIEF

2      **WHEREFORE**, MouseBelt respectfully requests that this Court enter judgment in favor of

3  MouseBelt, as follows:

4          A.      Awarding compensatory damages, in an amount to be proven at trial;

5          B.      Awarding punitive or exemplary damages as permitted by law;

6          C.      For a declaration that Defendants Armstrong and/or ResearchHub hold the

7                  ResearchHub equivalent equity shares held by MouseBelt in Knowledgr as

8                  constructive trustees for the benefit of Plaintiff MouseBelt;

9          D.      Awarding MouseBelt its reasonable attorneys' fees, costs, and other expenses

10                 incurred in this action, if and to the extent authorized by law;

11         E.      Awarding pre- and post-judgment interest at the maximum rate permitted by law;

12                 and

13         F.      Awarding such other and further relief deemed just and proper by this Court.

14

15  WHEREFORE, Plaintiff requests a trial by jury.

16

17

18  DATED: December 17, 2021                  PUTTERMAN | YU | WANG LLP

19

20                                           By: _____

21                                               Constance Yu
                                                 Attorneys for Plaintiff
22                                               MOUSEBELT LABS PTE. LTD

23

24

25

26

27

28