Pages 1-41

1                      UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF CALIFORNIA
2                            OAKLAND DIVISION

3
MOUSEBELT LABS PTE. LTD.,        )  Case No.  22-cv-04847-JST
4                                 )
                Plaintiff,        )  Oakland, California
5                                 )  Thursday, December 15, 2022
        v.                        )
6                                 )  ZOOM WEBINAR PROCEEDINGS
BRIAN ARMSTRONG, RESEARCHHUB      )
7  TECHNOLOGIES, INC., RESEARCHHUB, )
LLC, COINBASE, INC., COINBASE    )
8  ASSET MANAGEMENT, INC., d/b/a    )
COINBASE VENTURES, and DOES      )
9  1-25, inclusive,                 )
                                  )
10               Defendants.        )
                                  )
11  _____)

12

13                  TRANSCRIPT OF MOTION HEARING
                 BEFORE THE HONORABLE JON S. TIGAR
14               UNITED STATES DISTRICT COURT JUDGE

15

16  APPEARANCES:  (Via Zoom Webinar)

17  For Plaintiff:            DONALD J. PUTTERMAN, ESQ.
                             GEORGE E. CHIKOVANI, ESQ.
18                            Putterman Yu Wang LLP
                             345 California Street, Suite 1160
19                            San Francisco, California 94104
                             (415) 939-8779
20

21

22

23
    **[Additional Counsel on following page]**
24

25  Proceedings recorded by electronic sound recording; transcript
    produced by transcription service.

2

1    APPEARANCES:  (Cont'd.)

2    For Defendant Brian              JORDAN D. SEGALL, ESQ.
     Armstrong:                       Munger, Tolles & Olson LLP
3                                     350 South Grand Avenue, 50th Floor
                                      Los Angeles, California 90071-3426
4                                     (213) 683-9100

5                                     VIRGINIA GRACE DAVIS, ESQ.
                                      Munger, Tolles & Olson LLP
6                                     560 Mission Street, 27th Floor
                                      San Francisco, California 94105-2907
7                                     (415) 512-4000

8    For Defendant ResearchHub:       EUGENE NOVIKOV, ESQ.
                                      Durie Tangri LLP
9                                     217 Leidesdorff Street
                                      San Francisco, California 94111
10                                    (415) 236-6300

11   For Defendant Coinbase:          MARK R. CONRAD, ESQ.
                                      FELIPE CORREDOR, ESQ.
12                                    Conrad Metlitzky Kane LLP
                                      Four Embarcadero Center, Suite 1400
13                                    San Francisco, California 94111
                                      (415) 343-7100
14
     Transcription Service:           Peggy Schuerger
15                                    Ad Hoc Reporting
                                      2220 Otay Lakes Road, Suite 502-85
16                                    Chula Vista, California 91915
                                      (619) 236-9325
17

18

19

20

21

22

23

24

25

1    <u>OAKLAND, CALIFORNIA   THURSDAY, DECEMBER 15, 2022   2:00 P.M.</u>

2                              --oOo--

3        (Call to order of the Court.)

4            THE CLERK:   Your Honor, now calling Civil Matter 22-

5    4847, MouseBelt Labs, Ltd. v. Brian Armstrong, et al.  If counsel

6    could please state their appearances for the record, starting with

7    counsel for Plaintiff.

8            MR. CHIKOVANI:  This is George Chikovani from Putterman

9    Yu Wang appearing for MouseBelt Labs.  And with me is my partner,

10   Donald Putterman.

11           THE COURT:  Welcome.

12           MR. CONRAD:  Good morning, Your Honor.  Mark --

13           MR. PUTTERMAN:  Good afternoon, Your Honor.

14           MR. CONRAD:   -- Conrad on behalf of the Coinbase

15   Defendants, along with my colleague Felipe Corredor from Conrad

16   Metlitzky Kane.  Briefly, let me introduce the other defense

17   counsel.

18           Jordan Segall and Grace Davis Fisher from Munger, Tolles

19   on behalf of Brian Armstrong, and Eugene Novikov from Durie Tangri

20   on behalf of ResearchHub.

21           THE COURT:  Very good.  Welcome.  The matter's on

22   calendar to hear argument on Defendants' motion to compel

23   arbitration and stay litigation.  Who will be arguing for the

24   Defendants this afternoon?

25           MR. CONRAD:  I will, Your Honor.

4

1        THE COURT:  All right.  And who will be arguing for the

2   Plaintiff when we get there?

3        MR. CHIKOVANI:  I will be, Your Honor.

4        THE COURT:  All right.  Mr. Conrad, you have the floor.

5        MR. CONRAD:  Thank you, Your Honor.  Just in terms of

6   table-setting, I think it's important to note that there are four

7   elements in a motion like this to compel arbitration under the New

8   York Convention.  Three of those are undisputedly met.

9        Number one, arbitration --

10       THE COURT:  No.  Let me -- I should interject.  I try to

11  read the briefs before every argument and I did that here.  I read

12  *Mundi*.  I read *Setty*.  I read the case that *Setty* relies on.  I

13  read the *GE* case out of the Supreme Court.  I read the remand case

14  when it went back to the Eleventh Circuit.  There's a very

15  interesting concurrence by Judge Tjoflat, that might be relevant

16  on the question of whether federal common law is the right

17  standard.

18       So I say all that just to encourage the parties to focus

19  on the things where they think they're likely to have the most

20  trouble, and so they should persuade the Court that they're not in

21  trouble, or whatever else you think really is hotly contested.

22       MR. CONRAD:  Thank you, Your Honor.  I appreciate the

23  Court's preparation.  If the Court has questions with specific

24  issues that it is concerned about, I would be glad to address

25  those in the first instance.

1       But let me focus then on the key issue, which is whether

2  non-signatories such as the Defendants in this case can compel

3  arbitration through the equitable estoppel doctrine whereas here

4  a signatory is seeking to take advantage of the contracts that it

5  signs but not abide by all the terms of that as they may have put

6  in the arbitration clause.

7       There are two key disputes, I think, in the analysis

8  here.  The first is a choice of law question.  And then the second

9  is, depending on what law applies to an equitable estoppel

10  question -- and both sides have argued that it doesn't matter what

11  law applies -- they win.

12       Let me start with the choice of law question unless Your

13  Honor would prefer to take them in the reverse order.  We think

14  it's very clear that California law applies.  And let me start

15  with first principles, which is the FAA.  Under Chapter 1 of the

16  FAA, Section 2 requires occupation of state contract law,

17  including equitable principles regarding waiver, regarding

18  equitable estoppel, and so forth.

19       When courts -- and we've cited the *Kramer* case out of

20  the 9th Circuit and numerous cases that have relied on holding

21  that when you adjudicate a motion to compel arbitration under the

22  FAA, you apply state contract law.

23       The other side would have it that all of that changes in

24  the context of Chapter 2 under the New York Convention, and they

25  rely on *Setty* for that.  And I don't think that's correct.  That's

1   inconsistent with the choice of law principles that the Supreme

2   Court has articulated in *Arthur Andersen*.   In the case relied on

3   in the *Arthur Andersen*, Footnote (indiscernible), which was an

4   older case, in which the Supreme Court law contract principles

5   apply, importantly under Chapter 2 of the New York Convention,

6   there is a provision that Congress enacted, which is Section 208

7   of the FAA.   And what that section says is whenever you're

8   evaluating claims under the New York Convention, you apply the

9   same principles that you would apply under Chapter 1.   Which means

10  in this case that the choice of law principles required here

11  demand application of California law.

12          *Setty* is not to the contrary.   *Setty* I will admit is *In*

13  *re Henson* with some ideas expressed in a lot of other Ninth

14  Circuit cases, and I'm not sure how sound the analysis was.   But,

15  in any event, what *Setty* says on its face is when you have a case

16  involving federal claims exclusively -- which this case does not.

17  This case has state law claims exclusively.   When you have a case

18  involving federal claims exclusively, you apply federal common

19  law.   That was the limited holding of *Setty*.   To apply *Setty* in a

20  case like this would expand *Setty* beyond recognition.   It would

21  expend *Setty* beyond what Judge Bale in dissent in *Setty* said that

22  *Setty* was saying.   It would extend *Setty* so far as to -- as to

23  invalidate a host of other cases, such as the *Franklin* case that

24  we cited which *Setty* made no mention of.   So we believe it's very

25  clear that California law applies.

1           And so under that analysis, California law has been held

2  to permit the use of equitable estoppel to compel arbitration by

3  a   non-signatory   under   two   circumstances.     The   first

4  circumstance --

5           THE COURT:  Mr. Conrad, doesn't the Defendants' notice

6  of  removal  under  a  header  that  says  "Basis  for  Federal

7  Jurisdiction"  assert  that  the  Court  has  federal  question

8  jurisdiction because the agreements at issue here fall under the

9  New York Convention?

10          MR. CONRAD:  No.

11          THE COURT:  It doesn't say that?

12          MR.  CONRAD:   It -- it cites -- the header to that

13  section of the notice of removal -- and I have it.  It's on

14  page -- page 3 of the notice.  This is Docket No. 1.

15          "Basis for Removal:  Federal Question." "This Court has

16  original jurisdiction over the claims against Defendants because

17  those claims are subject to a written international arbitration

18  agreement that falls under the Convention and, as such are deemed

19  to arise under the laws and treaties of the United States."

20          And we cite 9 U.S.C. § 203.  That is for removal

21  jurisdiction.  It does not establish federal question jurisdiction

22  in the sense of the merits of the claims asserted.  So --

23          THE COURT:  All right.  And so -- and so is the sole

24  basis for -- first of all, I'm not aware of the idea that removal

25  jurisdiction and subject matter jurisdiction are different.  It

1  seems that that probably just portrays ignorance on my part, I

2  suppose.  Is the sole basis then for subject matter jurisdiction

3  in this case the diversity of -- diversity?

4          MR. CONRAD:  The basis on which we came to federal court

5  was not diversity.  It was the FAA.  The basis on which we --

6          THE COURT:  I -- I'm going to stop you.  I'm going to

7  stop you.  I'm going to stop you.  I'm going to repeat the

8  question.  I have to know what the basis for federal jurisdiction

9  is in every case.  Do you contend that the basis for federal

10 jurisdiction in this case is solely diversity, or is it also

11 something else?

12         MR. CONRAD:  It is diversity.  The Court has federal

13 subject matter jurisdiction over this case on the basis of

14 diversity.

15         THE COURT:  Only.  Let me read you paragraph 19 of your

16 notice of removal.

17         "The Court also has subject matter jurisdiction over all

18 claims asserted in this case, given the parties' diversity of

19 citizenship."

20         I think the use of the word "also" in that sentence,

21 unambiguously means that it's notice of removal, my reading -- my

22 reading of that notice of removal is correct and that is as of the

23 filing of the notice of removal, Defendants took the position that

24 the Convention was a separate basis for subject matter

25 jurisdiction in the case.

1          MR. CONRAD:  Your Honor, we certainly don't deny that

2    the Convention is the basis for getting into federal court.  We

3    don't deny that the Convention was implemented for federal

4    statute.  We are here because of a federal statute.

5          But what the case law teaches us is that when -- and in

6    *Setty*, they didn't say, We're here because the FAA is a federal

7    statute and we'll apply federal common law because it's a federal

8    statute.  What *Setty* said was we'll apply federal common law

9    because there are federal claims at issue, not because of federal

10   jurisdiction.  Otherwise, federal common law would apply in every

11   single case because in every single FAA case, we're in federal

12   court.

13          THE COURT:  Uh-huh.

14          MR. CONRAD:  What *Setty* was when you have federal

15   claims, which in that case was trademark claims, you apply federal

16   common law.  I don't think *Setty*'s consistent with the *Franklin*

17   court's analysis in any event, which it studiously ignored, even

18   though it had been raised in the 28(j) letter to the Court.  But

19   what *Franklin* teaches is that when you've got state law claims,

20   the analysis that you apply for equitable estoppel is state

21   jurisdiction, which is California in this case.

22          In any event, whether the Court applies federal common

23   law or state had California law or, for that matter, Singaporean,

24   although there's less robust jurisprudence that we have on that,

25   equitable estoppel applies here because that is where MouseBelt

1    has pled its claims.

2            The jurisprudence under California law teaches us that
3    "When allegations in claims are intimately intertwined with the
4    concepts and those are relied upon by the plaintiff, the are
5    estopped from seeking the benefits of those claims against third
6    parties."   It also teaches that "When there's substantial
7    interdependent and concerted conduct that are founded in or
8    intimately connected with the obligations of the underlying
9    agreement, the signatory seeking the same claims against non-
10   signatories can be estopped from denying arbitration."

11           That standard is met here and MouseBelt really doesn't
12   even try to deny that that standard is met.   MouseBelt, in
13   paragraph after paragraph after paragraph, relies on the
14   contractual claims, their claims are intertwined with those
15   agreements -- we went claim by claim in our opening brief -- and
16   challenges none of that analysis.

17           They also don't really deny that they've alleged
18   interconnected and interdependent concerted conduct between Joyce,
19   who was the CEO of the company that signed the agreement and who
20   individually signed the agreement in that capacity.   They engaged
21   in concerted actions with the Defendants here.   In fact, they
22   allege that all of the benefits that MouseBelt provided under
23   those contracts flowed directly to the Defendants in this case.
24   In other words, the Defendants got the benefit of MouseBelt's
25   performance under the contract.

1          Under those facts and under that theory, which is the

2    only theory MouseBelt has asserted here in connection with all of

3    its claims, it's clear equitable estoppel principles applied both

4    under California law and in federal common law.

5          I won't go into Singaporean law unless the Court is

6    interested in it.  I think that *In re Henson* is fairly clear that

7    when the FAA refers to state contract law, it refers not to the

8    choice of law clause in the arbitration contract but, rather, the

9    relevant state law principles of the forum state.  In fact, the

10   Ninth Circuit held that the district court in that case erred in

11   relying on the New York choice of law clause and, instead, said it

12   had applied the lower of the forum state, California.

13         So it seems the law here just is off the table.

14         So with that, I will turn back to this final issue which

15   is waiver, unless the Court has any questions on equitable

16   estoppel.

17         THE COURT:  I don't.  I don't.  I think -- I don't.  I

18   don't -- I -- I want to hear your argument.  I don't know that

19   you're going to have huge problems on the question of waiver.  I

20   note that your opponents don't respond to the assertion in your

21   brief, which appears to be uncontested, that Mr. Joyce was subject

22   to a nondisclosure provision that would have made his disclosure

23   of the agreements itself actionable.  They don't challenge your

24   citation to the restatement on that point.  They offer that --

25   that there was some colloquy between counsel and discovery

1  correspondence in which, you know, by negative implication maybe

2  other of your clients had access to these agreements.  But it's

3  their burden to show that you -- to have affirmative evidence that

4  your client was -- anyway, I don't need to be making your argument

5  for you.

6       This isn't -- this isn't the hard part of the case for

7  you.  I'll just say that.

8       MR. CONRAD:  Fair enough.  In that case, I will -- I

9  will add only that we did exercise diligence.  We were careful,

10  and it would have been reckless of us to have acted otherwise.  In

11  order to get into federal court, it requires unanimity in order to

12  remove.  There were the constraints that Your Honor mentioned on

13  Mr. Joyce's ability to share information, and counsel represented

14  him in an individual capacity to share information.  We did our

15  best to honor those obligations notwithstanding the fact that

16  MouseBelt has disclosed all the material terms of the contract in

17  its public filings.  And as soon as we got the agreement, we

18  removed the case and sought arbitration and this is not a case

19  about effectively prejudice.  It's a case about knowing derogation

20  -- the derogation in (indiscernible) conduct with respect to known

21  rights, and the rights simply weren't known.  It would be

22  irresponsible of me as an officer of the Court to have done

23  anything other than what we did.

24       With that, I think we made the key points that we wanted

25  to make with respect to -- to both the choice of law and the

1   equitable estoppel, and I'll reserve some time for rebuttal --

2          THE COURT:  Let me ask you -- I do have a question for

3   you, actually.  Let's say I decided that federal common law is the

4   rule of decision -- and it's not your position, but let's say I

5   went that way.  Do you think that -- oh, never mind.  The question

6   is answered in your brief.  I don't need to bother with it.

7          Mr. Chikovani or Mr. -- Mr. Chikovani.  Yeah.  The

8   microphone is yours.

9          MR. CHIKOVANI:  Thank you very much, Your Honor.  And in

10  light of your direction to defense counsel, I'll focus my argument

11  on the issues that were raised here.  Also, there are -- I'd like

12  to respond to some of those in some detail.  I do just want to, at

13  the outset, say that there's -- there's three key points that we

14  want to make sure we get to.

15         One is with respect to the choice of law analysis.  We

16  think Defendants completely misstate the holding of *Setty* and the

17  relationship between *Setty* and *Franklin* and the import of the *GE*

18  *Energy* case.  So I'd like to address that.

19         And then also that the -- we think that the law is

20  pretty clear that if it's not going to be federal common law,  it

21  would be Singapore law, not -- not California law before we get to

22  that.

23         Secondly, that under -- Mr. Conrad is right that each

24  party claims that there are three bodies of law, but the outcome

25  is the same, and (indiscernible) each side says that would win.

1            I'd like to address something that was not raised
2    clearly in the briefing and that is a very key point, and that is
3    that California courts, in addition to what was described in the
4    brief of the outcome only being arbitration only being compelled
5    where there is a relationship between the signatories and the non-
6    signatories, there is a 2020 California Court of Appeal case
7    called *Jarboe* which makes explicit that the distinction between
8    cases where arbitration is compelled based on equitable estoppel
9    and those where it is not, there is the existence of what the
10   court called an integral relationship between the non-signatories
11   and the signatories.  And the integral relationship language isn't
12   used for the first time in *Jarboe*.  It comes from the *Metalclad*
13   case which is one of the cases that Defendants rely on heavily,
14   and that's also cited in the *Kramer* federal case that they rely
15   on.

16           And the importance of the *Jarboe* case is that it makes
17   clear that the integral relationship between the signatories and
18   the non-signatories is a key portion of the California standard.
19   The *Jarboe* case --

20           THE COURT:  Why -- let's say that was the standard.  As
21   you know, I don't -- I don't know whether I'm going to adopt
22   California's rule of decision, but whether it's California or
23   federal, there's a question to -- if I adopt the federal common
24   law, there's a question to be decided about whether -- the
25   relationship between the claims and the agreement is sufficient or

1    whether there needs to be a relationship between the parties as

2    well, the second prong, which is very similar to the -- a prong

3    under California that you're describing.

4            Why isn't test met here?  Armstrong is an investor in

5    both companies.  Joyce is actually a signatory to the agreement.

6    The allegation is that Armstrong and his new entities set out

7    directly to frustrate the ability of MouseBelt to -- to get the

8    benefit of this new company.  What is it that's missing from the

9    relationship between these parties such that you don't think this

10   prong of the test is met?

11           MR. CHIKOVANI:  Your Honor, what's missing is, first,

12   that it doesn't fit into any of the categories that have been

13   recognized by the courts as forming a sufficient relationship

14   which usually involves either something -- a relationship that

15   existed at the time of the signing of the contract, such as the

16   non-signatory party being referenced in the agreements.  That was

17   not the case at the time.  None of the non-signatory parties had

18   -- had any involvement with MouseBelt or knowledge of them.  And

19   you'll hear that Patrick Joyce as an individual is not a party.

20   And so ResearchHub -- and ResearchHub did not exist at that time

21   when Patrick Joyce --

22           THE COURT:  The fact -- the fact that Patrick Joyce was

23   aware of these agreements is enough to support a waiver claim, but

24   he is not sufficient -- but because he's a non-signatory --

25   because he's not a named party, the parties in this case are not

1   close enough to satisfy that prong?

2           MR. CHIKOVANI:  That's correct, Your Honor.  They're --

3   they're two completely different types of relationships.   The

4   relationship that we're relying on with respect to the waiver

5   argument is that in his current role as ResearchHub chief

6   operating officer, Patrick Joyce's knowledge is imputed to

7   ResearchHub.  That is very different from ResearchHub having a

8   relationship to the contract and relationship that existed between

9   MouseBelt and Knowledge.

10          And what the courts focus on is whether the relationship

11  was of such a nature that it would be inequitable for the party,

12  the signatory party that's resisting arbitration, to refuse to now

13  arbitrate with the non-signatory parties.   And the only

14  relationship that any of the non-signatory parties have with

15  MouseBelt is that of an alleged third party wrongdoer.  The

16  allegation is that these parties came and interfered with the

17  contract at a later date.  There was no relationship at the time

18  the contract was signed and there was no subsequent acceptance by

19  MouseBelt or any of those third parties into the relationship,

20  say, "Okay, we're now going to allow you, you know, into -- into

21  our deal with Knowledge" such that it would be equitable to allow

22  those parties to take advantage of the arbitration clause.

23          And -- and under federal common law, the courts are

24  quite clear that where the alleged relationship is certainly that

25  of an alleged third party wrongdoer, as here, that third party

1    wrongdoer cannot take advantage of equitable estoppel to compel

2    arbitration.

3            And -- and, third, with respect to the waiver argument,

4    I would like to address that in some detail.  To -- at the outset,

5    I'd like to note that to the extent the Court was concerned that

6    MouseBelt had not responded to the Defendants' arguments that

7    there was a confidentiality clause or that there was a lack of

8    knowledge, we haven't had an opportunity to do that prior to now.

9    Those are arguments that were first raised by Defendants on their

10   reply.  So I would like to -- to respond to those arguments and

11   address those.

12           So with respect to Defendants' statements about federal

13   common law, we agree with Your Honor that the most straightforward

14   answer for that federal common law applies is that Defendants have

15   invoked federal question jurisdiction unambiguously in their

16   notice of removal.  So we're in agreement on that point.

17           However, even if that had not been the case and even if

18   the Court were to conclude that subject matter jurisdiction here

19   is only under diversity, the distinction that Defendants try to

20   draw to the holding of *Setty* is contradicted both by the direct

21   reasoning of *Setty* and the policies that *Setty* relied on.

22           So as to the first point, for its holding that the --

23   that federal common law applies to the equitable estoppel

24   analysis, the *Setty* court cites directly to the *Case Del Caffe*

25   decision out of the Ninth Circuit.  And while *Casa Del Caffe* was

1    not an equitable estoppel case, the Court relies on *Casa Del Caffe*

2    for the principle that because of the New York Convention, we

3    should apply federal common law.

4          In *Case Del Caffe*, the substantive claims there were

5    state law claims.  So it made no sense for the *Setty* court to rely

6    so directly on the *Casa Del Caffe* decision if its holding was

7    indeed meant to be limited only to federal substantive claims.

8          Secondly, the underlying policy analysis also suggests

9    there should be no distinction between whether the underlying

10   claims arise under federal law or state law to determine whether

11   federal common law applies.  The key point is the presence of the

12   New York Convention and the removal.  It's the New York Convention

13   that provides a federal issue and federal policy that gives rise

14   to the application of federal common law.

15         THE COURT:  You're probably going to win that point.

16         MR. CHIKOVANI:  Okay, Your Honor.  And so I won't -- I

17   won't belabor it.

18         THE COURT:  I mean, I think the issue with *Setty* is not

19   with the part that you're talking about.  I think I'm likely to

20   choose federal common law, as I may have signaled in my discussion

21   with Mr. Conrad.

22         I'm likely to choose that as the basis of decision.  The

23   more -- the more opaque question that arises about -- upon reading

24   *Setty* is I don't -- I don't -- I part ways with the Plaintiff when

25   it says *Setty* incorporated the standards in *Mundi*.  I mean, it --

1    I think it cites *Mundi*, but it doesn't anywhere -- anywhere -- in

2    the *Setty* opinion reference the prong of the arbitrability test

3    that there has to be any kind of relationship between the parties.

4    All *Setty* says -- and I should actually pull it up so I don't

5    misspeak.  Give me a second to do that.  All it says is for

6    equitable estoppel to apply, it is "essential that the subject

7    matter of the dispute is intertwined with the contract providing

8    for arbitration."  And it cites a 2013 Ninth Circuit case called

9    *Rajogopalan*.  It doesn't -- I really wish the court, when it sat

10   down to draft that opinion, had said "The test is holding" -- and

11   then said what the test was -- so that we could be certain that

12   the only element that has to be satisfied is the one that it

13   identifies in this order.

14        So I'm acknowledging to you that that law -- I think the

15   most common sense interpretation of *Setty*, to the extent that it

16   sets out a standard, is that -- is that equitable estoppel is

17   available where there is -- where the subject matter of the

18   dispute is intertwined with the contract providing for

19   arbitration.  It is another interpretation of that opinion to say

20   maybe there are additional elements that need to be satisfied, but

21   the *Setty* court didn't need to reach them because it found that

22   one wasn't satisfied.  Right?

23        So that's -- that's, in my own thinking, probably the

24   biggest ambiguity in this motion.  And by the way, this is a great

25   motion.  This is a great motion.  It's very interesting.  There's

1  a lot of moving parts.  It's very well-briefed on both sides.

2  It's a little frustrating because after I read all the cases and

3  my law clerk has done and write the order, I'd like to be pretty

4  certain we're going to be affirmed if it goes up, and there really

5  isn't enough guidance here.  Whichever -- whichever way we go,

6  we're going to be a little bit walking into new territory.

7       But I wonder what -- I wonder -- I don't know if I'm

8  asking you something.  Maybe I'm just telling you something, which

9  isn't good judicial practice.  I guess what I'm telling you is I

10  don't -- I don't see *Setty* importing *Mundi* whole cloth or

11  importing any test for *Mundi*.  I just don't see that.  And so for

12  me, once we decide the rule of decision is federal common law,

13  what's left from *Setty* is here are the conditions under which

14  equitable estoppel is available and I really see *Setty* standing on

15  its own.  And you're welcome to try to talk me out of that.

16       MR. CHIKOVANI:  Thank you, Your Honor.  Thanks for the

17  opportunity to address that question, and we agree that it's an

18  important one.  And I would also agree with you that the correct

19  way to interpret *Setty* is that the court never got to the question

20  of whether there was a sufficient relationship between the

21  signatories and the non-signatories because it resolved the

22  application of equitable estoppel in the negative before it got to

23  that step.

24       THE COURT:  Uh-huh.

25       MR. CHIKOVANI:  We do think that reading the -- reading

1  the cases, the body of case law as a whole makes very clear that

2  such a relationship between the signatories and the non-

3  signatories is required in order to compel arbitration.  And

4  that's based on a couple of different lines of cases.

5           One is --

6           THE COURT:  Give me your two best cases on that point.

7           MR. CHIKOVANI:  Well, Your Honor, I would -- I would say

8  that the Second Circuit cases that are -- the Second Circuit case

9  relied on --

10          THE COURT:  Like *Sokol*?

11          MR. CHIKOVANI:  *Sokol* is --

12          THE COURT:  Yeah.

13          MR. CHIKOVANI:  -- directly on point with this case.  It

14  involved a non-signatory party that was --

15          THE COURT:  I read *Sokol*.

16          MR. CHIKOVANI:  Yes.  I just want the names of two

17  cases.

18          MR. CHIKOVANI:  Your Honor, let me give you -- let me

19  give you one that is not cited in our briefs and refers to a

20  response to something that Defendants claimed in their reply brief

21  which is all of the district court cases that we've cited that

22  rely on *Sokol* and *Ross*, the other leading Second Circuit case, are

23  old and predate *Kramer* and, because of that, are irrelevant.

24          There's a case from January of this year called *Oasis*

25  *Media, Inc.* -- that's 2022 Westlaw 2189616 out of the Central

1  District --

2           THE COURT:  What's the name -- what's the name of the

3  plaintiff again in that case, please?

4           MR. CHIKOVANI:  Yes, Your Honor.  Oasis Media, Inc.

5           THE COURT:  Oasis Media.  Okay.

6           MR. CHIKOVANI:  Yes, *v. Biocia, Inc.*  And that was a

7  case that cited *Mundi* as the applicable standard and said the

8  *Mundi* standard incorporates *Sokol*, so we require --

9           THE COURT:  Is *Oasis Media* a Convention case?

10          MR. CHIKOVANI:  I don't believe so, Your Honor.  I

11 believe it was a case that was applying federal common law.

12          THE COURT:  Okay.

13          MR. CHIKOVANI:  Because of the presence of federal

14 cases.  And what the court said there was that under both

15 California and federal common law, equitable estoppel requires an

16 integral relationship between the party with whom the plaintiff

17 agreed to arbitrate and the non-signatory seeking to invoke

18 arbitration.

19          And for that, the court relied on *Mundi* and it also

20 cited the *Jarboe* California case that has the integral

21 relationship language.  And it cited as the types of relationships

22 that are sufficient --

23          THE COURT:  Mr. Chikovani, --

24          MR. CHIKOVANI:  Yes, Your Honor.

25          THE COURT:  -- am I correct in imagining that Mr. Conrad

1  is hearing the words *Jarboe* and *Oasis* for the first time this

2  afternoon?  I don't mean in his life; I just mean in the context

3  of this case.

4                  MR. CHIKOVANI:  Those cases are not -- they are not

5  cited in our opposition brief.

6                  THE COURT:  Is the answer to my question -- is the

7  answer to my question yes?

8                  MR. CHIKOVANI:  Well, I -- I can't presume to know

9  whether Mr. Conrad has heard of those cases.  He should have heard

10 in particular the *Jarboe* case.

11                 THE COURT:  Please stop.  This is just taking too long.

12                 MR. CHIKOVANI:  That's --

13                 THE COURT:  Did you -- did you or someone at your firm

14 make the other side aware of these cases before today?

15                 MR. CHIKOVANI:  We did not, Your Honor.

16                 THE COURT:  Okay.  So word to the wise, it just slows us

17 down a little bit because one of two things is true.  The cases

18 are pretty good for you.  They actually will affect the Court's

19 thinking or not.  Those are the two possibilities.  If it's the

20 first one, your opponents really need a chance to respond.  And

21 since I haven't read the cases yet, 'cause I didn't know about

22 them either, I don't know which one it is.

23                 And so I probably need to give Mr. Conrad a right to,

24 you know, address these cases briefly in something short in

25 writing after the hearing.  So in the future, if you know that

 1   there are matters you want to bring to the Court's attention that
 2   you didn't have an opportunity to bring in the brief, it's a great
 3   idea just, you know, 30 hours before the hearing to send an email
 4   to your opponent and say, "Just so you know, I'm going to be
 5   citing these cases."  Then I can -- then I can rule more quickly.
 6            But, anyway, go ahead.  I'm actually going to pull up
 7   *Oasis* while we're sitting here talking.
 8            MR. CHIKOVANI:  Fair enough, Your Honor.  We'll -- I'll
 9   take that in future practice, and we would appreciate the
10   opportunity for Defendants to address these cases.  We would ask
11   for an opportunity to address them further as well in that
12   situation.  But we do think that both of those cases, in
13   particular *Jarboe*, is important to -- to the Court's analysis.
14            But the -- the bottom line, Your Honor, is that all of
15   the case that Defendants -- the other cases that Defendants rely
16   on, there's no case where arbitration was compelled based on
17   equitable estoppel in the absence of the kind of relationship
18   between the signatories and the non-signatories.  That is absent
19   here.
20            I would note that that includes the *Franklin* case out of
21   the Ninth Circuit that Defendants rely on extensively.  The court
22   there cited as the applicable standard the *Kramer* case and it
23   recited a version of the California law standard that did not
24   include as an element a relationship, but then in its holding
25   saying the Ninth Circuit prior to *Franklin* had never compelled

1    arbitration based on equitable estoppel.  They said, We

2    acknowledge we're doing this for the first time.  And they said,

3    What's different here from *Kramer* and *Murphy* and the other cases

4    where we didn't compel arbitration is that the relationship

5    between the signatories and the non-signatories is qualitatively

6    different than it was in those other cases.

7            So I believe it's quite clear that all of the cases

8    point to the importance of relationship.

9            THE COURT:  Very good.

10           MR. CHIKOVANI:  And, Your Honor, at the -- at the risk

11   of overkill on a point that we did address, I just wanted to note

12   that the application of federal common law comes -- is dictated by

13   the application of the Supreme Court's test in the *Boyle* (ph) case

14   which sets out a two-part test for when there is a sufficient

15   federal interest for federal common law to apply.  That was cited

16   indirectly in *Setty*.  *Setty* cited a Seventh Circuit case called

17   *Argonaut Insurance* and the *Argonaut Insurance* case goes into

18   detail for why the Supreme Court's *Boyle* test directs the

19   application of federal common law.

20           I wanted to address with respect to the waiver argument,

21   Your Honor.  The Defendants, in responding to the waiver argument,

22   they (indiscernible) by never claiming that they did not have

23   knowledge of what to arbitrate.  All that the Defendants --

24           THE COURT:  Whose burden is it?

25           MR. CHIKOVANI:  -- said in their brief --

1          THE COURT:  Whose burden is it?

2          MR. CHIKOVANI:  Well, Your Honor, the question of burden

3  is also an interesting one that I wanted to address.  It is our

4  burden.

5          THE COURT:  Okay.

6          MR. CHIKOVANI:  But if I may --

7          THE COURT:  Mr. Chikovani, it's just a tic I have.  If

8  I ask somebody a simple question that's a predicate to something

9  else, the sooner we can figure out the answer to that question,

10  the sooner we can get to the good stuff.  So it's your burden.

11          MR. CHIKOVANI:  Yes, Your Honor.

12          THE COURT:  And the question I -- and we can -- and at

13  some point you can say whatever you like about what they have not

14  put in the record.  But my question is:  What is the affirmative

15  evidence that would support a finding of waiver other than the

16  fact that Joyce knew?  What's the other affirmative evidence?

17          And on the issue of Joyce, why isn't the combination of

18  this confidentiality agreement and the statement citation fatal to

19  the argument that Joyce has knowledge somehow hurts the Defendants

20  here?

21          MR. CHIKOVANI:  Well, yes, Your Honor.  If I can address

22  kind of the specific point of the confidentiality -- the

23  application of the confidentiality provision and the -- the

24  statement provision, the case that Defendants cite for that

25  proposition is completely inappposite here, which I believe the

1   Court will see upon reviewing it.   It was a trade secrets
2   misappropriation case --
3           THE COURT:  What's the case called?  I mean, I can look
4   it up, but if you know it, --
5           MR. CHIKOVANI:  I do, Your Honor.  It is --
6       (Pause.)
7           I'm sorry, Your Honor.  I don't -- I don't seem to have
8   it in my notes.  I will --
9           THE COURT:  Is it *Droeger v. Welsh Sporting Goods*
10  *Corporation*, Ninth Circuit (1976)?
11          MR. CHIKOVANI:  I believe so, Your Honor.  Yes.
12          THE COURT:  Okay.
13          MR. CHIKOVANI:  Yes.
14          THE COURT:  That's a *See Also* cite, which -- which the
15  old law review editor in me takes as a signal of weakness.  I
16  think you're really hanging your hat on that restatement
17  provision.  That's the way I read that paragraph.
18          MR. CHIKOVANI:  Yes, Your Honor.  And we -- we did a
19  search of whether any California court had adopted that particular
20  restatement provision in the decision and we did not find one.  So
21  -- and, you know, Defendants are claiming that this issue is -- is
22  governed by California law.
23          More generally, Your Honor, the issue here is that
24  either Defendants actually knew about the existence of the
25  arbitration clause because they did talk to Patrick Joyce about

1    it, or they had every reason to suspect that there was an

2    arbitration clause and then intentionally avoided asking about it

3    until they'd taken their shot at the merits issues in state court.

4    And it was only after getting unfavorable decisions in the state

5    court that they initiated any discussion about getting a copy of

6    the agreements.  And within the course of that, they never said,

7    The reason we're asking for this is because we think we might need

8    to compel to arbitrate.

9            THE COURT:  What is it about the facts and circumstances

10   of this particular commercial dispute that would give rise as a

11   matter of law to inquiry notice on the -- on the existence of an

12   arbitration provision?

13           MR. CHIKOVANI:  Well, Your Honor, it would be that --

14   just about every commercial contract these days contains an

15   arbitration clause.  It would also be that --

16           THE COURT:  Do you understand that if I ruled for you on

17   that basis, I would be saying that in every commercial dispute,

18   everybody's on inquiry notice that there's an arbitration

19   provision?  I don't think -- I don't think I'm being hyperbolic.

20           MR. CHIKOVANI:  Well, I don't -- I don't think the

21   ruling needs to be that broad, Your Honor.  Our particular point

22   here is that Coinbase is a particularly sophisticated party when

23   it comes to litigation.  Their very sophisticated in-house

24   department in Coinbase in the last six years has been involved in

25   no fewer than nine cases, seven in federal court, two in state

1  court, where they compelled arbitration.  It simply
2  (indiscernible) belief that Coinbase's first analysis of this
3  complaint didn't include, Hey, is there an arbitration clause
4  here?  And it's pretty -- and it's also undisputed that from the
5  point that they received the complaint, six months passed until
6  they made any inquiry about getting a copy of the agreements.  And
7  in those intervening six months, they lost the primary demurrer on
8  the merits almost entirely, and then they brought a second
9  demurrer, and it was right after they lost that second demurrer
10 and whereafter they filed an answer in state court, which we'd
11 also note is -- is an easier thing to do than having to file an
12 answer in federal court.  It was right after they did that they
13 compelled arbitration.

14         So I think that is a lot of grounds to infer that
15 Defendants had knowledge of the agreements and failed to pursue
16 it.  And I would note that there is at least one case that -- on
17 very similar facts on waiver where a defendant also said, We
18 didn't have a copy of the agreement itself, so the obligation to
19 seek arbitration, didn't realize until we got a copy of the
20 document, and the court in that case rejected that, and that's the
21 *Jallo v. Resurgent Capital Services* case out of the Eastern
22 District of Texas that's cited in our opposition brief.

23         And there, the court said that the defendant had a
24 reason to know that there was probably an arbitration clause at
25 issue and they could have asked for a copy of the agreement.  They

1   could have pursued informal discovery.  They could have at least

2   raised the issue that they would intend to seek arbitration.  And

3   by  failing  to  do  that,  that  those  were  actions  that  were

4   inconsistent  with  the  right  to  arbitrate  and  created

5   (indiscernible).

6           THE  COURT:   Mr. Chikovani, you've been going for a

7   substantial period of time.  I would invite you to begin to bring

8   the ship back into the harbor.

9           Mr. Putterman, did you want to say something?

10          MR. CHIKOVANI:  Thank you, Your Honor.

11          MR. PUTTERMAN:   I did, Your Honor, with the Court's

12  permission.  There's one other important point there.

13          THE COURT:  No, no.  Please stop.  Please stop.  If you

14  want to make some argument, you wait until counsel who has the

15  microphone is done with his argument and if there's something you

16  want to say, you can ask the Court at that time.  Please don't

17  interrupt.

18          MR. PUTTERMAN:  Very good, Your Honor.

19          THE COURT:  Mr. Chikovani, go ahead.

20          MR. CHIKOVANI:  Thanks, Your Honor.  I wanted to note

21  that Defendants rely heavily on cases that say that a party

22  arguing for waiver bears a heavy burden because waiver is a

23  disfavored doctrine.  All of those cases predate the Supreme

24  Court's decision earlier this year in *Morgan*, which was cited in

25  our opposition, and the specific thing that the Supreme Court did

1    there was remove the prejudice requirement of the waiver test.
2    But more generally, what Justice Kagan wrote in that decision was
3    that with respect to applying procedural rules like waiver, it's
4    not appropriate to put a thumb on the scale in that analysis based
5    on the federal policy in favor of arbitration.   A doctrine of
6    waiver has to be applied even-handedly just like it would in a
7    non-arbitration case.   So to the extent that Defendants are
8    relying on the heavy burden language from older cases, which they
9    cite several times in their reply brief, I would note that that is
10   inapplicable.
11           MR. CONRAD:  May I respond, Your Honor?
12           THE COURT:  Yes.  Mr. Chikovani, have you completed your
13   remarks?
14           MR. CHIKOVANI:  Oh, I did also want to -- to address the
15   application of Singapore law and why Singapore law applies under
16   an  applicable  choice  of  law  analysis,  with  Your  Honor's
17   permission.
18           THE COURT:  All right.  I would note for the parties
19   it's getting on ten to 3:00.  We're just a district court.
20   Anyway, go ahead.
21           MR. CHIKOVANI:  Fair enough, Your Honor, and I'll try to
22   keep it as short as possible.  And this is -- this is an issue
23   that is generally -- were addressed in the briefs.  The parties
24   addressed there's multiple different choice of law analyses that
25   could  apply  --  both  the  federal  common  law  standard  and  the

1   California courts usually follow the restatement analysis which

2   respects choice of law clauses when analyzing arbitration

3   agreements and which choice of law should apply to procedural

4   questions.  And we would in particular point the Court to the

5   *Motorola Credit Corporation* case out of the Second Circuit, that

6   is cited in our opposition brief, where the court succinctly put

7   that "If the non-signatory wants to invoke the arbitration clauses

8   in the grievance at issue, they must also accept the choice of law

9   clauses that govern those agreements."

10          So to the extent that the Court is not applying federal

11  common law, the next law to be applied is Singapore law which has

12  an even narrower equitable estoppel doctrine than federal common

13  law.

14          THE COURT:  I'll read the case.

15          MR. PUTTERMAN:  Your Honor, if Mr. Chikovani is

16  finished, may I make my comment?

17          THE COURT:  Yes.

18          MR. PUTTERMAN:  With regard to the knowledge of the

19  agreements, in our opposition brief we pointed out that there was

20  correspondence from opposing counsel stating that they had been

21  aware that Mr. Joyce had the agreements but were honoring

22  confidentiality.

23          They then asked us for copies of the agreements in June

24  of 2022.  At no time between the filing of the complaint and June

25  of 2022 did they ever simply ask us to stipulate or agree or give

1  permission for Mr. Joyce to provide them with the agreements.

2          THE COURT:  If I were to cite that fact in an order,

3  would I not be implying that they had some affirmative obligation

4  to make that request?

5          MR. PUTTERMAN:  Well, Your Honor, if they felt that they

6  had to ask us for the agreements, yes.  The answer is yes.  They

7  did have an affirmative obligation.

8          THE COURT:  I'm not aware of any authority for that.

9          MR. PUTTERMAN:  I understand, Your Honor, but --

10         THE COURT:  All right.

11         MR. PUTTERMAN:  -- it is --

12         THE COURT:  But I have the argument.

13         MR. PUTTERMAN:  It is circumstantial evidence of

14  willingful ignorance.

15         THE COURT:  Fair enough.  Mr. Conrad?

16         MR. CONRAD:  Thank you, Your Honor.  Just briefly on the

17  waiver points and then I want to focus on the issues that the

18  Court has raised regarding the application of federal common law.

19         The standard --

20         THE COURT:  I'm really interested in this -- on this

21  *Motorola* point that given that federal common law is the first

22  principle's rule of decision, that in federal common law case the

23  court is supposed to respect choice of law, if I had that in my

24  mind from my notes -- I'd have to go back and re-read it.  So if

25  you have an off-the-cuff response to that point, it would be

1  helpful to me.

2        MR. CONRAD:  My off-the-cuff response to that is that

3  it's inconsistent with *In re Henson* which says that you don't

4  apply the choice of law provision, but instead you apply law to

5  the forum state.  I think that's --

6        THE COURT:  Yeah.

7        MR. CONRAD:  -- the governing authority.

8        THE COURT:  Okay.

9        MR. CONRAD:  The --

10        THE COURT:  *Motorola*'s a Second Circuit case.  Okay.

11  Yeah.

12        MR. CONRAD:  Things are different in the Second Circuit

13  on a number of different levels in this case.

14        The Court focused in on what the standard is under

15  federal common law as articulated by the Ninth Circuit and asked

16  what their best case was.  And so I want to address that issue

17  because I think it reinforces our claim that there isn't a

18  qualitative difference between what happens under federal common

19  law and what happens under state law.

20        And for that proposition, I'd urge the Court to look at

21  the *Kramer* decision (2013), which cited --

22        THE COURT:  Is this the one that in Footnote 5 just

23  says, "Look, here's what *Setty* said"?

24        MR. CONRAD:  Correct.

25        THE COURT:  I'm not sure -- I love the footnote -- I

1    love the clarity of the footnote.  Anyway, I've read it.

2           MR. CONRAD:  Okay.  In that case, what the Court seems

3    to be grappling with is what to do with *Setty* which comes along

4    and doesn't really grapple with any of this.

5           THE COURT:  Right.

6           MR. CONRAD:  And in thinking through that question, what

7    I would urge the Court to do is look at what the *Setty* court

8    actually did.  In its penultimate paragraph, the *Setty* court says

9    two things.  Number one, "Here, the claims have no relationship

10   with the partnership deed contained in the arbitration agreement

11   at issue in this appeal."  The first thing.

12          Number two, "Moreover, any allegations of misconduct by

13   the signatory are not fully intertwined with SS Bangalore's claims

14   against SS Mumbai."

15          In other words, what *Setty* did in the final -- in the

16   final analysis, what *Setty* did is it applied the same two tests

17   that are required under California law, and that makes sense.

18   Because despite all of the confusion in this area of

19   jurisprudence, what -- what the law teaches us under both

20   California and the federal law common standard is that the closer

21   you get to an agreement, the less appropriate it is for you to

22   invoke the benefits of the agreement and ignore the other

23   requirements of it.

24          THE COURT:  Yeah.

25          MR. CONRAD:  And on that point, what I want to focus on

 1    are some of the allegations in the complaint.  We spelled them out

 2    in the --

 3              THE COURT:  You're going to win this point.

 4              MR. CONRAD:  Okay.  On --

 5              THE COURT:  If I were you, I'd take the snap and take a

 6    knee.  I want to ask you about something else.

 7              MR. CONRAD:  Okay.

 8              THE COURT:  So I skimmed Judge Gee's in *Oasis Media*

 9    while I was sitting here.  It's unfair for me to do that because

10    I'm the judge and so I don't have to get ready to make another

11    argument.  I can go off on these thoughts while you are -- you are

12    preparing to address the Court.  But one of the things she says in

13    there -- she has a fairly restrictive vision of the kind of

14    relationship there needs to be between the parties before

15    equitable estoppel is available.  And at one point, she writes

16    that, "Generally, the doctrine requires some sort of corporate

17    relationship to a signatory party; that is, involving

18    subsidiaries, affiliates, agents, and other related business

19    entities."  But she cites a 2008 Second Circuit case called *Ross*

20    for that proposition.

21              I'm unlikely to adopt Judge Gee's language without

22    something else persuading me that I should do that just because

23    the language strikes me as being more restrictive than other party

24    relationship cases that I've read.

25              And so with that lengthy introduction, my question for

1   you, Mr. Conrad, is what's the case, or maybe two cases, that you

2   think best describe the -- if I decide that there needs to be a

3   relationship between the parties in addition to some proximity

4   between the allegations in the complaint and the agreement -- like

5   everybody agrees that's -- got to find that.  But if I also

6   conclude that there's another element you have to satisfy and that

7   is some degree of proximity between the parties, which cases do

8   you think the Court should go to to get the test for how close

9   those parties need to be?  I apologize if that was too rambling.

10  If it wasn't clear, let me know.

11          MR. CONRAD:  I understand the question.  I don't have a

12  ready answer for a case that articulates that relationship.  I

13  would appreciate -- I tried to keep up with Your Honor's

14  (indiscernible) and I clicked on a wrong case and decided to

15  listen to the argument instead.  I would accept Your Honor's

16  invitation to file a very brief response to the *Jarboe* and the

17  *Oasis Medical* cases so that we could address this question.

18          What I would say is that I think it is easy when you

19  read a lot of these cases to distinct from any idea that

20  affiliates and parents and subsidiaries and other people,

21  including directors and so forth, it's easy to --

22          THE COURT:  That's the easy case.

23          MR. CONRAD:  It's easy to synthesize from them that, oh,

24  these cases are about related parties.  But they're not.  If they

25  were, the courts could easily articulate that standard and they

1  haven't.

2          THE COURT:  Yeah.  I don't need -- what I don't need is

3  further briefing on whether I should have that as a second

4  element.  I think the briefs already address that.  If there's

5  going to be -- well, anyway, let me -- let me let you wrap up and

6  I'm going to order a little further briefing and then I'm going to

7  take this -- and then we'll end the hearing.

8          MR. CONRAD:  Sure.  I guess the last point I would make

9  on that question is that if the Court reviews the types of

10 relationships where estoppel has been applied, there are a lot of

11 cases applying estoppel where the relationship is much more

12 attenuated than this.  For example, Judge Davila's decision in

13 *Torbit*.  I think this Court's --

14         THE COURT:  And say the name of the plaintiff again in

15 the case.

16         MR. CONRAD:  Torbit, I believe, T-o-r-b-i-t.  And that

17 was a (indiscernible) case.

18         THE COURT:  Yeah.

19         MR. CONRAD:  Where like this one, where the Plaintiff

20 contracted the competitor and the competitor invoked --

21 successfully invoked the arbitration clause.

22         The idea that Armstrong and, by extension, Coinbase

23 because that's the only extension to Coinbase that existed, are --

24 are complete strangers is belied -- even at the time of the

25 execution of these agreements is belied by the Plaintiffs'

1  allegations.  I'd urge the Court to look at paragraph 44 of the

2  first amended complaint where what MouseBelt alleges is in May of

3  2019, Joyce brought Armstrong into the fold and he knew he was

4  interested in investments.  And they intro- -- not only that, but

5  they introduced Armstrong to MouseBelt and made MouseBelt aware of

6  Armstrong's interest in the company.  And the date of the second

7  SAFE agreement is May 28th, 2019.  Of course it was foreseeable.

8  Of course it was all wrapped up in the relationship here between

9  Joyce and Armstrong.

10       So I -- with that, I will rest and hear the Court's

11  description of what it would like in supplemental briefing.

12       THE COURT:  I'm going to stop the clock there.  It's Mr.

13  Conrad's burden on the motion, so he is entitled to -- also in

14  terms of total time on the microphone.  I'm confident Mr. Conrad

15  did not have more than his share, so we're going to go ahead and

16  stop there.

17       I think I would like for Plaintiffs to file something --

18  four pages is probably enough, frankly -- but let's make it five

19  just because four sounds so mingy.  And I'll hope the parties

20  write -- well, anyway, you get the point.  Five pages including --

21  five pages addressing any authorities that the Plaintiffs cited to

22  the Court, and then the Defendants can respond to that.  A week

23  from today is the 22nd.  I have -- I have never -- I won't say

24  never.  "Never" is a long time.  I do not recall having ever made

25  something due a week between Christmas Day and New Year's Day.  So

1    unless the -- because I think people have other things to do.

2    Unless the Plaintiff would object, I would simply remove that week

3    from the calculus and have the -- Defendants' response due January

4    5th.   If the Plaintiff feels that that's -- there's something

5    unfair about that, I'm happy to extend their time.  I like my rule

6    about not making things due during that week so much that I would

7    work hard not to break it.

8              MR. CHIKOVANI:  No objection here, Your Honor.

9              THE COURT:  All right.  Very good.  So I'll hear from

10   the Plaintiff on the 22nd.   I'll hear from the Defendant on

11   January the 5th.  And at that point, the motion will stand under

12   submission.

13             MR. CONRAD:  Thank you, Your Honor.  The one item of

14   housekeeping that I would raise in closing is that there's

15   additionally a remand motion pending which the Court took off

16   calendar for next week.   I don't precisely know the Court's

17   thinking in connection with all of that, but I --

18             THE COURT:  If I send you to arbitration, the motion's

19   moot.

20             MR. CONRAD:  Certainly.

21             THE COURT:  That's the thinking.

22             MR. CONRAD:  If you -- if you don't, I would only note

23   that there are additional procedural aspects to the case,

24   including an appeal of the decision regarding arbitrability that

25   we would want an opportunity to raise before that remand motion is

1  decided.

2         THE COURT:  Nothing makes us happier than when the

3  parties send a joint email to Ms. Lee requesting the prompt

4  setting of a case management conference, so that tool is available

5  to you.

6         MR. CONRAD:  Thank you, Your Honor.

7         THE COURT:  All right.  Thank you, all.  That concludes

8  this hearing.

9         MR. CHIKOVANI:  Thank you very much, Your Honor.

10     (Proceedings adjourned at 3:03 p.m.)

11

12         I, Peggy Schuerger, certify that the foregoing is a

13  correct transcript from the official electronic sound recording

14  provided to me of the proceedings in the above-entitled matter.

15

16  _____*Peggy Schuerger*_____          December 24, 2022_____
    Signature of Approved Transcriber    Date
17
    Peggy Schuerger_____
18  *Ad Hoc Reporting*
    Approved Transcription Provider
19  for the U.S. District Court,
    Northern District of California
20

21

22

23

24

25