CONSTANCE J. YU (SBN 182704)
E-mail: cyu@plylaw.com
DONALD J. PUTTERMAN (SBN 90822)
E-mail: dputterman@plylaw.com
GEORGE CHIKOVANI (SBN 254437)
E-mail: gchikovani@plylaw.com
ELLEN P. LIU (SBN 280459)
E-mail: eliu@plylaw.com
PUTTERMAN | YU | WANG LLP
345 California Street, Suite 1160
San Francisco CA 94104-2626
Tel: (415) 839-8779
Fax: (415) 737-1363

Attorneys for Plaintiff
MOUSEBELT LABS PTE. LTD

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA (OAKLAND)

| | |
|---|---|
| MOUSEBELT LABS PTE. LTD, | Case No.  4:22-cv-04847-JST |
| Plaintiff, | **DECLARATION OF DONALD J. PUTTERMAN IN SUPPORT OF PLAINTIFF MOUSEBELT LABS PTE. LTD'S ADMINISTRATIVE MOTION REQUESTING HEARING ON POSSIBLE BREACH OF DUTY OF CANDOR BY DEFENDANTS' COUNSEL** |
| v. | |
| BRIAN ARMSTRONG, RESEARCHHUB TECHNOLOGIES, INC., RESEARCHHUB, LLC, COINBASE, INC., COINBASE ASSET MANAGEMENT, INC., d/b/a COINBASE VENTURES, and DOES 1-25, inclusive, | *Local Rule 7-11* |
| Defendants. | Judge: Honorable Jon S. Tigar |
| | Complaint Filed: December 17, 2021 |
| | Notice of Removal Filed: August 24, 2022 |

CASE NO. 4:22-cv-04847-JST

DECLARATION OF DONALD PUTTERMAN ISO PLAINTIFF'S ADMINISTRATIVE MOTION REQUESTING
HEARING ON POSSIBLE BREACH OF DUTY OF CANDOR BY DEFENDANTS' COUNSEL

## DECLARATION

I, DONALD J. PUTTERMAN, declare:

1. I am an active member of good standing of the State Bar of California and a partner at the law firm of PUTTERMAN | YU | WANG LLP, attorneys for Plaintiff MouseBelt Labs PTE, LTD. ("MouseBelt"). I have personal knowledge of the facts stated therein, and if required, could and would competently testify thereto.

2. After the December 15, 2022 oral argument on Defendants' Motion to Compel Arbitration. with the onset of holidays and vacations and while awaiting the Court's decision, MouseBelt's counsel had this matter on the back-burner.  In late January 2023, after among other things reviewing correspondence between Durie Tangri and MouseBelt's former counsel, considering all the facts and circumstances (including the specific language used by Defendants' counsel in their written papers and oral argument, and that language  apparently intended to imply; and the absence of any affirmative declarations denying knowledge by other counsel, and researching carefully counsel's duty of candor to opposing counsel and the court), I drafted a letter to Defendants' counsel addressing their statements to MouseBelt and to the Court regarding their knowledge of the arbitration clauses in the SAFE Agreements.

3. On February 7, 2023, my office sent a letter to all counsel of record regarding the SAFE Agreements. The letter requested a response on or before February 10, 2023. Attached hereto as **Exhibit A** is a true and correct copy of the letter.

4. On February 10, 2023, at approximately 5:40 p.m., I emailed counsel for all Defendants, noting we had received no responses to the February 7 letter, and that I would be circulating shortly a Zoom invitation for 11 a.m. Monday, February 13, to provide Defendants final opportunity to meet-and-confer before taking the issue raised in my letter to the Court. Attached hereto as **Exhibit B** is a true and correct copy of the email.

5. On February 13, 2023, at approximately 7 a.m., I received an email from Mark Conrad, counsel for Defendants Coinbase, Inc., Coinbase Asset Management, Inc., D/B/A/ Coinbase Ventures, responding to my February 7 letter and February 10 email. Mr. Conrad's email stated, in relevant part, that the Coinbase Defendants would not be providing a substantive response to the

February 7 letter, and were not interested in meeting and conferring: "We likewise reject the idea that we are required to engage with you any further on any of the subjects raised in your letter." Attached hereto as **Exhibit C** is a true and correct copy of the email.

6. At approximately 10:10 a.m. on February 13 I responded to Mr. Conrad's email, inquiring whether any of the Defendants' counsel intended to attend the 11 a.m. Zoom conference. At approximately 10:24 a.m., Miriam Kim, counsel for Defendant Brian Armstrong, replied stating that "Counsel for Brian Armstrong agrees with Mark Conrad's email and does not plan to attend the Zoom conference." At approximately 10:27 a.m., Eugene Novikov, counsel for Defendant ResearchHub Technologies, Inc., responded "Likewise for ResearchHub." Attached hereto as **Exhibit D** is a true and correct copy of this email chain.

7. Attached hereto as **Exhibit E** is a true and correct copy of a letter from Daralyn J. Durie, counsel for ResearchHub, to Zachary Kelman, former counsel to MouseBelt, dated August 21, 2020.

8. Attached hereto as **Exhibit F** is a true and correct copy of the reporter's transcript for the December 15, 2022 hearing on Defendants' Motion to Compel Arbitration.

I declare the foregoing to be true and correct under penalty of perjury of the laws of the United States. Executed this 15th day of February, 2023.

*/s/ Donald J. Putterman*
DONALD J. PUTTERMAN

DECLARATION OF DONALD PUTTERMAN ISO PLAINTIFF'S ADMINISTRATIVE MOTION REQUESTING
HEARING ON POSSIBLE BREACH OF DUTY OF CANDOR BY DEFENDANTS' COUNSEL

EXHIBIT A

Putterman | Yu | Wang LLP

345 California Street, Suite 1160
San Francisco, CA 94104
Tel. 415.839.8779 | Fax. 415.737.1363

Donald J. Putterman
dputterman@plylaw.com
DD. 415.839.5202

February 7, 2023

<u>Via Email</u>

Miriam Kim
Virginia Grace Davis
MUNGER, TOLLES & OLSON LLP
650 Mission Street
San Francisco, CA 94105-2907
Miriam.kim@mto.com
Grace.davisfisher@mto.com

Jordan D. Segall
MUNGER, TOLLES & OLSON LLP
350 South Grand Ave., 50th Floor
Los Angeles, CA 90071-3426
Jordan.segall@mto.com

Daralyn J. Durie
Eugene Novikov
Raghav Krishnapriyan
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105
Ddurie@mofo.com
Enovikov@mofo.com
Rkrishnapriyan@mofo.com

Kira A. Davis
W. Henry Huttinger
MORRISON & FOERSTER
707 Wilshire Boulevard, Suite 1000
Los Angeles, CA 90017-3543
Kiradavis@mofo.com
Hhuttinger@mofo.com

Felipe Corredor
Mark R. Conrad
CONRAD METLITZKY KANE LLP
Four Embarcadero Center, Suite 1400
San Francisco, CA 94111
Fcorredor@conmetkane.com
Mconrad@conmetkane.com

Re:   <u>*MouseBelt Labs PTE. LTD v. Brian Armstrong et al.* Case No. CGC-21-597202;
      SAFE Agreements</u>

Dear Counsel:

    During the course of litigating Defendants' Motion to Compel Arbitration, Defendants and
their counsel have avoided affirmatively representing to the Court that they did not know of the

Putterman | Yu | Wang LLP

February 7, 2023
Page 2

Agreements' arbitration terms, prior to Mousebelt's production of the Agreements on August 10, 2022. Instead, filings submitted by ResearchHub's counsel, Mark Conrad's Declaration and Mr. Conrad's oral argument have focused on MouseBelt's August production to *imply* that ResearchHub, the other Defendants and their counsel were not previously aware of the Agreements' arbitration provisions.  We are concerned that Defendants and their counsel have not been forthright with the Court concerning whether Defendants knew of the arbitration provisions incorporated in the MouseBelt-Knowledgr Accelerator and SAFE Agreements (the "Agreements"), before MouseBelt's production of the Agreements in August 2022. We write to request that you clarify this issue.

The following facts and circumstances prompt our concern:

- In June or July 2019, Patrick Joyce disclosed information from the Agreements to Brian Armstrong, at a minimum including Mousebelt's investment in Knowledgr. *See* First Amended Complaint ("FAC"), ¶¶ 75-76. He did so while ignoring Mousebelt's request that he obtain an executed Non-Disclosure Agreement from Mr. Armstrong before sharing Knowledgr confidential information with Mr. Armstrong. FAC, ¶¶ 59-65.

- On July 29, 2020, Zachary Kelman, another counsel for MouseBelt, wrote Mr. Armstrong c/o ResearchHub.  Mr. Kelman made certain allegations concerning events involving Knowledgr, Mr. Joyce, Mr. Armstrong and ResearchHub. Mr. Kelman's letter did not mention the Accelerator or SAFE Agreements, or their terms. Ms. Durie responded to this letter as ResearchHub's counsel on August 21, 2020. Among other things, her letter stated: "To our understanding, Mousebelt provided slightly more than $300,000 in funds to Knowledgr in connection with two SAFE Agreements." Mousebelt's investment was a term of the confidential Agreements, meaning Ms. Durie either saw or was informed of at least some of the Agreements' terms.

- Mousebelt's original Complaint was filed on December 17, 2021, including references to the Agreements and some of their terms.

- At no time thereafter, until June 23, 2022, did any of the Defendants or their respective counsel inquire concerning the Agreements, from which the inference could be drawn that they already had the Agreements or knew of their terms.

- At no time did any of the Defendants or their counsel request that Mousebelt consent to Mr. Joyce sharing the Agreements with the Defendants and their counsel.  This failure raises the same inference stated above.

Putterman | Yu | Wang LLP

February 7, 2023
Page 3

- After motion practice in the Superior Court and the filing of the First Amended Complaint, on June 7, 2022, the Conrad Melitztky firm substituted in for Goodwin Procter as counsel for the Coinbase Defendants.  We do not know what, if anything, Conrad Melitztky knew or was told (by either Goodwin Procter, its predecessor as Coinbase's counsel, or by other defense counsel), or what the other Defendants or their counsel previously knew concerning the arbitration provision.  According to Mr. Conrad (at oral argument), at some point Mr. Joyce was being advised by some (unidentified) personal counsel, indicating at a minimum, continuing access for assistance to Mr. Joyce.

- Sixteen days later, on June 23, 2022, Mark Conrad requested that MouseBelt produce the Accelerator and SAFE Agreements. This reflected diligence by Coinbase's new counsel *if, but only if,* they did not already have the Agreements or know their terms, but if so, this belated request underscored the unexplained prior lack of diligence by all Defendants and their counsel prior to that date. MouseBelt's counsel agreed to Mr. Conrad's request, subject to receiving Knowledgr's consent.  On June 28, Felipe Corredor, one of Coinbase's counsel, sent MouseBelt's counsel a consent letter signed by Mr. Joyce.

- During the course of these ongoing communications, on August 8, 2022, I asked Mr. Corredor if it was his position that Mr. Joyce and Mr. Armstrong did not have copies of the Agreements. Mr. Corredor responded that neither Mr. Armstrong nor Coinbase had copies of the Agreements, and that "Joyce is not a party to this case; while he does have the agreements, he is bound by confidentiality obligations (which he previously agreed in writing he would waive in connection with a production by Mousebelt)." However, as described above, Mr. Joyce previously had disclosed information from the Agreements to Mr. Armstrong and apparently to Ms. Durie, ignoring MouseBelt's request that he obtain an NDA from Mr. Armstrong.  Moreover, although Mr. Corredor responded on behalf of Mr. Armstrong, whom he did not and does not represent, he said nothing about ResearchHub.  Mr. Armstrong was a founder and officer of *both* ResearchHub and Coinbase; if he received or saw the Agreements or knew their terms in either capacity, that should have been disclosed

- On July 27, 2022, MouseBelt served discovery on ResearchHub and other Defendants. MouseBelt's Special Interrogatories Nos. 40 and 41, respectively, asked ResearchHub to identify all communications between ResearchHub and any other person concerning MouseBelt, and to identify all documents obtained by ResearchHub or anybody acting on its behalf from Patrick Joyce, and which concerned Mousebelt and Knowledgr. MouseBelt's Requests for Production of Documents, Nos. 3, 4 and 35, respectively, asked for production of all documents, including all communications, concerning Knowledgr; all documents received by ResearchHub or Armstrong from Joyce; and all documents, including all communications, concerning MouseBelt.

Putterman | Yu | Wang LLP

February 7, 2023
Page 4

- On July 20, 2022, Mr. Corredor asked for a 30-day extension of time for Defendants to respond to the Special Interrogatories.  As a professional courtesy, MouseBelt's counsel extended the time to respond to September 9, 2022.  On August 11, Mr. Corredor requested the courtesy of an extension for Defendants to respond to MouseBelt's Requests for Production of Documents to September 9, 2022.  That professional courtesy also was granted.  Ultimately, Defendants did not respond to any of the foregoing discovery, because they removed the case to federal court on August 24, 2022.
We believe the requests for extensions were made knowing that Defendants planned to remove the case to federal court and move to compel arbitration, and therefore would not be responding to MouseBelt's discovery, including the specific discovery identified above.

- After the parties agreed to a confidentiality stipulation, MouseBelt's counsel produced the Agreements to Coinbase's counsel on August 10, 2022.

- On behalf of all Defendants, ResearchHub – through its counsel Durie Tangri -- prepared and submitted the Notice of Removal.  Paragraph 21 of the Notice of Removal represented: "Plaintiff filed its Complaint on December 17, 2021, and produced the Agreements to Defendants on August 10, 2022."  That careful wording did not state that MouseBelt's production of the Agreements was the first time Defendants became aware of the arbitration provisions.

- On September 6, 2022, on behalf of all Defendants, Research Hub submitted Defendants' Motion to Compel Arbitration.  The accompanying Memorandum of Points and Authorities did not address the period of time which had elapsed since the original Complaint was filed on December 17, 2021.  It only alluded in footnote 1 to MouseBelt's alleged delay in producing the Agreements.  ResearchHub and the other Defendants did anticipate MouseBelt would raise delay and waiver as an issue, since also on September 6, the Conrad Melitztky firm simultaneously submitted Mr. Conrad's Declaration purporting to show *Conrad Melitztky*'s diligence in attempting to obtain production of the Agreements from Mousebelt.  It did not discuss, explain or excuse any other Defendants' lack of diligence described above.

- In particular, Mr. Conrad's Declaration did *not* state that production of the Agreements was the first time the Defendants had seen the Agreements or become aware of the arbitration terms.  Although ResearchHub's counsel were involved in this matter for much longer than Mr. Conrad's firm and were responsible for briefing the motion to compel arbitration, Durie Tangri submitted no separate declaration on behalf of ResearchHub.  Similarly, no separate declaration was submitted on behalf of Mr. Armstrong by his counsel, Munger, Tolles & Olson.

Putterman | Yu | Wang LLP

February 7, 2023
Page 5

- Notwithstanding that ResearchHub's counsel had drafted the papers, Mr. Conrad (the defense counsel with the shortest tenure on the case) presented Defendants' oral argument.  On the subject of waiver, Mr. Conrad argued in pertinent part: "I will only add that we did exercise diligence.  We were careful, and it would have been reckless of us to have acted otherwise. . . .. There were the constraints that Your Honor mentioned on Mr. Joyce's ability to share information, and counsel represented him in an individual capacity to share information. . . ..  And as soon as we got the agreement [sic], we removed the case and sought arbitration and this is not case about effectively prejudice.  It's a case about knowing derogation—the derogation in (indiscernible) conduct with respect to known rights, and the rights simply weren't known.  It would be irresponsible for me as an officer of the Court to have done anything other than what we did."  Transcript, 12:17-13:5.  Mr. Conrad thus expressly discussed only his firm's request and receipt of the Agreements from MouseBelt, not prior knowledge of other Defendants and their counsel – as to whom he *hinted* or *implied,* without expressly stating (and perhaps thereby seeking to avoid making a false statement or a statement for which he did not know if there was a basis for making), that there was no prior knowledge. No other counsel argued, and the Court did not ask any questions about Defendants' knowledge prior to the August 10, 2022, production of the Agreements.

- Defendants' Reply in Support of Motion to Compel Arbitration (again prepared by ResearchHub's counsel), responding to the waiver argument in Mousebelt's Opposition, stated as follows at pages 6-7:[1]

  > "Mousebelt fails to meet its "heavy burden" because Defendants removed to this Court and filed the present motion **promptly after Mousebelt produced the Agreements** . . .. Although Mousebelt relied extensively on the Agreements in its complaint . . . there is no dispute that it did not attach them to either of its complaints and did not produce them until nine months in the case, at which Defendants promptly removed.

  > Ninth Circuit cases are unequivocal that there can be no finding of waiver in the absence of an ability to exercise that right, **which Mousebelt ensured Defendants lacked.** [citations omitted]

  > . . . There is certainly no basis to conclude that **Armstrong or the Coinbase Defendants, who are even further removed from Joyce, had the Agreements,** particularly where the record establishes (and Mousebelt offers no evidence to contradict) that

[1] Deleting the discussion of whether Mr. Joyce's knowledge could be imputed to ResearchHub, which is not a subject of this letter.

Putterman | Yu | Wang LLP

February 7, 2023
Page 6

they did not obtain them, and therefore could not exercise their right to compel arbitration, until just before they removed the case to federal court.

**Mousebelt is reduced to arguing that 'Defendants implicitly admitted that at least ResearchHub had the agreements all along' because their response to an inquiry from Mousebelt did not expressly disclaim ResearchHub's knowledge . . . In fact, Mousebelt simply did not ask about ResearchHub. That Mousebelt is forced to mischaracterize Defendants' response to the question is posed as an admission that ResearchHub was aware of the Agreements highlights how far Mousebelt is from being able to satisfy it's 'heavy burden' to show waiver."** Emphasis added.

These assertions yet again were unaccompanied by any declarations confirming that none of the Defendants or their counsel knew of the Agreements' arbitration terms prior to MouseBelt's production. Such declarations would have been simple, *if* they could have been truthfully made; and, based on the sophistication and practice level of the law firms involved, it is inconceivable that they would not have done so, *if* they could have been truthfully made. Instead, the absence of such declarations combined with the Durie firm's statement that "[i]n fact, **Mousebelt simply did not ask about ResearchHub,**" suggests Defendants and their counsel believe that even if they did have prior knowledge of the arbitration terms, they were not obligated to disclose such knowledge unless Mousebelt (or presumably, the Court) asked exactly the right question, notwithstanding that through footnote 1 of the original Motion, Mr. Conrad's Declaration, the Reply and Mr. Conrad's oral argument, Defendants simultaneously were implying to the Court that none of the Defendants knew of the arbitration provisions prior to MouseBelt's production.

*If* Defendants had such prior knowledge, and *if* Defendants believe they were not obligated to disclose that knowledge while implying the contrary in their papers and oral argument unless they were directly asked, we respectfully disagree. Our position is that withholding from the Court such highly-material information while implying the contrary was true, would violate counsel's professional duty of candor to the Court. As stated by the Ninth Circuit:

"It is the duty of an attorney to . . . employ, for the purpose of maintaining the causes confided to him or her those means only as are consistent with the truth, and *never seek to mislead the judge or any judicial officer by an artifice or false statement of fact or law.*" Business and Professions Code, § 6068(d). "An attorney does not simply act as an advocate for his client; he is also an officer of

Putterman | Yu | Wang LLP

February 7, 2023
Page 7

the court.  As such, an attorney has a duty of good faith and candor in dealing with the judiciary," including non-disclosure of material facts.

*United States v. Associated Convalescent Enterprises, Inc.*, 766 F.2d 1342, 1346 (9th Cir. 1985) (trial counsel properly sanctioned for not disclosing prior knowledge that he government had identified him as a witness list and was therefore conflicted, until one day prior to trial when he asked to be disqualified, thereby delaying trial and causing additional costs to be incurred); *quoted in Mohazzabi v. Wells Fargo Bank,* 2022 WL 595878 (February 28, 2022, N. D. Cal.) (Tigar, U.S.D.J.) *3.

Silence can violate the duty of candor even regardless of an attorney's duty of confidentiality to the client. In *ING Bank, FSB v. Ahn*, 2010 WL 4807078 (November 19, 2010 N.D. Cal.) *1 (Henderson, U.S.D.J.), counsel remained silent about his client's inability to pay when the court appointed a special Discovery Master, and was criticized severely by Judge Henderson:  "When communicating with the Court about this or any other matter, **counsel** owes a **duty** of **candor**.  California law makes it a misdemeanor to intentionally mislead or deceive, conduct that is also proscribed by the state's rules of professional conduct. [citation omitted] A State Bar of California committee has held that silences violates the **duty** of **candor** under some some circumstances.  This is true even where an attorney owes a simultaneous **duty** of confidentiality to the client. . . . '[i]f the attorney's silence appears to be relied upon by the court as an affirmation . . ., the attorney is obligated by the duty of candor to inform the court that the silence is not intended as an affirmation . . ..'" Emphasis in original.  *E.g.*, *In re Central European Indus. Development Co., LLC*, 2009 WL 779807 (As amended, February 15, 2009 Bk. Ct. N.D. Cal.)(Montali, U.S.B.J.), *6 ("Furthermore, it is settled that concealment of material facts is just as misleading as explicit false statements, and accordingly, is misconduct calling for discipline," *citing to, inter alia, di Sabatino, supra,* and *Grove v. State Bar of Cal.*, 63 Cal.2nd 312, 315 (1965).) The existence of a joint defense agreement likewise does not excuse non-compliance with the duty of candor.  *U.S. v. McCabe*, 323 Fed.Appx. 580, 581 (9th Cir. 2009). The same duty of candor also applies when counsel is communicating with opposing counsel. *In re Central European Indus. Development Co., LLC*, 2009 WL 779807, *supra*, *6, *citing Hallinan v. State Bar of Cal.* (1948) 33 Cal.2nd 246, 249.

Specifically with regard to the issue raised herein, counsel cannot avoid the duty of candor by asserting the court failed to ask 'the right question.' In *Di Sabatino v. State Bar*, 27 Cal.3d 159, 162-163 (1980), the Supreme Court affirmed state bar discipline as appropriate where the attorney, after twice unsuccessfully requesting reduction of bail for clients, successfully approached the after-hours bail commissioner with the same request but did not disclose that he had made two prior requests which had not been granted.  The Supreme Court stated:

Putterman | Yu | Wang LLP

February 7, 2023
Page 8

Petitioner contends that the question of whether he failed to disclose the information regarding the two prior bail motions is irrelevant because the commissioner knew or should have known that bail had been set. He argues that he had no duty to make such disclosures because he was entitled to assume that the commissioner had sufficient knowledge of criminal law to realize that the question of bail must have been addressed in the court appearance he referred to. It is petitioner's position that the commissioner would have asked if he had been concerned about whether there had been any prior bail proceedings.

We find petitioner's position untenable. An attorney is obligated to "employ, for the purpose of maintaining the causes confided to him such means only as are consistent with truth, and never to seek to mislead the judge or any judicial officer by an artifice or false statement of fact or law." (Bus. & Prof. Code, s 6068, subd. (d); see also rule 7-105, Rules Prof. Conduct, for a similar statement.) The quoted statute "unqualifiedly require(s) an attorney to refrain from acts which mislead or deceive the court." (Sullins v. State Bar (1975) 15 Cal.3d 609, 620-621, 125 Cal.Rptr. 471, 478, 542 P.2d 631, 638.) It is settled that concealment of material facts is just as misleading as explicit false statements, and accordingly, is misconduct calling for discipline. (Grove v. State Bar (1965) 63 Cal.2d 312, 315, 46 Cal.Rptr. 513, 405 P.2d 553; Sullins v. State Bar, supra, 15 Cal.3d at p. 622, 125 Cal.Rptr. 471, 542 P.2d 631; Davidson v. State Bar (1976) 17 Cal.3d 570, 574, 131 Cal.Rptr. 379, 551 P.2d 1211.)

**Petitioner clearly had an affirmative duty to inform Commissioner Ziskrout fully and completely as to all relevant facts and circumstances regarding his request for bail reduction. The fact that the commissioner could have asked about the existence of prior bail reduction motions does not relieve petitioner of his duty of disclosure.** It is disingenuous to suggest that a bail commissioner asked to take after hours action would consider it irrelevant that two prior motions for bail reduction had been denied.

*Id.*, at 162-163.  Footnotes omitted.  Emphasis added.

In *Levine v. Berschneider*, 56 Cal.App.5th 916 (2020), after a settlement between landlord and tenant, tenant's counsel filed a motion to enforce the judgment for an alleged failure to pay the amount due under the settlement.  Four days before the scheduled hearing, tenant's counsel received payment in full, but did take the motion off calendar.  Unsuspecting landlord's counsel did not attend the hearing.  Tenant's counsel appeared at the hearing, told the court he had not

Putterman | Yu | Wang LLP

February 7, 2023
Page 9

"heard" from landlord's counsel, did not inform the court that he had received payment in full, and stood silent while the court held landlord's counsel in contempt and sanctioned him.  Landlord's counsel moved for relief and for sanctions against tenant's counsel. Tenant's counsel opposed sanctions on the ground, *inter alia*, that he had said nothing at the June 7 hearing that was false, "because the trial court never asked him whether he received the settlement checks." *Id.*, at 919.

The superior court held tenant's counsel in contempt for his lack of candor and sanctioned him, and the court of appeal affirmed, opining:

> In his briefs on appeal, and again at oral argument, appellant protested that he made no false or misleading statements to the trial court because the judge never asked whether he had received the settlement checks. . . .. According to appellant, the trial court judge had a duty to ask whether the settlement had been paid, if that fact was important to the judge. We wholeheartedly reject this reasoning. **It was not the trial court's duty to inquire whether any material fact had changed since appellant filed the motion. Instead, appellant's duty of candor required him to inform the court that the settlement had been paid.**
>
> An attorney is an officer of the court and owes the court a duty of candor. [citations omitted] This means that, "A lawyer shall not ... knowingly make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer." (Rules Prof. Conduct, rule 3.3(a)(1).) In a similar vein, section 6068 of the Business and Professions Code explains that every attorney has a duty "never to seek to mislead the judge or any judicial officer by an artifice or false statement of fact or law." (Bus. & Prof. Code, § 6068, subd. (d).)
>
> The duty of candor is not simply an obligation to answer honestly when asked a direct question by the trial court. It includes an affirmative duty to inform the court when a material statement of fact or law has become false or misleading in light of subsequent events. [citations omitted]
>
> In *Grove v. State Bar of California* (1965) 63 Cal.2d 312, 46 Cal.Rptr. 513, 405 P.2d 553, our Supreme Court dealt with an attorney who was less than candid with the trial court. The attorney was twice informed by opposing counsel that he could not attend a certain hearing. The attorney allowed the trial court to believe that the matter was uncontested. The offending attorney "contends that the failure to convey ... [opposing counsel's] request for a continuance does not constitute misleading 'the judge or any judicial officer by an artifice or false statement of fact or law.' (Bus. & Prof.

Putterman | Yu | Wang LLP

February 7, 2023
Page 10

> Code, section 6068, subd. (d).) There is no merit to this contention. **The concealment of a request for a continuance misleads the judge as effectively as a false statement that there was no request. No distinction can therefore be drawn among concealment, half-truth, and false statement of fact. [Citation.] 'It is the endeavor to secure an advantage by means of falsity which is denounced.'** [Citation.]" (*Id.* at p. 315, 46 Cal.Rptr. 513, 405 P.2d 553.)

> So here. Counsel's decision to not tell the trial court that he had received "word" from opposing counsel was a concealment and a "half-truth." This violates the attorney's obligation as an officer of the court to be candid with the court. This was intended to secure an advantage and it worked, temporarily. Counsel had received the settlement checks. This is not an insignificant fact. Every trial court hearing a similar motion would want to be apprised of this development.

*Id.*, at 921-922. Emphasis added. *See also In re Glumetza Antitrust Litigation*, 2021 WL 1817092 (May 6, 2021 N.D. Cal.) (Alsup, U.S.D.J.) *16, *quoting Levine.*

Possession of the Agreements and/or knowledge of the arbitration provisions prior to August 10, 2022, was highly material to MouseBelt's defense of waiver to the motion to compel, especially given Defendants' avoidance of MouseBelt's discovery and their efforts to imply without actually affirming they had no such possession or knowledge,  If any of Defendants or their counsel either had the Agreements or knew of the arbitration provisions in the circumstances described herein, they had a duty of candor to disclose such possession or knowledge to the Court. Hence, the reason for this letter.

We respectfully request that all defense counsel to whom this letter is addressed, on behalf of themselves and their clients, respond to the following questions:

1.  Did they have a copies or copies of the Agreements, have access to the Agreements or had they seen the Agreements, at any time prior to August 10, 2022?  If so, when?

2.  Were they aware of the existence of the arbitration provisions, whether directly or by having been told that such provisions existed, at any time prior to August 10, 2022?  If so, when?

The foregoing are simple and direct questions, calling for simple and direct answers. If any of you do not unequivocally deny such possession, access or knowledge, including by either refusing to answer or by evading a direct answer, we immediately will be taking this matter up with the Court.

Putterman | Yu | Wang LLP

February 7, 2023
Page 11

    We are also copying Mr. Chatterjee of Goodwin Procter, Coinbase's former counsel, to request that he respond as well if he is willing to do so.  We acknowledge that Goodwin Procter was no longer Coinbase's counsel when the events described above occurred, and therefore presumably did not participate in any conduct which may have misled the Court; but Goodwin Procter's knowledge, if any, would be imputed to Coinbase.  For that reason, if we must take this issue to the Court and the Court determines further inquiries are appropriate, questions may be directed to Goodwin Procter.

    We would appreciate your responses by no later than the close of business on Friday, February 10, 2023; because the questions are simple and the responses should be equally simple, there is no need for any extensions.

        Thank you for your anticipated cooperation.

Very truly yours,

Donald J. Putterman

CC: nchatterjee@goodwinlaw.com

EXHIBIT B

| | |
|---|---|
| **From:** | Donald Putterman |
| **To:** | miriam.kim@mto.com; grace.davisfisher@mto.com; ddurie@mofo.com; enovikov@mofo.com; rkrishnapriyan@mofo.com; fcorredor@conmetkane.com; mconrad@conmetkane.com; jordan.segall@mto.com; kiradavis@mofo.com; hhuttinger@mofo.com |
| **Cc:** | Vida Yeung; nchatterjee@goodwinlaw.com; Constance Yu; Ellen Liu; George Chikovani |
| **Subject:** | Re: MouseBelt v. Armstrong et al., San Francisco Superior Court Case No. CGC-21-597202 - Official Correspondence |
| **Date:** | Friday, February 10, 2023 5:39:48 PM |

Counsel:

As we have not heard back from you in response to my letter of Tuesday, February 7, I will be circulating shortly a Zoom invitation for 11 AM Monday, February 13, to provide any of you a final opportunity to meet-and-confer before taking the issue raised in my letter to the Court.

Get Outlook for iOS

---

**From:** Vida Yeung <vyeung@plylaw.com>
**Sent:** Tuesday, February 7, 2023 2:35 PM
**To:** miriam.kim@mto.com <miriam.kim@mto.com>; grace.davisfisher@mto.com <grace.davisfisher@mto.com>; ddurie@mofo.com <ddurie@mofo.com>; enovikov@mofo.com <enovikov@mofo.com>; rkrishnapriyan@mofo.com <rkrishnapriyan@mofo.com>; fcorredor@conmetkane.com <fcorredor@conmetkane.com>; mconrad@conmetkane.com <mconrad@conmetkane.com>; jordan.segall@mto.com <jordan.segall@mto.com>; kiradavis@mofo.com <kiradavis@mofo.com>; hhuttinger@mofo.com <hhuttinger@mofo.com>
**Cc:** Donald Putterman <dputterman@plylaw.com>; Vida Yeung <vyeung@plylaw.com>; nchatterjee@goodwinlaw.com <nchatterjee@goodwinlaw.com>
**Subject:** RE: MouseBelt v. Armstrong et al., San Francisco Superior Court Case No. CGC-21-597202 - Official Correspondence

Good afternoon, Counsel,

Please find attached Donald J. Putterman's **Letter to Defense Counsel** for:
*MouseBelt Labs PTE. LTD v. Brian Armstrong et al.* Case No. CGC-21-597202, concerning SAFE Agreements,
dated February 7, 2023.

Let me know if you have trouble opening the .pdf attachment.

Vida Yeung
Office Assistant
Putterman | Yu | Wang LLP
345 California St. | Suite 1160
San Francisco, CA 94104
vyeung@plylaw.com
Office. 415.839.8779 | Fax. 415.737.1363

*******************************************************************

CONFIDENTIALITY
This e-mail and any attached documents may contain confidential and privileged material for the sole use of the intended recipient(s). Any review, use, distribution or disclosure by others is strictly prohibited. If you are not the intended recipient (or authorized to receive the transmittal for the recipient), please contact the sender by reply e-mail [or at (415) 839-8779] and delete all copies of this message.

EXHIBIT C

| From: | Mark Conrad |
|---|---|
| To: | Donald Putterman; miriam.kim@mto.com; grace.davisfisher@mto.com; ddurie@mofo.com; enovikov@mofo.com; rkrishnapriyan@mofo.com; Felipe Corredor; jordan.segall@mto.com; kiradavis@mofo.com; hhuttinger@mofo.com |
| Cc: | Vida Yeung; nchatterjee@goodwinlaw.com; Constance Yu; Ellen Liu; George Chikovani |
| Subject: | RE: MouseBelt v. Armstrong et al., San Francisco Superior Court Case No. CGC-21-597202 - Official Correspondence |
| Date: | Monday, February 13, 2023 7:00:20 AM |
| Attachments: | image001.png |

Mr. Putterman:

We received your February 7 letter.  That letter, like your Friday evening email below, clearly has nothing to do with engaging defense counsel in a meaningful dialogue, but instead is transparently about posturing for the Court.

Your 11-page, single-space letter arrived in our inboxes nearly eight weeks after the hearing on our motion to compel arbitration, and it identifies no reason why you waited two months to raise any of the issues in it and then unreasonably demanded a response within three days. All of the facts and allegations it raises have been known to you for many months, after all.  Instead, your communications are part of an obvious, improper attempt to supplement the record on the issue of waiver, as to which Judge Tigar made it abundantly clear that he believed Plaintiff had failed to carry its burden in opposing Defendants' motion.

Furthermore, while the letter casts aspersions on the conduct of defense counsel, the issues raised in your letter all stem from a problem that is entirely of MouseBelt's own making — namely, its decision to withhold its SAFE contracts from the pleadings it filed, and then its extreme delay in producing those documents based on a purported need to protect the confidentiality of contracts whose material terms it had already publicly disclosed.  We emphatically reject the notion that any of defense counsel acted in any way at any time to mislead or deceive the Court. To the contrary, Judge Tigar's comments at the hearing indicated that he understood full well the state of the factual record on waiver, including the facts and allegations now presented in your 11-page letter, all of which either were (or in any event could have been) highlighted for the Court in Plaintiff's briefing or at oral argument before the motion was submitted.

We likewise reject the idea that we are required to engage with you any further on any of the subjects raised in your letter, and if you decide to seek leave from the Court to present it with additional information or argument on the subject of waiver, please submit this email with anything you file.  You should expect that we will both oppose any effort to submit additional briefing as an untimely attempt to supplement the record based on facts known to or alleged by MouseBelt all along, and that we will defend the conduct of defense counsel, which has complied at all times with our obligations both to the Court and our clients.

Best regards,

Mark Conrad



**From:** Donald Putterman <dputterman@plylaw.com>
**Sent:** Friday, February 10, 2023 5:40 PM
**To:** miriam.kim@mto.com; grace.davisfisher@mto.com; ddurie@mofo.com; enovikov@mofo.com; rkrishnapriyan@mofo.com; Felipe Corredor <fcorredor@conmetkane.com>; Mark Conrad <mconrad@conmetkane.com>; jordan.segall@mto.com; kiradavis@mofo.com; hhuttinger@mofo.com
**Cc:** Vida Yeung <vyeung@plylaw.com>; nchatterjee@goodwinlaw.com; Constance Yu <cyu@plylaw.com>; Ellen Liu <eliu@plylaw.com>; George Chikovani <gchikovani@plylaw.com>
**Subject:** Re: MouseBelt v. Armstrong et al., San Francisco Superior Court Case No. CGC-21-597202 - Official Correspondence

Counsel:

As we have not heard back from you in response to my letter of Tuesday, February 7, I will be circulating shortly a Zoom invitation for 11 AM Monday, February 13, to provide any of you a final opportunity to meet-and-confer before taking the issue raised in my letter to the Court.

Get Outlook for iOS

---

**From:** Vida Yeung <vyeung@plylaw.com>
**Sent:** Tuesday, February 7, 2023 2:35 PM
**To:** miriam.kim@mto.com <miriam.kim@mto.com>; grace.davisfisher@mto.com <grace.davisfisher@mto.com>; ddurie@mofo.com <ddurie@mofo.com>; enovikov@mofo.com <enovikov@mofo.com>; rkrishnapriyan@mofo.com <rkrishnapriyan@mofo.com>; fcorredor@conmetkane.com <fcorredor@conmetkane.com>; mconrad@conmetkane.com <mconrad@conmetkane.com>; jordan.segall@mto.com <jordan.segall@mto.com>; kiradavis@mofo.com <kiradavis@mofo.com>; hhuttinger@mofo.com <hhuttinger@mofo.com>
**Cc:** Donald Putterman <dputterman@plylaw.com>; Vida Yeung <vyeung@plylaw.com>; nchatterjee@goodwinlaw.com <nchatterjee@goodwinlaw.com>
**Subject:** RE: MouseBelt v. Armstrong et al., San Francisco Superior Court Case No. CGC-21-597202 - Official Correspondence

Good afternoon, Counsel,

Please find attached Donald J. Putterman's **Letter to Defense Counsel** for:
*MouseBelt Labs PTE. LTD v. Brian Armstrong et al.* Case No. CGC-21-597202, concerning SAFE Agreements,
dated February 7, 2023.

Let me know if you have trouble opening the .pdf attachment.

Vida Yeung
Office Assistant
Putterman | Yu | Wang LLP
345 California St. | Suite 1160
San Francisco, CA 94104

vyeung@plylaw.com
Office. 415.839.8779 | Fax. 415.737.1363
*********************************************************************

CONFIDENTIALITY
This e-mail and any attached documents may contain confidential and privileged material for the sole use of the intended recipient(s). Any review, use, distribution or disclosure by others is strictly prohibited. If you are not the intended recipient (or authorized to receive the transmittal for the recipient), please contact the sender by reply e-mail [or at (415) 839-8779] and delete all copies of this message.

EXHIBIT D

| | |
|---|---|
| **From:** | Novikov, Eugene |
| **To:** | Kim, Miriam; Donald Putterman; Mark Conrad; Davis Fisher, Grace; Durie, Daralyn J.; Krishnapriyan, Raghav; Felipe Corredor; Segall, Jordan; Davis, Kira A; Huttinger, Henry |
| **Cc:** | Vida Yeung; nchatterjee@goodwinlaw.com; Constance Yu; Ellen Liu; George Chikovani |
| **Subject:** | RE: MouseBelt v. Armstrong et al., San Francisco Superior Court Case No. CGC-21-597202 - Official Correspondence |
| **Date:** | Monday, February 13, 2023 10:27:10 AM |
| **Attachments:** | image001.png |

Likewise for ResearchHub.

---

**From:** Kim, Miriam <Miriam.Kim@mto.com>
**Sent:** Monday, February 13, 2023 10:24 AM
**To:** Donald Putterman <dputterman@plylaw.com>; Mark Conrad <mconrad@conmetkane.com>; Davis Fisher, Grace <Grace.DavisFisher@mto.com>; Durie, Daralyn J. <DDurie@mofo.com>; Novikov, Eugene <ENovikov@mofo.com>; Krishnapriyan, Raghav <RKrishnapriyan@mofo.com>; Felipe Corredor <fcorredor@conmetkane.com>; Segall, Jordan <Jordan.Segall@mto.com>; Davis, Kira A <KiraDavis@mofo.com>; Huttinger, Henry <HHuttinger@mofo.com>
**Cc:** Vida Yeung <vyeung@plylaw.com>; nchatterjee@goodwinlaw.com; Constance Yu <cyu@plylaw.com>; Ellen Liu <eliu@plylaw.com>; George Chikovani <gchikovani@plylaw.com>
**Subject:** RE: MouseBelt v. Armstrong et al., San Francisco Superior Court Case No. CGC-21-597202 - Official Correspondence

==External Email==

---

Counsel for Brian Armstrong agrees with Mark Conrad's email and does not plan to attend the Zoom conference.  Thank you.

Regards,

Miriam Kim

**Miriam Kim | Munger, Tolles & Olson LLP**
560 Mission Street | San Francisco, CA 94105
Tel:  415.512.4041 | Fax:  415.644.6941 | miriam.kim@mto.com | Bio | LinkedIn | www.mto.com

---

**From:** Donald Putterman <dputterman@plylaw.com>
**Sent:** Monday, February 13, 2023 10:10 AM
**To:** Mark Conrad <mconrad@conmetkane.com>; Kim, Miriam <Miriam.Kim@mto.com>; Davis Fisher, Grace <Grace.DavisFisher@mto.com>; ddurie@mofo.com; enovikov@mofo.com; rkrishnapriyan@mofo.com; Felipe Corredor <fcorredor@conmetkane.com>; Segall, Jordan

<Jordan.Segall@mto.com>; kiradavis@mofo.com; hhuttinger@mofo.com
**Cc:** Vida Yeung <vyeung@plylaw.com>; nchatterjee@goodwinlaw.com; Constance Yu
<cyu@plylaw.com>; Ellen Liu <eliu@plylaw.com>; George Chikovani <gchikovani@plylaw.com>
**Subject:** RE: MouseBelt v. Armstrong et al., San Francisco Superior Court Case No. CGC-21-597202 -
Official Correspondence

Does anybody intend to attend the Zoom conference that I scheduled?

Donald J. Putterman
Partner
Putterman | Yu | Wang LLP
345 California St. | Suite 1160
San Francisco, CA 94104
dputterman@plylaw.com
Direct. 415.839.5202 | Cell. 415.794.4473 | Fax. 415.737.1363
**********************************************************************
CONFIDENTIALITY
This e-mail and any attached documents may contain confidential and privileged material for the sole use
of the intended recipient(s). Any review, use, distribution or disclosure by others is strictly prohibited. If
you are not the intended recipient (or authorized to receive the transmittal for the recipient), please
contact the sender by reply e-mail [or at (415) 839-8779] and delete all copies of this message.

---

**From:** Mark Conrad <mconrad@conmetkane.com>
**Sent:** Monday, February 13, 2023 7:00 AM
**To:** Donald Putterman <dputterman@plylaw.com>; miriam.kim@mto.com;
grace.davisfisher@mto.com; ddurie@mofo.com; enovikov@mofo.com; rkrishnapriyan@mofo.com;
Felipe Corredor <fcorredor@conmetkane.com>; jordan.segall@mto.com; kiradavis@mofo.com;
hhuttinger@mofo.com
**Cc:** Vida Yeung <vyeung@plylaw.com>; nchatterjee@goodwinlaw.com; Constance Yu
<cyu@plylaw.com>; Ellen Liu <eliu@plylaw.com>; George Chikovani <gchikovani@plylaw.com>
**Subject:** RE: MouseBelt v. Armstrong et al., San Francisco Superior Court Case No. CGC-21-597202 -
Official Correspondence

Mr. Putterman:

We received your February 7 letter.  That letter, like your Friday evening email below, clearly has
nothing to do with engaging defense counsel in a meaningful dialogue, but instead is transparently
about posturing for the Court.

Your 11-page, single-space letter arrived in our inboxes nearly eight weeks after the hearing on our
motion to compel arbitration, and it identifies no reason why you waited two months to raise any of
the issues in it and then unreasonably demanded a response within three days. All of the facts and
allegations it raises have been known to you for many months, after all.  Instead, your
communications are part of an obvious, improper attempt to supplement the record on the issue of
waiver, as to which Judge Tigar made it abundantly clear that he believed Plaintiff had failed to carry
its burden in opposing Defendants' motion.

Furthermore, while the letter casts aspersions on the conduct of defense counsel, the issues raised in your letter all stem from a problem that is entirely of MouseBelt's own making — namely, its decision to withhold its SAFE contracts from the pleadings it filed, and then its extreme delay in producing those documents based on a purported need to protect the confidentiality of contracts whose material terms it had already publicly disclosed.  We emphatically reject the notion that any of defense counsel acted in any way at any time to mislead or deceive the Court. To the contrary, Judge Tigar's comments at the hearing indicated that he understood full well the state of the factual record on waiver, including the facts and allegations now presented in your 11-page letter, all of which either were (or in any event could have been) highlighted for the Court in Plaintiff's briefing or at oral argument before the motion was submitted.

We likewise reject the idea that we are required to engage with you any further on any of the subjects raised in your letter, and if you decide to seek leave from the Court to present it with additional information or argument on the subject of waiver, please submit this email with anything you file.  You should expect that we will both oppose any effort to submit additional briefing as an untimely attempt to supplement the record based on facts known to or alleged by MouseBelt all along, and that we will defend the conduct of defense counsel, which has complied at all times with our obligations both to the Court and our clients.

Best regards,
Mark Conrad



---

**From:** Donald Putterman <dputterman@plylaw.com>
**Sent:** Friday, February 10, 2023 5:40 PM
**To:** miriam.kim@mto.com; grace.davisfisher@mto.com; ddurie@mofo.com; enovikov@mofo.com; rkrishnapriyan@mofo.com; Felipe Corredor <fcorredor@conmetkane.com>; Mark Conrad <mconrad@conmetkane.com>; jordan.segall@mto.com; kiradavis@mofo.com; hhuttinger@mofo.com
**Cc:** Vida Yeung <vyeung@plylaw.com>; nchatterjee@goodwinlaw.com; Constance Yu <cyu@plylaw.com>; Ellen Liu <eliu@plylaw.com>; George Chikovani <gchikovani@plylaw.com>
**Subject:** Re: MouseBelt v. Armstrong et al., San Francisco Superior Court Case No. CGC-21-597202 - Official Correspondence

Counsel:

As we have not heard back from you in response to my letter of Tuesday, February 7, I will be circulating shortly a Zoom invitation for 11 AM Monday, February 13, to provide any of you a final opportunity to meet-and-confer before taking the issue raised in my letter to the Court.

Get Outlook for iOS

---

**From:** Vida Yeung <vyeung@plylaw.com>
**Sent:** Tuesday, February 7, 2023 2:35 PM
**To:** miriam.kim@mto.com <miriam.kim@mto.com>; grace.davisfisher@mto.com <grace.davisfisher@mto.com>; ddurie@mofo.com <ddurie@mofo.com>; enovikov@mofo.com <enovikov@mofo.com>; rkrishnapriyan@mofo.com <rkrishnapriyan@mofo.com>; fcorredor@conmetkane.com <fcorredor@conmetkane.com>; mconrad@conmetkane.com <mconrad@conmetkane.com>; jordan.segall@mto.com <jordan.segall@mto.com>; kiradavis@mofo.com <kiradavis@mofo.com>; hhuttinger@mofo.com <hhuttinger@mofo.com>
**Cc:** Donald Putterman <dputterman@plylaw.com>; Vida Yeung <vyeung@plylaw.com>; nchatterjee@goodwinlaw.com <nchatterjee@goodwinlaw.com>
**Subject:** RE: MouseBelt v. Armstrong et al., San Francisco Superior Court Case No. CGC-21-597202 - Official Correspondence

Good afternoon, Counsel,

Please find attached Donald J. Putterman's **Letter to Defense Counsel** for:
*MouseBelt Labs PTE. LTD v. Brian Armstrong et al.* Case No. CGC-21-597202, concerning SAFE Agreements,
dated February 7, 2023.

Let me know if you have trouble opening the .pdf attachment.

Vida Yeung
Office Assistant
Putterman | Yu | Wang LLP
345 California St. | Suite 1160
San Francisco, CA 94104
vyeung@plylaw.com
Office. 415.839.8779 | Fax. 415.737.1363
*********************************************************************

CONFIDENTIALITY
This e-mail and any attached documents may contain confidential and privileged material for the sole use of the intended recipient(s). Any review, use, distribution or disclosure by others is strictly prohibited. If you are not the intended recipient (or authorized to receive the transmittal for the recipient), please contact the sender by reply e-mail [or at (415) 839-8779] and delete all copies of this message.


======================================================================
==========


This message may be confidential and privileged. Use or disclosure by anyone other than an intended addressee is prohibited. If you received this message in error, please delete it and advise the sender by reply email. Learn about Morrison & Foerster LLP's Privacy Policy.
.

EXHIBIT E

# Durie Tangri

Daralyn J. Durie
415-362-6666 (main)
ddurie@durietangri.com

August 21, 2020

**VIA EMAIL**

Zachary Kelman
Kelman PLLC
1232 First Avenue, 20600
New York, NY 1012
zachary@kelman.law

Re:   Mousebelt's July 29, 2020 letter to ResearchHub

Dear Mr. Kelman:

As I explained previously, we represent ResearchHub in connection with the allegations raised in your letter of July 29, 2020.  I respond here on behalf of ResearchHub to Mousebelt's July 29 allegations.

ResearchHub denies the allegations and implications of your letter, which is rife with factual and other inaccuracies.

First and foremost, ResearchHub did not strike a deal with Knowledgr's founders or employees to misappropriate trade secrets or intellectual property, and ResearchHub did not misappropriate trade secrets or intellectual property from Knowledgr.  Notably, despite the gravity of Mousebelt's accusation, you cite to no evidence – because there is none – in support of your claim.  Nor did ResearchHub set out to destroy Knowledgr.  Mousebelt has no valid claim against ResearchHub.

Second, to the extent that your letter implies that there is some impropriety in Mr. Joyce's decision to switch jobs, that implication is unfounded.  Mr. Joyce was free to leave Knowledgr; Mousebelt has no claim against ResearchHub based on Mr. Joyce's decision.  Again, Mousebelt cites no evidence in support of its implied accusation.

Third, it is simply ludicrous to suggest that Mousebelt's stake in Knowledgr is conservatively estimated at $13.5 million, based on a valuation of $325 million.  Indeed, the magnitude of the misrepresentation by Mousebelt is such that it casts doubt on all other aspects of Mousebelt's letter.  To our understanding, Mousebelt provided slightly more than $300,000 in funds to Knowledgr in connection with two SAFE agreements.  That does not translate into a $13.5 million equity stake; as best we can tell, those numbers are pulled from thin air in order to attempt to intimidate ResearchHub.  Additionally, because Mousebelt has no valid cause of action against ResearchHub, Mousebelt will not be entitled to attorneys' fees and double damages.

Zachary Kelman
August 21, 2020
Page 2

Fourth and finally, we reject Mousebelt's demand for $7.5 million to avoid litigation.  We are aware of no basis for Mousebelt to file any suit against ResearchHub, much less one that would entitle Mousebelt to damages in excess of $7.5 million.  Should Mousebelt pursue a litigation, we are confident that the evidence would show that ResearchHub did not misappropriate trade secrets.

In conclusion, I hope that this letter has clarified for Mousebelt that its accusations are meritless.  That we have not itemized all reasons why each accusation is wrong does not mean that we agree with any aspect of your letter; to be clear, we do not.

\*          \*          \*

As I note above, Mousebelt has provided no evidence in support of its claims, and we are aware of no such evidence.  If you nevertheless believe that Mousebelt has evidence of its accusations that it could but did not provide, we are happy to review any such materials.  Please send to my attention.

Should Mousebelt instead choose to do as you threaten, and file an objectively baseless suit against ResearchHub, ResearchHub reserves its rights to seek to recover its attorneys' fees and costs from Mousebelt, and to seek any such other relief as is warranted.

To the extent that you believe that we have misunderstood any of Mousebelt's letter, please do not hesitate to contact me.

Very truly yours,

Daralyn J. Durie

EXHIBIT F

Pages 1-41

1                    UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF CALIFORNIA
2                         OAKLAND DIVISION

3
MOUSEBELT LABS PTE. LTD.,        ) Case No.  22-cv-04847-JST
4                                 )
              Plaintiff,          ) Oakland, California
5                                 ) Thursday, December 15, 2022
       v.                         )
6                                 ) ZOOM WEBINAR PROCEEDINGS
BRIAN ARMSTRONG, RESEARCHHUB      )
7  TECHNOLOGIES, INC., RESEARCHHUB,)
LLC, COINBASE, INC., COINBASE    )
8  ASSET MANAGEMENT, INC., d/b/a   )
COINBASE VENTURES, and DOES      )
9  1-25, inclusive,               )
                                  )
10              Defendants.        )
                                  )
11 _____)

12

13                    TRANSCRIPT OF MOTION HEARING
                 BEFORE THE HONORABLE JON S. TIGAR
14               UNITED STATES DISTRICT COURT JUDGE

15

16 APPEARANCES:  (Via Zoom Webinar)

17 For Plaintiff:            DONALD J. PUTTERMAN, ESQ.
                            GEORGE E. CHIKOVANI, ESQ.
18                          Putterman Yu Wang LLP
                            345 California Street, Suite 1160
19                          San Francisco, California 94104
                            (415) 939-8779
20

21

22

23
   **[Additional Counsel on following page]**
24

25 Proceedings recorded by electronic sound recording; transcript
   produced by transcription service.

2

1   APPEARANCES:  (Cont'd.)

2   For Defendant Brian            JORDAN D. SEGALL, ESQ.
    Armstrong:                     Munger, Tolles & Olson LLP
3                                  350 South Grand Avenue, 50th Floor
                                   Los Angeles, California 90071-3426
4                                  (213) 683-9100

5                                  VIRGINIA GRACE DAVIS, ESQ.
                                   Munger, Tolles & Olson LLP
6                                  560 Mission Street, 27th Floor
                                   San Francisco, California 94105-2907
7                                  (415) 512-4000

8   For Defendant ResearchHub:     EUGENE NOVIKOV, ESQ.
                                   Durie Tangri LLP
9                                  217 Leidesdorff Street
                                   San Francisco, California 94111
10                                 (415) 236-6300

11  For Defendant Coinbase:        MARK R. CONRAD, ESQ.
                                   FELIPE CORREDOR, ESQ.
12                                 Conrad Metlitzky Kane LLP
                                   Four Embarcadero Center, Suite 1400
13                                 San Francisco, California 94111
                                   (415) 343-7100
14
    Transcription Service:         Peggy Schuerger
15                                 Ad Hoc Reporting
                                   2220 Otay Lakes Road, Suite 502-85
16                                 Chula Vista, California 91915
                                   (619) 236-9325
17

18

19

20

21

22

23

24

25

3

1    <u>OAKLAND, CALIFORNIA   THURSDAY, DECEMBER 15, 2022   2:00 P.M.</u>

2                                 --oOo--

3       (Call to order of the Court.)

4             THE CLERK:  Your Honor, now calling Civil Matter 22-

5    4847, MouseBelt Labs, Ltd. v. Brian Armstrong, et al.  If counsel

6    could please state their appearances for the record, starting with

7    counsel for Plaintiff.

8             MR. CHIKOVANI:  This is George Chikovani from Putterman

9    Yu Wang appearing for MouseBelt Labs.  And with me is my partner,

10   Donald Putterman.

11            THE COURT:  Welcome.

12            MR. CONRAD:  Good morning, Your Honor.  Mark --

13            MR. PUTTERMAN:  Good afternoon, Your Honor.

14            MR. CONRAD:  -- Conrad on behalf of the Coinbase

15   Defendants, along with my colleague Felipe Corredor from Conrad

16   Metlitzky Kane.  Briefly, let me introduce the other defense

17   counsel.

18            Jordan Segall and Grace Davis Fisher from Munger, Tolles

19   on behalf of Brian Armstrong, and Eugene Novikov from Durie Tangri

20   on behalf of ResearchHub.

21            THE COURT:  Very good.  Welcome.  The matter's on

22   calendar to hear argument on Defendants' motion to compel

23   arbitration and stay litigation.  Who will be arguing for the

24   Defendants this afternoon?

25            MR. CONRAD:  I will, Your Honor.

4

1          THE COURT:  All right.  And who will be arguing for the

2   Plaintiff when we get there?

3          MR. CHIKOVANI:  I will be, Your Honor.

4          THE COURT:  All right.  Mr. Conrad, you have the floor.

5          MR. CONRAD:  Thank you, Your Honor.  Just in terms of

6   table-setting, I think it's important to note that there are four

7   elements in a motion like this to compel arbitration under the New

8   York Convention.  Three of those are undisputedly met.

9          Number one, arbitration --

10         THE COURT:  No.  Let me -- I should interject.  I try to

11  read the briefs before every argument and I did that here.  I read

12  *Mundi*.  I read *Setty*.  I read the case that *Setty* relies on.  I

13  read the *GE* case out of the Supreme Court.  I read the remand case

14  when it went back to the Eleventh Circuit.  There's a very

15  interesting concurrence by Judge Tjoflat, that might be relevant

16  on the question of whether federal common law is the right

17  standard.

18         So I say all that just to encourage the parties to focus

19  on the things where they think they're likely to have the most

20  trouble, and so they should persuade the Court that they're not in

21  trouble, or whatever else you think really is hotly contested.

22         MR. CONRAD:  Thank you, Your Honor.  I appreciate the

23  Court's preparation.  If the Court has questions with specific

24  issues that it is concerned about, I would be glad to address

25  those in the first instance.

1          But let me focus then on the key issue, which is whether

2    non-signatories such as the Defendants in this case can compel

3    arbitration through the equitable estoppel doctrine whereas here

4    a signatory is seeking to take advantage of the contracts that it

5    signs but not abide by all the terms of that as they may have put

6    in the arbitration clause.

7          There are two key disputes, I think, in the analysis

8    here.  The first is a choice of law question.  And then the second

9    is, depending on what law applies to an equitable estoppel

10   question -- and both sides have argued that it doesn't matter what

11   law applies -- they win.

12         Let me start with the choice of law question unless Your

13   Honor would prefer to take them in the reverse order.  We think

14   it's very clear that California law applies.  And let me start

15   with first principles, which is the FAA.  Under Chapter 1 of the

16   FAA, Section 2 requires occupation of state contract law,

17   including equitable principles regarding waiver, regarding

18   equitable estoppel, and so forth.

19         When courts -- and we've cited the *Kramer* case out of

20   the 9th Circuit and numerous cases that have relied on holding

21   that when you adjudicate a motion to compel arbitration under the

22   FAA, you apply state contract law.

23         The other side would have it that all of that changes in

24   the context of Chapter 2 under the New York Convention, and they

25   rely on *Setty* for that.  And I don't think that's correct.  That's

1    inconsistent with the choice of law principles that the Supreme

2    Court has articulated in *Arthur Andersen*.  In the case relied on

3    in the *Arthur Andersen*, Footnote (indiscernible), which was an

4    older case, in which the Supreme Court law contract principles

5    apply, importantly under Chapter 2 of the New York Convention,

6    there is a provision that Congress enacted, which is Section 208

7    of the FAA.  And what that section says is whenever you're

8    evaluating claims under the New York Convention, you apply the

9    same principles that you would apply under Chapter 1.  Which means

10   in this case that the choice of law principles required here

11   demand application of California law.

12           *Setty* is not to the contrary.  *Setty* I will admit is *In*

13   *re Henson* with some ideas expressed in a lot of other Ninth

14   Circuit cases, and I'm not sure how sound the analysis was.  But,

15   in any event, what *Setty* says on its face is when you have a case

16   involving federal claims exclusively -- which this case does not.

17   This case has state law claims exclusively.  When you have a case

18   involving federal claims exclusively, you apply federal common

19   law.  That was the limited holding of *Setty*.  To apply *Setty* in a

20   case like this would expand *Setty* beyond recognition.  It would

21   expend *Setty* beyond what Judge Bale in dissent in *Setty* said that

22   *Setty* was saying.  It would extend *Setty* so far as to -- as to

23   invalidate a host of other cases, such as the *Franklin* case that

24   we cited which *Setty* made no mention of.  So we believe it's very

25   clear that California law applies.

1        And so under that analysis, California law has been held

2   to permit the use of equitable estoppel to compel arbitration by

3   a   non-signatory   under   two   circumstances.     The   first

4   circumstance --

5        THE COURT:  Mr. Conrad, doesn't the Defendants' notice

6   of   removal   under   a   header   that   says   "Basis   for   Federal

7   Jurisdiction"   assert   that   the   Court   has   federal   question

8   jurisdiction because the agreements at issue here fall under the

9   New York Convention?

10       MR. CONRAD:  No.

11       THE COURT:  It doesn't say that?

12       MR.  CONRAD:   It -- it cites -- the header to that

13  section of the notice of removal -- and I have it.  It's on

14  page -- page 3 of the notice.  This is Docket No. 1.

15       "Basis for Removal:  Federal Question."  "This Court has

16  original jurisdiction over the claims against Defendants because

17  those claims are subject to a written international arbitration

18  agreement that falls under the Convention and, as such are deemed

19  to arise under the laws and treaties of the United States."

20       And we cite 9 U.S.C. § 203.  That is for removal

21  jurisdiction.  It does not establish federal question jurisdiction

22  in the sense of the merits of the claims asserted.  So --

23       THE COURT:  All right.  And so -- and so is the sole

24  basis for -- first of all, I'm not aware of the idea that removal

25  jurisdiction and subject matter jurisdiction are different.  It

1   seems that that probably just portrays ignorance on my part, I
2   suppose.  Is the sole basis then for subject matter jurisdiction
3   in this case the diversity of -- diversity?
4         MR. CONRAD:  The basis on which we came to federal court
5   was not diversity.  It was the FAA.  The basis on which we --
6         THE COURT:  I -- I'm going to stop you.  I'm going to
7   stop you.  I'm going to stop you.  I'm going to repeat the
8   question.  I have to know what the basis for federal jurisdiction
9   is in every case.  Do you contend that the basis for federal
10  jurisdiction in this case is solely diversity, or is it also
11  something else?
12        MR. CONRAD:  It is diversity.  The Court has federal
13  subject matter jurisdiction over this case on the basis of
14  diversity.
15        THE COURT:  Only.  Let me read you paragraph 19 of your
16  notice of removal.
17        "The Court also has subject matter jurisdiction over all
18  claims asserted in this case, given the parties' diversity of
19  citizenship."
20        I think the use of the word "also" in that sentence,
21  unambiguously means that it's notice of removal, my reading -- my
22  reading of that notice of removal is correct and that is as of the
23  filing of the notice of removal, Defendants took the position that
24  the Convention was a separate basis for subject matter
25  jurisdiction in the case.

9

1          MR. CONRAD:  Your Honor, we certainly don't deny that

2     the Convention is the basis for getting into federal court.  We

3     don't deny that the Convention was implemented for federal

4     statute.  We are here because of a federal statute.

5          But what the case law teaches us is that when -- and in

6     *Setty*, they didn't say, We're here because the FAA is a federal

7     statute and we'll apply federal common law because it's a federal

8     statute.  What *Setty* said was we'll apply federal common law

9     because there are federal claims at issue, not because of federal

10    jurisdiction.  Otherwise, federal common law would apply in every

11    single case because in every single FAA case, we're in federal

12    court.

13          THE COURT:  Uh-huh.

14          MR. CONRAD:  What *Setty* was when you have federal

15    claims, which in that case was trademark claims, you apply federal

16    common law.  I don't think *Setty*'s consistent with the *Franklin*

17    court's analysis in any event, which it studiously ignored, even

18    though it had been raised in the 28(j) letter to the Court.  But

19    what *Franklin* teaches is that when you've got state law claims,

20    the analysis that you apply for equitable estoppel is state

21    jurisdiction, which is California in this case.

22          In any event, whether the Court applies federal common

23    law or state had California law or, for that matter, Singaporean,

24    although there's less robust jurisprudence that we have on that,

25    equitable estoppel applies here because that is where MouseBelt

1  has pled its claims.

2        The jurisprudence under California law teaches us that
3  "When allegations in claims are intimately intertwined with the
4  concepts and those are relied upon by the plaintiff, the are
5  estopped from seeking the benefits of those claims against third
6  parties."   It also teaches that "When there's substantial
7  interdependent and concerted conduct that are founded in or
8  intimately connected with the obligations of the underlying
9  agreement, the signatory seeking the same claims against non-
10 signatories can be estopped from denying arbitration."

11        That standard is met here and MouseBelt really doesn't
12 even try to deny that that standard is met.   MouseBelt, in
13 paragraph after paragraph after paragraph, relies on the
14 contractual claims, their claims are intertwined with those
15 agreements -- we went claim by claim in our opening brief -- and
16 challenges none of that analysis.

17        They also don't really deny that they've alleged
18 interconnected and interdependent concerted conduct between Joyce,
19 who was the CEO of the company that signed the agreement and who
20 individually signed the agreement in that capacity.   They engaged
21 in concerted actions with the Defendants here.   In fact, they
22 allege that all of the benefits that MouseBelt provided under
23 those contracts flowed directly to the Defendants in this case.
24 In other words, the Defendants got the benefit of MouseBelt's
25 performance under the contract.

1          Under those facts and under that theory, which is the

2   only theory MouseBelt has asserted here in connection with all of

3   its claims, it's clear equitable estoppel principles applied both

4   under California law and in federal common law.

5          I won't go into Singaporean law unless the Court is

6   interested in it.  I think that *In re Henson* is fairly clear that

7   when the FAA refers to state contract law, it refers not to the

8   choice of law clause in the arbitration contract but, rather, the

9   relevant state law principles of the forum state.  In fact, the

10  Ninth Circuit held that the district court in that case erred in

11  relying on the New York choice of law clause and, instead, said it

12  had applied the lower of the forum state, California.

13         So it seems the law here just is off the table.

14         So with that, I will turn back to this final issue which

15  is waiver, unless the Court has any questions on equitable

16  estoppel.

17         THE COURT:  I don't.  I don't.  I think -- I don't.  I

18  don't -- I -- I want to hear your argument.  I don't know that

19  you're going to have huge problems on the question of waiver.  I

20  note that your opponents don't respond to the assertion in your

21  brief, which appears to be uncontested, that Mr. Joyce was subject

22  to a nondisclosure provision that would have made his disclosure

23  of the agreements itself actionable.  They don't challenge your

24  citation to the restatement on that point.  They offer that --

25  that there was some colloquy between counsel and discovery

1  correspondence in which, you know, by negative implication maybe

2  other of your clients had access to these agreements.  But it's

3  their burden to show that you -- to have affirmative evidence that

4  your client was -- anyway, I don't need to be making your argument

5  for you.

6          This isn't -- this isn't the hard part of the case for

7  you.  I'll just say that.

8          MR. CONRAD:  Fair enough.  In that case, I will -- I

9  will add only that we did exercise diligence.  We were careful,

10  and it would have been reckless of us to have acted otherwise.  In

11  order to get into federal court, it requires unanimity in order to

12  remove.  There were the constraints that Your Honor mentioned on

13  Mr. Joyce's ability to share information, and counsel represented

14  him in an individual capacity to share information.  We did our

15  best to honor those obligations notwithstanding the fact that

16  MouseBelt has disclosed all the material terms of the contract in

17  its public filings.  And as soon as we got the agreement, we

18  removed the case and sought arbitration and this is not a case

19  about effectively prejudice.  It's a case about knowing derogation

20  -- the derogation in (indiscernible) conduct with respect to known

21  rights, and the rights simply weren't known.  It would be

22  irresponsible of me as an officer of the Court to have done

23  anything other than what we did.

24          With that, I think we made the key points that we wanted

25  to make with respect to -- to both the choice of law and the

1    equitable estoppel, and I'll reserve some time for rebuttal --

2           THE COURT:  Let me ask you -- I do have a question for

3    you, actually.  Let's say I decided that federal common law is the

4    rule of decision -- and it's not your position, but let's say I

5    went that way.  Do you think that -- oh, never mind.  The question

6    is answered in your brief.  I don't need to bother with it.

7           Mr. Chikovani or Mr. -- Mr. Chikovani.  Yeah.  The

8    microphone is yours.

9           MR. CHIKOVANI:  Thank you very much, Your Honor.  And in

10   light of your direction to defense counsel, I'll focus my argument

11   on the issues that were raised here.  Also, there are -- I'd like

12   to respond to some of those in some detail.  I do just want to, at

13   the outset, say that there's -- there's three key points that we

14   want to make sure we get to.

15          One is with respect to the choice of law analysis.  We

16   think Defendants completely misstate the holding of *Setty* and the

17   relationship between *Setty* and *Franklin* and the import of the *GE*

18   *Energy* case.  So I'd like to address that.

19          And then also that the -- we think that the law is

20   pretty clear that if it's not going to be federal common law,  it

21   would be Singapore law, not -- not California law before we get to

22   that.

23          Secondly, that under -- Mr. Conrad is right that each

24   party claims that there are three bodies of law, but the outcome

25   is the same, and (indiscernible) each side says that would win.

1          I'd like to address something that was not raised

2    clearly in the briefing and that is a very key point, and that is

3    that California courts, in addition to what was described in the

4    brief of the outcome only being arbitration only being compelled

5    where there is a relationship between the signatories and the non-

6    signatories, there is a 2020 California Court of Appeal case

7    called *Jarboe* which makes explicit that the distinction between

8    cases where arbitration is compelled based on equitable estoppel

9    and those where it is not, there is the existence of what the

10   court called an integral relationship between the non-signatories

11   and the signatories.  And the integral relationship language isn't

12   used for the first time in *Jarboe*.  It comes from the *Metalclad*

13   case which is one of the cases that Defendants rely on heavily,

14   and that's also cited in the *Kramer* federal case that they rely

15   on.

16          And the importance of the *Jarboe* case is that it makes

17   clear that the integral relationship between the signatories and

18   the non-signatories is a key portion of the California standard.

19   The *Jarboe* case --

20          THE COURT:  Why -- let's say that was the standard.  As

21   you know, I don't -- I don't know whether I'm going to adopt

22   California's rule of decision, but whether it's California or

23   federal, there's a question to -- if I adopt the federal common

24   law, there's a question to be decided about whether -- the

25   relationship between the claims and the agreement is sufficient or

1   whether there needs to be a relationship between the parties as
2   well, the second prong, which is very similar to the -- a prong
3   under California that you're describing.

4           Why isn't test met here?  Armstrong is an investor in
5   both companies.  Joyce is actually a signatory to the agreement.
6   The allegation is that Armstrong and his new entities set out
7   directly to frustrate the ability of MouseBelt to -- to get the
8   benefit of this new company.  What is it that's missing from the
9   relationship between these parties such that you don't think this
10  prong of the test is met?

11          MR. CHIKOVANI:  Your Honor, what's missing is, first,
12  that it doesn't fit into any of the categories that have been
13  recognized by the courts as forming a sufficient relationship
14  which usually involves either something -- a relationship that
15  existed at the time of the signing of the contract, such as the
16  non-signatory party being referenced in the agreements.  That was
17  not the case at the time.  None of the non-signatory parties had
18  -- had any involvement with MouseBelt or knowledge of them.  And
19  you'll hear that Patrick Joyce as an individual is not a party.
20  And so ResearchHub -- and ResearchHub did not exist at that time
21  when Patrick Joyce --

22          THE COURT:  The fact -- the fact that Patrick Joyce was
23  aware of these agreements is enough to support a waiver claim, but
24  he is not sufficient -- but because he's a non-signatory --
25  because he's not a named party, the parties in this case are not

1  close enough to satisfy that prong?

2          MR. CHIKOVANI: That's correct, Your Honor.  They're --

3  they're two completely different types of relationships.  The

4  relationship that we're relying on with respect to the waiver

5  argument is that in his current role as ResearchHub chief

6  operating officer, Patrick Joyce's knowledge is imputed to

7  ResearchHub.  That is very different from ResearchHub having a

8  relationship to the contract and relationship that existed between

9  MouseBelt and Knowledge.

10          And what the courts focus on is whether the relationship

11  was of such a nature that it would be inequitable for the party,

12  the signatory party that's resisting arbitration, to refuse to now

13  arbitrate with the non-signatory parties.  And the only

14  relationship that any of the non-signatory parties have with

15  MouseBelt is that of an alleged third party wrongdoer.  The

16  allegation is that these parties came and interfered with the

17  contract at a later date.  There was no relationship at the time

18  the contract was signed and there was no subsequent acceptance by

19  MouseBelt or any of those third parties into the relationship,

20  say, "Okay, we're now going to allow you, you know, into -- into

21  our deal with Knowledge" such that it would be equitable to allow

22  those parties to take advantage of the arbitration clause.

23          And -- and under federal common law, the courts are

24  quite clear that where the alleged relationship is certainly that

25  of an alleged third party wrongdoer, as here, that third party

1   wrongdoer cannot take advantage of equitable estoppel to compel

2   arbitration.

3          And -- and, third, with respect to the waiver argument,

4   I would like to address that in some detail.  To -- at the outset,

5   I'd like to note that to the extent the Court was concerned that

6   MouseBelt had not responded to the Defendants' arguments that

7   there was a confidentiality clause or that there was a lack of

8   knowledge, we haven't had an opportunity to do that prior to now.

9   Those are arguments that were first raised by Defendants on their

10  reply.  So I would like to -- to respond to those arguments and

11  address those.

12         So with respect to Defendants' statements about federal

13  common law, we agree with Your Honor that the most straightforward

14  answer for that federal common law applies is that Defendants have

15  invoked federal question jurisdiction unambiguously in their

16  notice of removal.  So we're in agreement on that point.

17         However, even if that had not been the case and even if

18  the Court were to conclude that subject matter jurisdiction here

19  is only under diversity, the distinction that Defendants try to

20  draw to the holding of *Setty* is contradicted both by the direct

21  reasoning of *Setty* and the policies that *Setty* relied on.

22         So as to the first point, for its holding that the --

23  that federal common law applies to the equitable estoppel

24  analysis, the *Setty* court cites directly to the *Case Del Caffe*

25  decision out of the Ninth Circuit.  And while *Casa Del Caffe* was

1  not an equitable estoppel case, the Court relies on *Casa Del Caffe*

2  for the principle that because of the New York Convention, we

3  should apply federal common law.

4        In *Case Del Caffe*, the substantive claims there were

5  state law claims.  So it made no sense for the *Setty* court to rely

6  so directly on the *Casa Del Caffe* decision if its holding was

7  indeed meant to be limited only to federal substantive claims.

8        Secondly, the underlying policy analysis also suggests

9  there should be no distinction between whether the underlying

10  claims arise under federal law or state law to determine whether

11  federal common law applies.  The key point is the presence of the

12  New York Convention and the removal.  It's the New York Convention

13  that provides a federal issue and federal policy that gives rise

14  to the application of federal common law.

15        THE COURT:  You're probably going to win that point.

16        MR. CHIKOVANI:  Okay, Your Honor.  And so I won't -- I

17  won't belabor it.

18        THE COURT:  I mean, I think the issue with *Setty* is not

19  with the part that you're talking about.  I think I'm likely to

20  choose federal common law, as I may have signaled in my discussion

21  with Mr. Conrad.

22        I'm likely to choose that as the basis of decision.  The

23  more -- the more opaque question that arises about -- upon reading

24  *Setty* is I don't -- I don't -- I part ways with the Plaintiff when

25  it says *Setty* incorporated the standards in *Mundi*.  I mean, it --

1   I think it cites *Mundi*, but it doesn't anywhere -- anywhere -- in

2   the *Setty* opinion reference the prong of the arbitrability test

3   that there has to be any kind of relationship between the parties.

4   All *Setty* says -- and I should actually pull it up so I don't

5   misspeak.   Give me a second to do that.   All it says is for

6   equitable estoppel to apply, it is "essential that the subject

7   matter of the dispute is intertwined with the contract providing

8   for arbitration."   And it cites a 2013 Ninth Circuit case called

9   *Rajogopalan*.   It doesn't -- I really wish the court, when it sat

10  down to draft that opinion, had said "The test is holding" -- and

11  then said what the test was -- so that we could be certain that

12  the only element that has to be satisfied is the one that it

13  identifies in this order.

14        So I'm acknowledging to you that that law -- I think the

15  most common sense interpretation of *Setty*, to the extent that it

16  sets out a standard, is that -- is that equitable estoppel is

17  available where there is -- where the subject matter of the

18  dispute is intertwined with the contract providing for

19  arbitration.   It is another interpretation of that opinion to say

20  maybe there are additional elements that need to be satisfied, but

21  the *Setty* court didn't need to reach them because it found that

22  one wasn't satisfied.   Right?

23        So that's -- that's, in my own thinking, probably the

24  biggest ambiguity in this motion.   And by the way, this is a great

25  motion.   This is a great motion.   It's very interesting.   There's

20

1   a lot of moving parts.  It's very well-briefed on both sides.

2   It's a little frustrating because after I read all the cases and

3   my law clerk has done and write the order, I'd like to be pretty

4   certain we're going to be affirmed if it goes up, and there really

5   isn't enough guidance here.  Whichever -- whichever way we go,

6   we're going to be a little bit walking into new territory.

7        But I wonder what -- I wonder -- I don't know if I'm

8   asking you something.  Maybe I'm just telling you something, which

9   isn't good judicial practice.  I guess what I'm telling you is I

10  don't -- I don't see *Setty* importing *Mundi* whole cloth or

11  importing any test for *Mundi*.  I just don't see that.  And so for

12  me, once we decide the rule of decision is federal common law,

13  what's left from *Setty* is here are the conditions under which

14  equitable estoppel is available and I really see *Setty* standing on

15  its own.  And you're welcome to try to talk me out of that.

16       MR. CHIKOVANI:  Thank you, Your Honor.  Thanks for the

17  opportunity to address that question, and we agree that it's an

18  important one.  And I would also agree with you that the correct

19  way to interpret *Setty* is that the court never got to the question

20  of whether there was a sufficient relationship between the

21  signatories and the non-signatories because it resolved the

22  application of equitable estoppel in the negative before it got to

23  that step.

24       THE COURT:  Uh-huh.

25       MR. CHIKOVANI:  We do think that reading the -- reading

1    the cases, the body of case law as a whole makes very clear that

2    such a relationship between the signatories and the non-

3    signatories is required in order to compel arbitration.   And

4    that's based on a couple of different lines of cases.

5              One is --

6              THE COURT:   Give me your two best cases on that point.

7              MR. CHIKOVANI:   Well, Your Honor, I would -- I would say

8    that the Second Circuit cases that are -- the Second Circuit case

9    relied on --

10             THE COURT:   Like *Sokol*?

11             MR. CHIKOVANI:   *Sokol* is --

12             THE COURT:   Yeah.

13             MR. CHIKOVANI:   -- directly on point with this case.   It

14   involved a non-signatory party that was --

15             THE COURT:   I read *Sokol*.

16             MR. CHIKOVANI:   Yes.   I just want the names of two

17   cases.

18             MR. CHIKOVANI:   Your Honor, let me give you -- let me

19   give you one that is not cited in our briefs and refers to a

20   response to something that Defendants claimed in their reply brief

21   which is all of the district court cases that we've cited that

22   rely on *Sokol* and *Ross*, the other leading Second Circuit case, are

23   old and predate *Kramer* and, because of that, are irrelevant.

24             There's a case from January of this year called *Oasis*

25   *Media, Inc.* -- that's 2022 Westlaw 2189616 out of the Central

1    District --

2              THE COURT:  What's the name -- what's the name of the

3    plaintiff again in that case, please?

4              MR. CHIKOVANI:  Yes, Your Honor.  Oasis Media, Inc.

5              THE COURT:  Oasis Media.  Okay.

6              MR. CHIKOVANI:  Yes, *v. Biocia, Inc.*  And that was a

7    case that cited *Mundi* as the applicable standard and said the

8    *Mundi* standard incorporates *Sokol*, so we require --

9              THE COURT:  Is *Oasis Media* a Convention case?

10             MR. CHIKOVANI:  I don't believe so, Your Honor.  I

11   believe it was a case that was applying federal common law.

12             THE COURT:  Okay.

13             MR. CHIKOVANI:  Because of the presence of federal

14   cases.  And what the court said there was that under both

15   California and federal common law, equitable estoppel requires an

16   integral relationship between the party with whom the plaintiff

17   agreed to arbitrate and the non-signatory seeking to invoke

18   arbitration.

19             And for that, the court relied on *Mundi* and it also

20   cited the *Jarboe* California case that has the integral

21   relationship language.  And it cited as the types of relationships

22   that are sufficient --

23             THE COURT:  Mr. Chikovani, --

24             MR. CHIKOVANI:  Yes, Your Honor.

25             THE COURT:  -- am I correct in imagining that Mr. Conrad

1   is hearing the words *Jarboe* and *Oasis* for the first time this

2   afternoon?  I don't mean in his life; I just mean in the context

3   of this case.

4              MR. CHIKOVANI:   Those cases are not -- they are not

5   cited in our opposition brief.

6              THE COURT:   Is the answer to my question -- is the

7   answer to my question yes?

8              MR. CHIKOVANI:   Well, I -- I can't presume to know

9   whether Mr. Conrad has heard of those cases.  He should have heard

10  in particular the *Jarboe* case.

11             THE COURT:  Please stop.  This is just taking too long.

12             MR. CHIKOVANI:  That's --

13             THE COURT:  Did you -- did you or someone at your firm

14  make the other side aware of these cases before today?

15             MR. CHIKOVANI:  We did not, Your Honor.

16             THE COURT:  Okay.  So word to the wise, it just slows us

17  down a little bit because one of two things is true.  The cases

18  are pretty good for you.  They actually will affect the Court's

19  thinking or not.  Those are the two possibilities.  If it's the

20  first one, your opponents really need a chance to respond.  And

21  since I haven't read the cases yet, 'cause I didn't know about

22  them either, I don't know which one it is.

23             And so I probably need to give Mr. Conrad a right to,

24  you know, address these cases briefly in something short in

25  writing after the hearing.  So in the future, if you know that

1    there are matters you want to bring to the Court's attention that

2    you didn't have an opportunity to bring in the brief, it's a great

3    idea just, you know, 30 hours before the hearing to send an email

4    to your opponent and say, "Just so you know, I'm going to be

5    citing these cases."  Then I can -- then I can rule more quickly.

6           But, anyway, go ahead.  I'm actually going to pull up

7    *Oasis* while we're sitting here talking.

8           MR. CHIKOVANI:  Fair enough, Your Honor.  We'll -- I'll

9    take that in future practice, and we would appreciate the

10   opportunity for Defendants to address these cases.  We would ask

11   for an opportunity to address them further as well in that

12   situation.  But we do think that both of those cases, in

13   particular *Jarboe*, is important to -- to the Court's analysis.

14          But the -- the bottom line, Your Honor, is that all of

15   the case that Defendants -- the other cases that Defendants rely

16   on, there's no case where arbitration was compelled based on

17   equitable estoppel in the absence of the kind of relationship

18   between the signatories and the non-signatories.  That is absent

19   here.

20          I would note that that includes the *Franklin* case out of

21   the Ninth Circuit that Defendants rely on extensively.  The court

22   there cited as the applicable standard the *Kramer* case and it

23   recited a version of the California law standard that did not

24   include as an element a relationship, but then in its holding

25   saying the Ninth Circuit prior to *Franklin* had never compelled

1   arbitration based on equitable estoppel. They said, We

2   acknowledge we're doing this for the first time. And they said,

3   What's different here from *Kramer* and *Murphy* and the other cases

4   where we didn't compel arbitration is that the relationship

5   between the signatories and the non-signatories is qualitatively

6   different than it was in those other cases.

7          So I believe it's quite clear that all of the cases

8   point to the importance of relationship.

9          THE COURT: Very good.

10          MR. CHIKOVANI: And, Your Honor, at the -- at the risk

11   of overkill on a point that we did address, I just wanted to note

12   that the application of federal common law comes -- is dictated by

13   the application of the Supreme Court's test in the *Boyle* (ph) case

14   which sets out a two-part test for when there is a sufficient

15   federal interest for federal common law to apply. That was cited

16   indirectly in *Setty*. *Setty* cited a Seventh Circuit case called

17   *Argonaut Insurance* and the *Argonaut Insurance* case goes into

18   detail for why the Supreme Court's *Boyle* test directs the

19   application of federal common law.

20          I wanted to address with respect to the waiver argument,

21   Your Honor. The Defendants, in responding to the waiver argument,

22   they (indiscernible) by never claiming that they did not have

23   knowledge of what to arbitrate. All that the Defendants --

24          THE COURT: Whose burden is it?

25          MR. CHIKOVANI:  -- said in their brief --

1        THE COURT:  Whose burden is it?

2        MR. CHIKOVANI:  Well, Your Honor, the question of burden

3   is also an interesting one that I wanted to address.  It is our

4   burden.

5        THE COURT:  Okay.

6        MR. CHIKOVANI:  But if I may --

7        THE COURT:  Mr. Chikovani, it's just a tic I have.  If

8   I ask somebody a simple question that's a predicate to something

9   else, the sooner we can figure out the answer to that question,

10  the sooner we can get to the good stuff.  So it's your burden.

11       MR. CHIKOVANI:  Yes, Your Honor.

12       THE COURT:  And the question I -- and we can -- and at

13  some point you can say whatever you like about what they have not

14  put in the record.  But my question is:  What is the affirmative

15  evidence that would support a finding of waiver other than the

16  fact that Joyce knew?  What's the other affirmative evidence?

17       And on the issue of Joyce, why isn't the combination of

18  this confidentiality agreement and the statement citation fatal to

19  the argument that Joyce has knowledge somehow hurts the Defendants

20  here?

21       MR. CHIKOVANI:  Well, yes, Your Honor.  If I can address

22  kind of the specific point of the confidentiality -- the

23  application of the confidentiality provision and the -- the

24  statement provision, the case that Defendants cite for that

25  proposition is completely inappposite here, which I believe the

1  Court will see upon reviewing it.  It was a trade secrets
2  misappropriation case --
3         THE COURT:  What's the case called?  I mean, I can look
4  it up, but if you know it, --
5         MR. CHIKOVANI:  I do, Your Honor.  It is --
6      (Pause.)
7         I'm sorry, Your Honor.  I don't -- I don't seem to have
8  it in my notes.  I will --
9         THE COURT:  Is it *Droeger v. Welsh Sporting Goods*
10 *Corporation*, Ninth Circuit (1976)?
11        MR. CHIKOVANI:  I believe so, Your Honor.  Yes.
12        THE COURT:  Okay.
13        MR. CHIKOVANI:  Yes.
14        THE COURT:  That's a *See Also* cite, which -- which the
15 old law review editor in me takes as a signal of weakness.  I
16 think you're really hanging your hat on that restatement
17 provision.  That's the way I read that paragraph.
18        MR. CHIKOVANI:  Yes, Your Honor.  And we -- we did a
19 search of whether any California court had adopted that particular
20 restatement provision in the decision and we did not find one.  So
21 -- and, you know, Defendants are claiming that this issue is -- is
22 governed by California law.
23        More generally, Your Honor, the issue here is that
24 either Defendants actually knew about the existence of the
25 arbitration clause because they did talk to Patrick Joyce about

1  it, or they had every reason to suspect that there was an

2  arbitration clause and then intentionally avoided asking about it

3  until they'd taken their shot at the merits issues in state court.

4  And it was only after getting unfavorable decisions in the state

5  court that they initiated any discussion about getting a copy of

6  the agreements.  And within the course of that, they never said,

7  The reason we're asking for this is because we think we might need

8  to compel to arbitrate.

9       THE COURT:  What is it about the facts and circumstances

10  of this particular commercial dispute that would give rise as a

11  matter of law to inquiry notice on the -- on the existence of an

12  arbitration provision?

13       MR. CHIKOVANI:  Well, Your Honor, it would be that --

14  just about every commercial contract these days contains an

15  arbitration clause.  It would also be that --

16       THE COURT:  Do you understand that if I ruled for you on

17  that basis, I would be saying that in every commercial dispute,

18  everybody's on inquiry notice that there's an arbitration

19  provision?  I don't think -- I don't think I'm being hyperbolic.

20       MR. CHIKOVANI:  Well, I don't -- I don't think the

21  ruling needs to be that broad, Your Honor.  Our particular point

22  here is that Coinbase is a particularly sophisticated party when

23  it comes to litigation.  Their very sophisticated in-house

24  department in Coinbase in the last six years has been involved in

25  no fewer than nine cases, seven in federal court, two in state

1    court, where they compelled arbitration. It simply
2    (indiscernible) belief that Coinbase's first analysis of this
3    complaint didn't include, Hey, is there an arbitration clause
4    here?  And it's pretty -- and it's also undisputed that from the
5    point that they received the complaint, six months passed until
6    they made any inquiry about getting a copy of the agreements.  And
7    in those intervening six months, they lost the primary demurrer on
8    the merits almost entirely, and then they brought a second
9    demurrer, and it was right after they lost that second demurrer
10   and whereafter they filed an answer in state court, which we'd
11   also note is -- is an easier thing to do than having to file an
12   answer in federal court.  It was right after they did that they
13   compelled arbitration.

14           So I think that is a lot of grounds to infer that
15   Defendants had knowledge of the agreements and failed to pursue
16   it.  And I would note that there is at least one case that -- on
17   very similar facts on waiver where a defendant also said, We
18   didn't have a copy of the agreement itself, so the obligation to
19   seek arbitration, didn't realize until we got a copy of the
20   document, and the court in that case rejected that, and that's the
21   *Jallo v. Resurgent Capital Services* case out of the Eastern
22   District of Texas that's cited in our opposition brief.

23           And there, the court said that the defendant had a
24   reason to know that there was probably an arbitration clause at
25   issue and they could have asked for a copy of the agreement.  They

1    could have pursued informal discovery.  They could have at least

2    raised the issue that they would intend to seek arbitration.  And

3    by failing to do that, that those were actions that were

4    inconsistent with the right to arbitrate and created

5    (indiscernible).

6            THE COURT:  Mr. Chikovani, you've been going for a

7    substantial period of time.  I would invite you to begin to bring

8    the ship back into the harbor.

9            Mr. Putterman, did you want to say something?

10           MR. CHIKOVANI:  Thank you, Your Honor.

11           MR. PUTTERMAN:  I did, Your Honor, with the Court's

12   permission.  There's one other important point there.

13           THE COURT:  No, no.  Please stop.  Please stop.  If you

14   want to make some argument, you wait until counsel who has the

15   microphone is done with his argument and if there's something you

16   want to say, you can ask the Court at that time.  Please don't

17   interrupt.

18           MR. PUTTERMAN:  Very good, Your Honor.

19           THE COURT:  Mr. Chikovani, go ahead.

20           MR. CHIKOVANI:  Thanks, Your Honor.  I wanted to note

21   that Defendants rely heavily on cases that say that a party

22   arguing for waiver bears a heavy burden because waiver is a

23   disfavored doctrine.  All of those cases predate the Supreme

24   Court's decision earlier this year in *Morgan*, which was cited in

25   our opposition, and the specific thing that the Supreme Court did

1   there was remove the prejudice requirement of the waiver test.

2   But more generally, what Justice Kagan wrote in that decision was

3   that with respect to applying procedural rules like waiver, it's

4   not appropriate to put a thumb on the scale in that analysis based

5   on the federal policy in favor of arbitration.   A doctrine of

6   waiver has to be applied even-handedly just like it would in a

7   non-arbitration case.   So to the extent that Defendants are

8   relying on the heavy burden language from older cases, which they

9   cite several times in their reply brief, I would note that that is

10  inapplicable.

11          MR. CONRAD:  May I respond, Your Honor?

12          THE COURT:  Yes.  Mr. Chikovani, have you completed your

13  remarks?

14          MR. CHIKOVANI:  Oh, I did also want to -- to address the

15  application of Singapore law and why Singapore law applies under

16  an  applicable  choice  of  law  analysis,  with  Your  Honor's

17  permission.

18          THE COURT:  All right.  I would note for the parties

19  it's getting on ten to 3:00.  We're just a district court.

20  Anyway, go ahead.

21          MR. CHIKOVANI:  Fair enough, Your Honor, and I'll try to

22  keep it as short as possible.  And this is -- this is an issue

23  that is generally -- were addressed in the briefs.  The parties

24  addressed there's multiple different choice of law analyses that

25  could apply -- both the federal common law standard and the

32

1  California courts usually follow the restatement analysis which

2  respects choice of law clauses when analyzing arbitration

3  agreements and which choice of law should apply to procedural

4  questions.  And we would in particular point the Court to the

5  *Motorola Credit Corporation* case out of the Second Circuit, that

6  is cited in our opposition brief, where the court succinctly put

7  that "If the non-signatory wants to invoke the arbitration clauses

8  in the grievance at issue, they must also accept the choice of law

9  clauses that govern those agreements."

10          So to the extent that the Court is not applying federal

11  common law, the next law to be applied is Singapore law which has

12  an even narrower equitable estoppel doctrine than federal common

13  law.

14          THE COURT:  I'll read the case.

15          MR. PUTTERMAN:  Your Honor, if Mr. Chikovani is

16  finished, may I make my comment?

17          THE COURT:  Yes.

18          MR. PUTTERMAN:  With regard to the knowledge of the

19  agreements, in our opposition brief we pointed out that there was

20  correspondence from opposing counsel stating that they had been

21  aware that Mr. Joyce had the agreements but were honoring

22  confidentiality.

23          They then asked us for copies of the agreements in June

24  of 2022.  At no time between the filing of the complaint and June

25  of 2022 did they ever simply ask us to stipulate or agree or give

1  permission for Mr. Joyce to provide them with the agreements.

2          THE COURT:  If I were to cite that fact in an order,

3  would I not be implying that they had some affirmative obligation

4  to make that request?

5          MR. PUTTERMAN:  Well, Your Honor, if they felt that they

6  had to ask us for the agreements, yes.  The answer is yes.  They

7  did have an affirmative obligation.

8          THE COURT:  I'm not aware of any authority for that.

9          MR. PUTTERMAN:  I understand, Your Honor, but --

10          THE COURT:  All right.

11          MR. PUTTERMAN:  -- it is --

12          THE COURT:  But I have the argument.

13          MR. PUTTERMAN:  It is circumstantial evidence of

14  willingful ignorance.

15          THE COURT:  Fair enough.  Mr. Conrad?

16          MR. CONRAD:  Thank you, Your Honor.  Just briefly on the

17  waiver points and then I want to focus on the issues that the

18  Court has raised regarding the application of federal common law.

19          The standard --

20          THE COURT:  I'm really interested in this -- on this

21  *Motorola* point that given that federal common law is the first

22  principle's rule of decision, that in federal common law case the

23  court is supposed to respect choice of law, if I had that in my

24  mind from my notes -- I'd have to go back and re-read it.  So if

25  you have an off-the-cuff response to that point, it would be

34

1  helpful to me.

2          MR. CONRAD:  My off-the-cuff response to that is that

3  it's inconsistent with *In re Henson* which says that you don't

4  apply the choice of law provision, but instead you apply law to

5  the forum state.  I think that's --

6          THE COURT:  Yeah.

7          MR. CONRAD:  -- the governing authority.

8          THE COURT:  Okay.

9          MR. CONRAD:  The --

10         THE COURT:  *Motorola*'s a Second Circuit case.  Okay.

11 Yeah.

12         MR. CONRAD:  Things are different in the Second Circuit

13 on a number of different levels in this case.

14         The Court focused in on what the standard is under

15 federal common law as articulated by the Ninth Circuit and asked

16 what their best case was.  And so I want to address that issue

17 because I think it reinforces our claim that there isn't a

18 qualitative difference between what happens under federal common

19 law and what happens under state law.

20         And for that proposition, I'd urge the Court to look at

21 the *Kramer* decision (2013), which cited --

22         THE COURT:  Is this the one that in Footnote 5 just

23 says, "Look, here's what *Setty* said"?

24         MR. CONRAD:  Correct.

25         THE COURT:  I'm not sure -- I love the footnote -- I

1    love the clarity of the footnote.  Anyway, I've read it.

2            MR. CONRAD:  Okay.  In that case, what the Court seems

3    to be grappling with is what to do with *Setty* which comes along

4    and doesn't really grapple with any of this.

5            THE COURT:  Right.

6            MR. CONRAD:  And in thinking through that question, what

7    I would urge the Court to do is look at what the *Setty* court

8    actually did.  In its penultimate paragraph, the *Setty* court says

9    two things.  Number one, "Here, the claims have no relationship

10    with the partnership deed contained in the arbitration agreement

11    at issue in this appeal."  The first thing.

12            Number two, "Moreover, any allegations of misconduct by

13    the signatory are not fully intertwined with SS Bangalore's claims

14    against SS Mumbai."

15            In other words, what *Setty* did in the final -- in the

16    final analysis, what *Setty* did is it applied the same two tests

17    that are required under California law, and that makes sense.

18    Because despite all of the confusion in this area of

19    jurisprudence, what -- what the law teaches us under both

20    California and the federal law common standard is that the closer

21    you get to an agreement, the less appropriate it is for you to

22    invoke the benefits of the agreement and ignore the other

23    requirements of it.

24            THE COURT:  Yeah.

25            MR. CONRAD:  And on that point, what I want to focus on

1  are some of the allegations in the complaint.  We spelled them out

2  in the --

3          THE COURT:  You're going to win this point.

4          MR. CONRAD:  Okay.  On --

5          THE COURT:  If I were you, I'd take the snap and take a

6  knee.  I want to ask you about something else.

7          MR. CONRAD:  Okay.

8          THE COURT:  So I skimmed Judge Gee's in *Oasis Media*

9  while I was sitting here.  It's unfair for me to do that because

10 I'm the judge and so I don't have to get ready to make another

11 argument.  I can go off on these thoughts while you are -- you are

12 preparing to address the Court.  But one of the things she says in

13 there -- she has a fairly restrictive vision of the kind of

14 relationship there needs to be between the parties before

15 equitable estoppel is available.  And at one point, she writes

16 that, "Generally, the doctrine requires some sort of corporate

17 relationship to a signatory party; that is, involving

18 subsidiaries, affiliates, agents, and other related business

19 entities."  But she cites a 2008 Second Circuit case called *Ross*

20 for that proposition.

21         I'm unlikely to adopt Judge Gee's language without

22 something else persuading me that I should do that just because

23 the language strikes me as being more restrictive than other party

24 relationship cases that I've read.

25         And so with that lengthy introduction, my question for

1    you, Mr. Conrad, is what's the case, or maybe two cases, that you

2    think best describe the -- if I decide that there needs to be a

3    relationship between the parties in addition to some proximity

4    between the allegations in the complaint and the agreement -- like

5    everybody agrees that's -- got to find that.   But if I also

6    conclude that there's another element you have to satisfy and that

7    is some degree of proximity between the parties, which cases do

8    you think the Court should go to to get the test for how close

9    those parties need to be?   I apologize if that was too rambling.

10   If it wasn't clear, let me know.

11          MR. CONRAD:   I understand the question.   I don't have a

12   ready answer for a case that articulates that relationship.   I

13   would appreciate -- I tried to keep up with Your Honor's

14   (indiscernible) and I clicked on a wrong case and decided to

15   listen to the argument instead.   I would accept Your Honor's

16   invitation to file a very brief response to the *Jarboe* and the

17   *Oasis Medical* cases so that we could address this question.

18          What I would say is that I think it is easy when you

19   read a lot of these cases to distinct from any idea that

20   affiliates and parents and subsidiaries and other people,

21   including directors and so forth, it's easy to --

22          THE COURT:   That's the easy case.

23          MR. CONRAD:   It's easy to synthesize from them that, oh,

24   these cases are about related parties.   But they're not.   If they

25   were, the courts could easily articulate that standard and they

38

1  haven't.

2        THE COURT:  Yeah.  I don't need -- what I don't need is

3  further  briefing  on  whether  I  should  have  that  as  a  second

4  element.   I think the briefs already address that.   If there's

5  going to be -- well, anyway, let me -- let me let you wrap up and

6  I'm going to order a little further briefing and then I'm going to

7  take this -- and then we'll end the hearing.

8        MR. CONRAD:  Sure.  I guess the last point I would make

9  on  that  question  is  that  if  the  Court  reviews  the  types  of

10  relationships where estoppel has been applied, there are a lot of

11  cases  applying  estoppel  where  the  relationship  is  much  more

12  attenuated than this.   For example, Judge Davila's decision in

13  *Torbit*.   I think this Court's --

14        THE COURT:  And say the name of the plaintiff again in

15  the case.

16        MR. CONRAD:  Torbit, I believe, T-o-r-b-i-t.  And that

17  was a (indiscernible) case.

18        THE COURT:  Yeah.

19        MR. CONRAD:   Where like this one, where the Plaintiff

20  contracted  the  competitor  and  the  competitor  invoked  --

21  successfully invoked the arbitration clause.

22        The  idea  that  Armstrong  and,  by  extension,  Coinbase

23  because that's the only extension to Coinbase that existed, are --

24  are  complete  strangers  is  belied  --  even  at  the  time  of  the

25  execution  of  these  agreements  is  belied  by  the  Plaintiffs'

1   allegations.  I'd urge the Court to look at paragraph 44 of the

2   first amended complaint where what MouseBelt alleges is in May of

3   2019, Joyce brought Armstrong into the fold and he knew he was

4   interested in investments.  And they intro- -- not only that, but

5   they introduced Armstrong to MouseBelt and made MouseBelt aware of

6   Armstrong's interest in the company.  And the date of the second

7   SAFE agreement is May 28th, 2019.  Of course it was foreseeable.

8   Of course it was all wrapped up in the relationship here between

9   Joyce and Armstrong.

10          So I -- with that, I will rest and hear the Court's

11  description of what it would like in supplemental briefing.

12          THE COURT:  I'm going to stop the clock there.  It's Mr.

13  Conrad's burden on the motion, so he is entitled to -- also in

14  terms of total time on the microphone.  I'm confident Mr. Conrad

15  did not have more than his share, so we're going to go ahead and

16  stop there.

17          I think I would like for Plaintiffs to file something --

18  four pages is probably enough, frankly -- but let's make it five

19  just because four sounds so mingy.  And I'll hope the parties

20  write -- well, anyway, you get the point.  Five pages including --

21  five pages addressing any authorities that the Plaintiffs cited to

22  the Court, and then the Defendants can respond to that.  A week

23  from today is the 22nd.  I have -- I have never -- I won't say

24  never.  "Never" is a long time.  I do not recall having ever made

25  something due a week between Christmas Day and New Year's Day.  So

1  unless the -- because I think people have other things to do.

2  Unless the Plaintiff would object, I would simply remove that week

3  from the calculus and have the -- Defendants' response due January

4  5th.   If the Plaintiff feels that that's -- there's something

5  unfair about that, I'm happy to extend their time.  I like my rule

6  about not making things due during that week so much that I would

7  work hard not to break it.

8            MR. CHIKOVANI:  No objection here, Your Honor.

9            THE COURT:  All right.  Very good.  So I'll hear from

10  the Plaintiff on the 22nd.   I'll hear from the Defendant on

11  January the 5th.  And at that point, the motion will stand under

12  submission.

13            MR. CONRAD:  Thank you, Your Honor.  The one item of

14  housekeeping that I would raise in closing is that there's

15  additionally a remand motion pending which the Court took off

16  calendar for next week.   I don't precisely know the Court's

17  thinking in connection with all of that, but I --

18            THE COURT:  If I send you to arbitration, the motion's

19  moot.

20            MR. CONRAD:  Certainly.

21            THE COURT:  That's the thinking.

22            MR. CONRAD:  If you -- if you don't, I would only note

23  that there are additional procedural aspects to the case,

24  including an appeal of the decision regarding arbitrability that

25  we would want an opportunity to raise before that remand motion is

1  decided.

2          THE COURT:  Nothing makes us happier than when the

3  parties send a joint email to Ms. Lee requesting the prompt

4  setting of a case management conference, so that tool is available

5  to you.

6          MR. CONRAD:  Thank you, Your Honor.

7          THE COURT:  All right.  Thank you, all.  That concludes

8  this hearing.

9          MR. CHIKOVANI:  Thank you very much, Your Honor.

10      (Proceedings adjourned at 3:03 p.m.)

11

12          I, Peggy Schuerger, certify that the foregoing is a

13  correct transcript from the official electronic sound recording

14  provided to me of the proceedings in the above-entitled matter.

15

16  _____*Peggy Schuerger*_____     <u>December 24, 2022</u>
        *Peggy Schuerger*
17  Signature of Approved Transcriber            Date

    _____
18  Peggy Schuerger
    ***Ad Hoc Reporting***
19  Approved Transcription Provider
    for the U.S. District Court,
20  Northern District of California

21

22

23

24

25