UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MOUSEBELT LABS PTE. LTD.,

Plaintiff,

v.

BRIAN ARMSTRONG, et al.,

Defendants.

Case No. 22-cv-04847-JST

**ORDER GRANTING MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS**

Re: ECF No. 11

Before the Court is Defendants' motion to compel arbitration and stay proceedings.  ECF No. 11.  The Court will grant the motion.

I.      **BACKGROUND**

As set forth in the complaint, Plaintiff MouseBelt Labs Pte. Ltd. ("MouseBelt") is a foreign company organized under the laws of Singapore, and it operates as a "full-service blockchain accelerator and startup studio that invests in blockchain startups."  First Amended Complaint ("FAC") ¶ 16, ECF No. 1-39.  MouseBelt invested $40,000 in cash and $275,000 in developer services in Knowledgr—a company founded and headed by Patrick Joyce.  *Id.* ¶ 35. Knowledgr was intended to be an academic research crowdsourcing platform where contributors would receive "decentralized blockchain tokens," i.e., "cryptocurrency similar to Bitcoin," in exchange for their contributions.  *Id.* ¶ 3.  MouseBelt made these investments pursuant to two Accelerator Agreements executed in January and May 2019, respectively ("Agreements"), and corresponding Simple Agreements for Future Equity ("SAFEs").  *Id.* ¶ 2; ECF Nos. 8-2 & 8-3. The Agreements provide that MouseBelt, in exchange for its investments, would receive 19% of Knowledgr's preferred stock and 10.1% of the tokens that Knowledgr planned to issue by the end of 2019.  FAC ¶ 2, 34-35; *see* ECF No. 8-2 at 4, 6, 16; ECF No. 8-3 at 2, 5, 16.

United States District Court
Northern District of California

1    Each of the Agreements contains an identical arbitration clause.  The Agreements provide,

2    All disputes, controversies, or differences arising out of or in
     connection with this Agreement, including any question regarding
3    its existence, validity or termination, shall first be resolved by
     negotiation and/or amicable discussions.  If any such disputes,
4    controversies, or differences cannot be resolved through the
     foregoing means three (3) weeks from the date on which it was first
5    referred to, then any such disputes, controversies, or differences
     shall be referred to the Singapore International Arbitration Centre
6    (the "SIAC") and finally resolved by arbitration in Singapore in
     accordance with the Arbitration Rules of the Singapore International
7    Arbitration Centre (the "SIAC Rules") for the time being in force,
     which rules are deemed to be incorporated by reference in this
8    clause.

9    ECF No. 8-2 at 13; ECF No. 8-3 at 13.

10        On December 17, 2021, MouseBelt filed its original complaint in San Francisco Superior

11   Court.  ECF No. 1-1.  Defendants demurred to the complaint.  ECF Nos. 1-13, 1-15, 1-16.  The

12   demurrers were overruled in part and sustained in part with leave to amend.  ECF Nos. 1-32, 1-33,

13   1-34.

14        MouseBelt filed the operative complaint on May 31, 2022, which named as defendants

15   Brian Armstrong; ResearchHub Technologies, Inc., and ResearchHub, LLC (collectively,

16   "ResearchHub"); Coinbase, Inc., and Coinbase Asset Management, Inc., doing business as

17   Coinbase Ventures (collectively, "Coinbase"); and twenty-five unnamed individuals.  Armstrong

18   is the founder and CEO of Coinbase, as well as the founder and controlling shareholder of

19   ResearchHub.  FAC ¶ 17.  Coinbase is a "popular cryptocurrency exchange . . . with more than 35

20   million users."  *Id.* ¶ 37.  ResearchHub operates a "website and application" that "permits users to

21   collaborate on scientific research," which would have made ResearchHub a direct competitor of

22   Knowledgr.  *Id.* ¶ 18

23        MouseBelt alleges that Defendants conspired to induce Joyce to take a number of actions,

24   including: to begin secretly working on the ResearchHub project while simultaneously acting as

25   CEO of Knowledgr; to disclose Knowledgr's confidential information and divert Knowledgr's

26   assets to ResearchHub; to neglect the development of Knolwedgr; to misrepresent to MouseBelt

27   the nature of his relationship with Armstrong and ResearchHub and the reasons for delays related

28   to the development of Knowledgr; to mislead MouseBelt into believing that he intended to

United States District Court
Northern District of California

continue to develop Knowledgr, that Armstrong was interested in investing in Knowledgr, and that Knowledge's token could be listed and traded on Coinbase; and to abandon Knowledgr altogether in favor of ResearchHub, where Joyce accepted and continues to hold a position of Chief Scientific Officer.  *Id.* ¶¶ 7–9, 13–15, 29, 52–55, 81, 84–85, 91–93, 108–111, 115–16.

MouseBelt further alleges that, because Knowledgr never came to fruition, "Defendants' actions annihilated the value of MouseBelt's contractual rights to ownership of equity in Knowledgr and a share of the future tokens to be issued by Knowledgr, as well as the expected reputational and other benefits of association with a successful startup."  *Id.* ¶ 15.  MouseBelt brings claims for (1) fraud, (2) intentional interference with contractual relations, (3) intentional interference with prospective economic advantage, (4) negligent interference with prospective economic advantage, (5) unjust enrichment, and (6) quantum meruit.  *Id.* ¶¶ 106-152.

Defendants demurred to the FAC, ECF No. 1-42, and the demurrer was overruled on August 11, 2022, ECF No. 1-50.  On August 22, 2022, Defendants answered the FAC.  ECF Nos. 1-51, 1-52, 1-53.  Two days later, on August 24, Defendants removed the case to this Court.  ECF No. 1.  Defendants filed the instant motion on September 6, 2022.  ECF No. 11.  The Court held a hearing on the motion on December 15, 2022 and ordered supplemental briefing on new authorities raised at the hearing.  ECF No. 31.  The parties subsequently filed supplemental briefs.  ECF Nos. 32 & 35.

## II.    JURISDICTION

The Court has jurisdiction under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards ("Convention"), June 10, 1958, 21 U.S.T. 2517.  The Convention, "commonly known as the New York Convention," *Al-Qarqani v. Chevron Corp.*, 8 F.4th 1018, 1022 (9th Cir. 2021), is "a multilateral treaty that addresses international arbitration," *GE Energy Power Conversion France SAS, Corp. v. Outokumpu Stainless USA, LLC* ("*GE Energy*"), 140 S. Ct. 1637, 1644 (2020).  Congress implemented the Convention in Chapter 2 of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq*.  *See* Pub. L. No. 91-368, 8 Stat. 692 (codified at 9 U.S.C. §§ 201–208).  As codified, the Convention provides that "[a]n action or proceeding falling under the Convention shall be deemed to arise under the laws and treaties of the United

States," and it vests "[t]he district courts of the United States" with "original jurisdiction over such an action or proceeding, regardless of the amount in controversy." 9 U.S.C. § 203. Removal of a case from state court to federal court is appropriate where "the subject matter of an action or proceeding pending in a State court relates to an arbitration agreement or award falling under the Convention." 9 U.S.C. § 205.[1]

To satisfy the jurisdictional prerequisites of the Convention, four conditions must be present:

> (1) there is an agreement in writing within the meaning of the Convention; (2) the agreement provides for arbitration in the territory of a signatory of the Convention; (3) the agreement arises out of a legal relationship, whether contractual or not, which is considered commercial; and (4) a party to the agreement is not an American citizen, or that the commercial relationship has some reasonable relation with one or more foreign states.

*Balen v. Holland America Line Inc.*, 583 F.3d 647, 654-55 (9th Cir. 2009) (quoting *Bautista v. Star Cruises*, 396 F.3d 1289, 1294–95 (11th Cir. 2005)).

All four requirements are met. First, the Agreements are agreements in writing within the meaning of the Convention because Convention provides that "[t]he term 'agreement in writing' shall include an arbitral clause in a contract or an arbitration agreement," Convention art. II(2), and because the parties to the Agreements are not both citizens of the United States, 9 U.S.C. § 202. Second, the Agreements provide for arbitration in Singapore, which is a signatory to the Convention. Third, the Agreements arise out of a legal relationship that is commercial insofar as MouseBelt exchanged capital and services for future equity and cryptocurrency tokens. Fourth, MouseBelt is organized under the laws of Singapore and is therefore a citizen of Singapore.

## III.    LEGAL STANDARD

"The arbitrability of a particular dispute is a threshold issue to be decided by the courts." *Nagrampa v. MailCoups,* 469 F.3d 1257, 1268 (9th Cir. 2006). Under the FAA, arbitration

---

[1] The Ninth Circuit has clarified that an agreement "relates to" a plaintiff's suit "whenever an arbitration agreement under the Convention could *conceivably* affect the outcome of the plaintiff's case." *Infuturia Glob. Ltd. v. Sequus Pharm., Inc.*, 631 F.3d 1133, 1137–38 (9th Cir. 2011) (quoting *Beiser v. Weyler*, 284 F.3d 665, 669 (5th Cir. 2002)). Here, removal was proper because this Court's enforcement of the arbitration clauses in the Agreements could conceivably affect the outcome of this case.

United States District Court
Northern District of California

1  agreements "shall be valid, irrevocable, and enforceable, save upon such grounds that exist at law

2  or in equity for the revocation of any contract." 9 U.S.C. § 2.  This provision reflects "both a

3  liberal federal policy favoring arbitration, and the fundamental principle that arbitration is a matter

4  of contract." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (internal quotation

5  marks and citations omitted).

6        On a motion to compel arbitration, the Court's role under the FAA is "limited to

7  determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the

8  agreement encompasses the dispute at issue." *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207

9  F.3d 1126, 1130 (9th Cir. 2000).  If the Court is "satisfied that the making of the agreement for

10 arbitration or the failure to comply therewith is not in issue, the [C]ourt shall make an order

11 directing the parties to proceed to arbitration in accordance with the terms of the agreement."  9

12 U.S.C. § 4.  Where the claims alleged in a complaint are subject to arbitration, the Court may stay

13 the action pending arbitration.  *Id.* § 3.

## IV.    DISCUSSION

15       The parties dispute whether Defendants waived any right to arbitrate by participating in the

16 state court litigation on the merits.  Assuming that Defendants did not wave that right, the parties

17 further dispute whether Defendants, as non-signatories to the Agreements, may compel arbitration

18 under the doctrine of equitable estoppel.

19      **A.    Waiver**

20       To prove that a party waived its right to arbitration, "the party asserting waiver must

21 demonstrate: (1) knowledge of an existing right to compel arbitration and (2) intentional acts

22 inconsistent with that existing right." *Armstrong v. Michaels Stores, Inc.*, 59 F.4th 1011, 1015

23 (9th Cir. 2023).  A party is deemed not to have waived its right to arbitration "after substantial

24 litigation" where "unique circumstances . . . explain[] the long delay in filing a motion to compel,

25 such as absence of knowledge, a party's pro se status, or intervening law." *Martin v. Yasuda*, 829

26 F.3d 1118, 1127 n.5 (9th Cir. 2016).

27       MouseBelt contends that Defendants "knew about the arbitration clause through Patrick

28 Joyce, who executed the agreements on behalf of Knowledgr."  ECF No. 20 at 25.  According to

United States District Court
Northern District of California

1    MouseBelt, because Joyce now works for ResearchHub, Joyce's knowledge of the Agreements is

2    imputed to ResearchHub, and ResearchHub's knowledge of the agreements is imputed to

3    Defendants Armstrong and Coinbase.[2]  Defendants argue that MouseBelt has failed to satisfy its

4    burden of proof because Joyce's knowledge cannot be imputed to any Defendant, and because

5    Defendants otherwise timely moved to compel arbitration upon MouseBelt's production of the

6    Agreements during discovery.  ECF No. 26 at 19-20.

7         The Court agrees with Defendants.  The Agreements are marked as confidential and thus

8    prohibit their disclosure.  *See* ECF Nos. 8-2 & 8-3.  Joyce, as CEO of Knowledgr, had a duty not

9    to disclose the Agreements or their contents, and that duty persisted even if Joyce was

10   subsequently employed by ResearchHub.  *See* Restatement (Third) of Agency § 5.03 ("[W]hen an

11   agent is subject to a duty to another not to disclose a fact to the principal, the agent's knowledge is

12   not imputed to the principal.  Information that an agent learns in confidence from one principal is

13   not imputed to another principial.").  Although MouseBelt implicitly acknowledges this point, *see*

14   ECF No. 20 at 26, MouseBelt protests that Defendants never affirmatively stated that "(1)

15   ResearchHub did not have the agreements; (2) the Defendants and their counsel were unaware of

16   the agreements and their terms; or (3) that the sophisticated Defendants and their well-regarded

17   counsel neither knew nor suspected the agreements included an arbitration clause," *id.*  As the

18   party seeking to prove waiver, however, MouseBelt bears the burden to show that Defendants had

19   knowledge of the arbitration clauses; Defendants need not affirmatively prove that they lacked

20   such knowledge.

21        Mousebelt has "provided no evidence establishing" that Defendants "had 'knowledge' of

22

23   _____

24   [2]  MouseBelt requests that the Court take judicial notice of the contents of the LinkedIn profile of
     Patrick Joyce as of September 20, 2022, and the contents of a post on Medium authored by Brian
25   Armstrong on March 4, 2022.  ECF No. 21.  The Court grants judicial notice of the existence of
     these materials, but not for the truth or accuracy of the statements therein.  *See Lee v. City of Los*
26   *Angeles*, 250 F.3d 668, 689–90 (9th Cir. 2001).  Additionally, the Court "can consider the
     existence of the [materials] identified by [MouseBelt]," but the Court "may not, on the basis of
27   these [materials], draw inferences or take notice of facts that might reasonably be disputed."
     *United States v. Corinthian Colleges*, 655 F.3d 984, 999 (9th Cir. 2011).  MouseBelt relies on
28   these materials to argue that Defendants had knowledge of the arbitration clauses in the
     Agreements.  This inference is precisely the type that might reasonably be disputed, so the Court
     cannot draw it.

[their] right to compel arbitration" prior to MouseBelt's production of the Agreements. *Britton v. Co-op Banking Grp.*, 916 F.2d 1405, 1413 (9th Cir. 1990). To the contrary, the evidence that Mousebelt did provide indicates that Defendants requested a copy of the Agreements on June 22, 2022, and that Mousebelt produced the Agreements to Defendants on August 10, 2022. ECF No. 20-1 at 4. Defendants' removal of the case to this court on August 24, 2022, ECF No. 1, and prompt filing of the instant motion on September 6, 2022, ECF No. 11, is entirely consistent with the premise that Defendants first learned of the arbitration clauses after they received the Agreements on August 10. That Defendants moved to compel arbitration after substantial litigation in the state court is of no consequence because they previously lacked knowledge of a right to arbitrate. *Yasuda*, 829 F.3d at 1127 n.5. MouseBelt has thus failed to meet its burden to prove waiver.

### B. Equitable Estoppel

Defendants seek to enforce the arbitration clauses under the doctrine of equitable estoppel. The parties dispute (1) whether federal law, state law, or the signatories' choice of law controls the Court's equitable estoppel inquiry; (2) the requirements of that inquiry per its source of law; and (3) the outcome of that inquiry given the facts of this case. The Court addresses each issue in turn.

#### a. Applicable Law

"In the arbitration context, 'equitable estoppel allows a nonsignatory to a written agreement containing an arbitration clause to compel arbitration where a signatory to the written agreement must rely on the terms of that agreement in asserting its claims against the nonsignatory.'" *GE Energy*, 140 S. Ct. at 1644 (quoting *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 630 (2009)). "The New York Convention and its implementing legislation emphasize the need for uniformity in the application of international arbitration agreements." *Setty v. Shrinivas Sugandhalaya LLP*, 3 F.4th 1166, 1168 (9th Cir. 2021). The Ninth Circuit has acknowledged that this need for uniformity is "of *paramount* importance" such that "application of state-specific law would undermine this purpose." *Id.* (emphasis in original) (quoting *Certain Underwriters at Lloyd's v. Argonaut Ins. Co.*, 500 F.3d 571, 580–81 (7th Cir. 2007)); *accord Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 520 n.15 (1974) ("The goal of the Convention, and

7

the principal purpose underlying American adoption and implementation of it, was to encourage the recognition and enforcement of commercial arbitration agreements in international contracts and *to unify the standards by which agreements to arbitrate are observed* and arbitral awards are enforced in the signatory countries." (emphasis added)).  Accordingly, courts apply federal common law "in determining the arbitrability in federal claims by or against non-signatories to an arbitration agreement."  *Id.*

Defendants nonetheless contend that California law applies to the question of whether Defendants may equitably estop MouseBelt from avoiding arbitration.  ECF No. 8-1 at 17; ECF No. 26 at 8–11.  MouseBelt argues that federal common law applies, and, if it does not, then Singapore law applies.  ECF No. 20 at 12-14.

Defendants advance three arguments in support of their contention, all of which lack merit. First, Defendants cite a number of cases to argue that "[t]ime and time again, the Ninth Circuit has applied state contract law to assess the arbitrability of disputes based on equitable estoppel."  ECF No. 26 at 9.  None of the cases relied upon by Defendants, however, concerns an agreement governed by the Convention.  The Ninth Circuit in those cases did not and had no reason to address the question of whether federal common law would apply to questions of arbitrability arising from such an agreement.

Second, Defendants argue that the Supreme Court's decision in *GE Energy* forecloses the application of federal common law.  *Id.*  This argument misunderstands the holding of that decision.  In *GE Energy*, the Supreme Court addressed the narrow question of "whether the equitable estoppel principles permitted under Chapter 1 of the FAA . . . 'conflict with . . . the Convention.'"  140 S. Ct. at 1644–45 (quoting 9 U.S.C. § 208).  The Court held "only that the New York Convention does not conflict with the enforcement of arbitration agreements by nonsignatories under domestic-law equitable estoppel doctrines."  *Id.* at 1648.  The Court expressly declined to determine "whether GE Energy could enforce the arbitration clauses under principles of equitable estoppel or which body of law governs that determination," concluding that "[t]hose questions can be addressed on remand."  *Id.*  *GE Energy* thus provides no answer to the

question at hand.[3]

Third, Defendants argue that federal common law cannot apply because this case arises under the Court's diversity jurisdiction, not its federal question jurisdiction, such that California law should apply.  ECF No. 26 at 10.  In the same vein, Defendants argue that *Setty* does not apply because the Ninth Circuit held only that courts apply federal common law "in determining the arbitrability of *federal claims* by or against non-signatories to an arbitration agreement," 3 F.4th at 168 (emphasis added), whereas the "claims in this case are California state law claims,"  ECF No. 26 at 9.

These arguments are belied, in part, by Defendants' own notice of removal.  Under a header that reads "Basis for Removal: Federal Question," the notice states that the Court has federal question jurisdiction because the Agreements fall under the Convention.  ECF No. 1 at 3.  This invocation is appropriate, as 9 U.S.C. § 203 provides that "[a]n action or proceeding falling under the Convention shall be deemed to arise under the laws and treaties of the United States."  Because this language is similar to the language of 28 U.S.C. § 1331, which "extends to civil actions 'arising under' federal law," the Ninth Circuit has held that the two statutes "should be read similarly."  *Al-Qarqani*, 8 F.4th at 1024–25.  And although MouseBelt asserts state law claims, the Supreme Court has long recognized that federal question jurisdiction is not limited to "plaintiffs pleading a cause of action created by federal law."  *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 313 (2005).  Rather, "in certain cases," such as the one at hand, "federal-question jurisdiction will lie over state-law claims that implicate significant federal issues."  *Id.*

Accordingly, *Setty*'s reference to "federal claims" is best read as referring to actions that arise under federal law rather than claims predicated on federal causes of action.  The "need for

---

[3] To the extent that the parties dispute the significance of Justice Sotomayor's concurrence, the Court emphasizes that its holding is consistent therewith.  Justice Sotomayor wrote that "[a]ny applicable domestic doctrines must be rooted in the principle of consent to arbitrate."  *GE Energy*, 140 S. Ct. at 1648 (Sotomayor, J., concurring).  As a signatory to the Agreements, MouseBelt consented to arbitrate.  Therefore, the federal common law doctrine of equitable estoppel as applied to this case is rooted in that principle.

United States District Court
Northern District of California

uniformity in the interpretation of international arbitration agreements" exists regardless of whether the claims to be arbitrated are state or federal. *Setty*, 3 F.4th at 1168. To hold otherwise would disregard Ninth Circuit's acknowledgement that the "application of state-specific law would undermine" that uniformity.[4] *Id.*

In support of this conclusion, the Court finds persuasive the approach of the concurrence to the Eleventh Circuit's opinion in *Outokumpu Stainless USA, LLC v. Coverteam SAS* ("*GE Energy II*"), 2022 WL 2643936 (11th Cir. 2022), which was issued on remand from the Supreme Court's decision in *GE Energy*. The case concerned a set of "Alabama state law claims" asserted by a domestic plaintiff against a foreign defendant. *GE Energy II*, 2022 WL 2643936, at *1. The defendant sought to equitably estop the plaintiff from repudiating the arbitration clause in a contract arising under the Convention to which the plaintiff was a signatory and the defendant was a nonsignatory. The Eleventh Circuit declined to resolve the question of equitable estoppel and instead held that the defendant was a defined party covered by the arbitration clause. *Id.* at *3. Concurring in the judgment, Judge Tjoflat addressed the equitable estoppel question, applying the two-part inquiry for determining whether federal common law displaces state law set forth by the Supreme Court in *Boyle v. United Technologies Corp.*, 487 U.S. 500, 504–507 (1988). *See GE Energy II*, 2022 WL 2643936, at *6. Under that inquiry, courts first consider whether the case involves "uniquely federal interests," *Boyle*, 486 U.S. at 504 (quoting *Texas Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 640 (1981)). If so, courts proceed to consider whether "a 'significant conflict' exists between an identifiable 'federal policy or interest and the [operation]

---

[4] The procedural history of *Setty* supports the Court's conclusion. The Ninth Circuit withdrew the original opinion in *Setty* on a denial of rehearing en banc. The original opinion concluded that federal common law applied because the case "involve[d] federal claims and turn[ed] on the court's federal question jurisdiction," whereas decisions that applied state contract law "all involved only-state law claims, and also relied on the court's diversity jurisdiction." *Setty v. Shrinivas Sugandhalaya LLP*, 986 F.3d 1139, 1141–42 (9th Cir. 2021), *withdrawn on denial of reh'g en banc*, 998 F.3d 897 (9th Cir. 2021). The amended opinion altered only this quoted language, replacing it with the discussion of the need for "uniformity in the application of international arbitration agreements" and the conclusion that courts should apply federal common law "in determining the arbitrability of federal claims by or against non-signatories to an arbitration agreement." *Setty*, 3 F.4th at 1168. This alteration suggests that the Ninth Circuit retracted the distinction between claims predicated on federal versus state causes of action that Defendants advocate.

United States District Court
Northern District of California

1    of state law,'" or whether "the application of state law would 'frustrate specific objectives' of

2    federal legislation." *Id.* at 507 (alteration in original) (first quoting *Wallis v. Pan Am. Petroleum*

3    *Corp.*, 384 U.S. 63, 68 (1966); and then quoting *United States v. Kimbell Foods*, 440 U.S. 715,

4    729 (1979)).

5          As to the first part of the inquiry, Judge Tjoflat concluded that the purpose of the New

6    York Convention is to provide for the uniform enforcement of international arbitration

7    agreements, and that there is a uniquely federal interest in ensuring that the United States satisfies

8    its treaty obligations by providing such enforcement. *GE Energy II*, 2022 WL 2643936, at *6.  As

9    to the second part, Judge Tjoflat concluded that "allowing each state . . . to impose its own test for

10   threshold questions of arbitrability would create an unmanageable tangle of arbitration law in the

11   United States, lead to forum shopping, and frustrate the uniform standards the New York

12   Convention and Chapter 2 of the FAA were enacted to create." *Id.*  Accordingly, Judge Tjoflat

13   concluded that federal common law displaced state law as to the question of whether the dispute

14   was arbitrable under the doctrine of equitable estoppel.  Notably, the Ninth Circuit in *Setty*

15   reasoned along virtually identical lines of the *Boyle* inquiry by acknowledging the "need for

16   uniformity in the interpretation of international arbitration agreements," noting the "application of

17   state-specific law would undermine" that uniformity, and concluding on that basis that federal

18   common law applied.  *Setty*, 3 F.4th at 1168.[5]  The Court therefore agrees with Judge Tjoflat's

19   reasoning as well as the outcome it compels when applied to this case.[6]  The Court holds that

20   federal common law supplies the proper rule of decision.

21          Even if the Court were to first consider the argument that the signatories' choice of law

22   _____

23   [5] The Court notes that the Seventh Circuit also applied the *Boyle* inquiry to determine whether
     federal common law should be applied to interpret the terms of an arbitration agreement falling
24   under the Convention.  *See Certain Underwriters*, 500 F.3d at 581.  The Ninth Circuit in *Setty*
     relied on the Seventh Circuit's decision in *Certain Underwriters* to substantiate its conclusion that
25   federal common law applied because of the need for uniformity in the interpretation of
     international arbitration agreements.  *Setty*, 3 F.4th at 1168.

26   [6] The *Boyle* inquiry reconciles *Setty* and other cases concerning agreements falling under the New
     York Convention with cases where courts have otherwise held that state law equitable estoppel
27   principles apply to agreements governed by the Federal Arbitration Act.  *See, e.g., Arthur*
     *Andersen LLP v. Carlisle*, 556 U.S. 624 (2009); *Mundi v. Union Sec. Life Ins. Co.*, 555 F.3d 1042
28   (9th Cir. 2009).

controls, the outcome would be the same.  Each of the Agreements contains a choice-of-law provision that provides for the construction and interpretation of the Agreements in accordance with Singapore law.  *See* ECF No. 8-2 at 13; ECF No. 8-3 at 13.  But that does not necessarily mean that Singapore law applies to the threshold question of arbitrability.  *See* ECF No. 8-2 at 13; ECF No. 8-3 at 13.  Rather, the Ninth Circuit has held that "courts should apply federal arbitrability law absent 'clear and unmistakable evidence' that the parties agreed to apply non-federal arbitrability law."  *Cape Flattery Ltd. v. Titan Maritime*, *LLC*, 647 F.3d 914, 921 (9th Cir. 2011) (quoting *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)).  Because the Agreements are "ambiguous concerning whether [Singaporean] law also applies to determine whether a given dispute is arbitrable in the first place[,] . . . federal law applies to determine arbitrability."  *Id.*  The parties mistakenly assume that federal choice-of-law rules would apply to the question of arbitrability.  *See* ECF No. 20 at 20–21; ECF No. 26 at 15–17.  Federal arbitrability law per *Setty* directs that federal common law principles of estoppel apply.

### b.      Legal Standard

The parties further dispute the federal common law requirements for equitable estoppel. MouseBelt argues that Defendants are required to establish both that (1) MouseBelt's "claims were intertwined with the underlying contractual obligations" and (2) there is a "close relationship between the entities involved, as well as the relationship of the alleged wrongs to the non-signatory's obligations and duties in the contract."  ECF No. 20 at 7 (quoting *Mundi v. Union Sec. Life Ins. Co*., 555 F.3d 1042, 1046 (9th Cir. 2009)).  Defendants argue that the inquiry is solely whether "the subject matter of the dispute is intertwined with the contract providing for arbitration."  ECF No. 26 at 13 (quoting *Setty*, 3 F.4th at 1169).

In *Setty*, the Ninth Circuit wrote, "For equitable estoppel to apply, it is 'essential . . . that the subject matter of the dispute [is] intertwined with the contract providing for arbitration.'" *Setty*, 3 F.4th at 1169 (alteration in original) (citing *Rajagopalan v. NoteWorld*, *LLC*, 718 F.3d 844, 847 (9th Cir. 2013)).  The Ninth Circuit held that the appellants' claims against the appellees were "not clearly 'intertwined' with the Partnership Deed providing for arbitration."  *Id.* at 1169. *Setty* neither mentioned nor discussed the relationship between the parties or the relationship of the

12

alleged wrongs to the nonsignatory's obligations and duties in the contract.  MouseBelt contends, however, that *Setty* implicitly incorporates the entire standard set forth in *Mundi* because *Setty* quotes *Mundi* for the general proposition that "[e]quitable estoppel precludes a party from claiming the benefits of a contract while simultaneously attempting to avoid the burdens that contract imposes."  3 F.4th at 1169 (quoting *Mundi*, 555 F.3d at 1045).

There are two flaws with this argument, each of which is fatal.   First, there is no explicit or implicit indication from the text of *Setty* that the opinion incorporated any standard set forth in *Mundi*.  To the contrary, the Ninth Circuit has written that "[a]lthough the court in *Mundi* cited federal equitable estoppel cases, rather than looking directly to applicable state law, the court applied the same substantive law on equitable estoppel that a California court would have applied."  *Kramer v. Toyota Corp.*, 705 F.3d 1122, 1130 n.5 (9th Cir. 2012).  In other words, *Mundi* is not a federal common law equitable estoppel case.  Second, even if *Mundi* purported to articulate the federal common law standard, the language that MouseBelt quotes as representing a second requirement is not, in fact, a requirement.  Rather, the Ninth Circuit in *Mundi* wrote,

> We have examined two types of equitable estoppel in the arbitration context. . . .   Under the second, *a signatory may be required to arbitrate a claim brought by a nonsignatory* because of the close relationship between the entities involved, as well as the relationship of the alleged wrongs to the non-signatory's obligations and duties in the contract and the fact that the claims were intertwined with the underlying contractual obligations. . . . *Neither line of cases addresses the precise situation we face.*

555 F.3d at 1046 (emphases added) (quotation marks and citation omitted).  The Ninth Circuit concluded that the exact language that MouseBelt quotes as a requirement did not address the circumstances at hand.  Those circumstances concerned a signatory suing a nonsignatory and the nonsignatory seeking to compel arbitration, as do those in the case at hand.  "[T]he *Mundi* court held," and held only, "that in order for a nonsignatory to compel a signatory to arbitrate, the signatory's claims must be 'intertwined with,' 'arise out of,' or 'relate directly to' the contract providing for arbitration."  *Kramer*, 705 F.3d at 1130 n.5 (quoting *Mundi*, 555 F.3d at 1047).

For these reasons, the Court finds MouseBelt's argument to be without merit.  The Court will apply the standard as set forth in *Setty*, considering whether "the subject matter in dispute [is]

13

intertwined with the contract providing for arbitration." *Setty*, 3 F.4th at 1169.

<b>c.</b>    <b>Application</b>

Applying the foregoing standard, the Court concludes that the dispute at hand is intertwined with the Agreements.  As discussed above, all of MouseBelt's claims are predicated on allegations that Defendants induced Joyce to shirk and to eventually abdicate Knowledgr's contractual obligations to MouseBelt.  Those obligations existed only by virtue of the Agreements, and the harm allegedly suffered by MouseBelt cannot be divorced from those obligations.  In MouseBelt's own words, Defendants' conduct "annihilated the value of MouseBelt's contractual rights to ownership of equity in Knowledgr and a share of the future tokens to be issued by Knowledgr, as well as the expected reputational and other benefits of association with a successful startup."  FAC ¶ 15.  Thus, any assessment of damages in this case will hinge on the value of those contractual rights and the degree of injury otherwise suffered by MouseBelt as a result of Knowledgr's failure to satisfy its obligations under the Agreements.

Even if Defendants were required to establish that a relationship existed between the parties, the Court would conclude that Defendants have satisfied that requirement.  The line of Ninth Circuit caselaw on which *Setty* relies for its articulation of the federal common law standard for equitable estoppel traces its roots to the Second Circuit's decision in *Sokol Holdings, Inc. v. BMB Munai, Inc.*, 542 F.3d 354 (2d Cir. 2008).  *See Setty*, 3 F.4th at 1166 (quoting *Rajagopolan v. NoteWorld, LLC*, 718 F.3d 844, 847 (9th Cir. 2013)).  There, the Second Circuit held that "in addition to the 'intertwined' factual issues, there must be a relationship among the parties of a nature that justifies a conclusion that the party which agreed to arbitrate with another entity should be estopped from denying an obligation to arbitrate a similar dispute with the adversary which is not a party to the arbitration agreement."  *Sokol Holdings*, 542 F.3d at 359.

Here, the nature of the relationship between the parties justifies the conclusion that MouseBelt should be equitably estopped from repudiating the arbitration clause in the Agreements.  MouseBelt alleges that, in May 2019, "Joyce brought to MouseBelt's attention" that "Armstrong expressed an interest in Knowledgr," and that "Mousebelt and Joyce sent a video demonstration of Knowledgr's prototype to Armstrong so he could gauge whether he wanted to

14

invest." FAC ¶ 46.  MouseBelt and Knowledgr executed the second of the Agreements that same month.  *Id.* ¶ 2.  Armstrong offered to invest $50,000 in Knowledgr on June 28, 2019; Joyce conveyed that representation to MouseBelt, Joyce sent a due diligence package to Armstrong that included information related to MouseBelt's investment in Knowledgr; and Armstrong wired that $50,000 to Knowledgr and executed an investment agreement in mid-July 2019.  *Id.* ¶ 70–73. MouseBelt further alleges that "Armstrong acted as ResearchHub['s], Coinbase['s], and Coinbase Ventures' actual and apparent agent."  *Id.* ¶ 71.  In sum, in addition to the alleged collusive conduct between Defendants and Knowledgr, MouseBelt and Armstrong were both investors in Knowledgr; MouseBelt and Armstrong were aware of each other's respective investments; Mousebelt played a role in soliciting Armstrong's investment; and Armstrong is an agent of the remaining Defendants.  These circumstances evince a relationship sufficient to equitably estop MouseBelt from repudiating the arbitration clause.  Therefore, MouseBelt is required to arbitrate its claims against Defendants.

The result would be the same under the federal common law standard as articulated by other circuits.  For example, in *GE Energy II*, Judge Tjoflat relied on the Eleventh Circuit's standard, under which a nonsignatory may compel arbitration in either of two circumstances. "The first is where 'the signatory to a written agreement containing an arbitration clause 'must rely on the terms of the written agreement in asserting [its] claims' against the nonsignatory'. . . .  The second is where the signatory 'raises allegations of' collusive misconduct between the nonsignatory and other signatories to the contract."  *GE Energy II*, 2022 WL 264936, at \*7 (Tjoflat, J., concurring) (quoting *MS Dealer Serv. Corp. v. Franklin*, 177 F.3d 942, 947 (11th Cir. 1999), *abrogated on other grounds by Arthur Andersen LLP v. Carlisle*, 556 U.S. 624 (2009)).  The Fourth Circuit and Fifth Circuit apply the same standard.  *See American Bankers Ins. Grp., Inc. v. Long*, 453 F.3d 623, 627 & n.3 (4th Cir. 2006); *Westmoreland v. Sadoux*, 299 F.3d 462, 467 (5th Cir. 2002).  As discussed above, the case at hand reflects both circumstances.  The Court further notes that there is a substantial if not complete overlap between this standard and the standard articulated in *Setty*.  That is, a subject matter in dispute may be properly characterized as intertwined with the contract providing for arbitration where the signatory must rely on the terms

of the written agreement in asserting its claims against the nonsignatory, or where the signatory raises allegations of collusive conduct between the nonsignatory and other signatories.

## CONCLUSION

For the foregoing reasons, Defendants' motion is granted, and this case is hereby stayed. MouseBelt's motion to remand, ECF No. 25, is denied as moot. The Clerk shall administratively close the file. This order shall not be considered a dismissal or disposition of this action against any party. If further proceedings become necessary, any party may initiate them in the same manner as if this order had not been entered.

**IT IS SO ORDERED.**

Dated: May 24, 2023

_____
JON S. TIGAR
United States District Judge